**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF MARYLAND
(GREENBELT DIVISION)**

| | | |
|---|---|---|
| In re: | * | Chapter 11 |
| **CREATIVE HAIRDRESSERS INC.,** *et al.*[1] **,** | * | Case Nos. |
| | * | (Joint Administration Requested) |
| Debtors. | * | |

\*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*

**DECLARATION OF PHIL HORVATH IN SUPPORT
OF DEBTORS' FIRST DAY MOTIONS**

I, Phil Horvath, hereby declare under penalty of perjury:

1.      I am the President and Chief Operating Officer of Creative Hairdressers, Inc. ("CHI") and am familiar with Ratner Companies, L.C. ("Ratner Co.") which provides management services to CHI (each a "Debtor" and collectively, the "Debtors"). In these capacities, I am familiar with the Debtors' day-to-day operations, businesses, financial affairs, and books and records.

2.      On the date hereof (the "Petition Date"), the Debtors filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"). The Debtors continue to operate their businesses and manage their affairs as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

3.      I submit this declaration (the "First Day Declaration") to provide an overview of the Debtors' chapter 11 cases. Except as otherwise indicated herein, all facts set forth in this First Day Declaration are based upon my personal knowledge of the Debtors' operations and finances,

---

[1] The Debtors in these chapter 11 cases are: (i) Creative Hairdressers, Inc. and (ii) Ratner Companies, L.C.

information learned from my review of relevant documents, information supplied to me by other members of the Debtors' management and the Debtors' professional advisors, or my opinion based on my experience, knowledge, and information concerning the Debtors' operations and financial condition. I am authorized to submit this First Day Declaration on behalf of the Debtors, and, if called upon to testify, I could and would testify competently to the facts set forth herein.

## Background

4.      CHI was founded in 1974 by Dennis Ratner and Ann Ratner.  CHI operated under the Hair Cuttery, Bubbles and Cielo brands.  CHI is incorporated under the laws of the Commonwealth of Virginia.  CHI has become one of the nation's largest independent family owned chain of hair salons, providing comprehensive services for both female and male guests. It presently owns and operates approximately 800 hair salon locations, including approximately 100 locations in the State of Maryland.[2]  Prior to being forced to suspend its operations as a result of the Covid-19 crisis, CHI employed over 10,000 full and part time employees.

5.       Ratner Co. is organized under the laws of the Commonwealth of Virginia and provides management services to CHI and certain other affiliated entities.

## The Debtors Business Operations

6.      CHI promoted itself as having a "love culture" committed to people first values providing stylists the best career path and training, which resulted in low staff turnover, while it enhanced the guest experience to build loyalty and retention.  To support its more than 800 stores, CHI established a large corporate and field support structure that included legal and real estate, marketing, merchandising, communications, business and technical training and recruiting.

---

[2]  In addition to Maryland, CHI operates salons in Connecticut, the District of Columbia, Delaware, Florida, Illinois, Indiana, Massachusetts, North Carolina, New Hampshire, New Jersey, Pennsylvania, Rhode Island, Virginia, Wisconsin and West Virginia.

7.    For the fiscal year ending September 2019, CHI had approximately $440,000,000 in revenues.  In recent years CHI has been subject to the impact of large competitors who embarked on aggressive expansions of their operations with the resultant market saturation eroding CHI's profitability.  In order to address these market forces over the last several years, CHI's management and ownership implemented a number of strategic initiatives to enhance profitability, including closing underperforming stores, focusing on hair coloring and implementing a multi-phased salon professional commission structure.

8.    In the fall of 2019, CHI also retained the services of Carl Marks Advisors to provide advisory services and to help formulate an overall business restructuring plan.  CHI also retained A&G Realty Partners, LLC ("A&G") to help it seek accommodations from landlords. Carl Marks, A&G and management of CHI embarked on efforts to increase CHI's profitability, including closing under-performing locations, reducing corporate overhead and making selected reductions in employee count.

9.    The efforts that CHI and its advisors began implementing started showing promise, as CHI's guest traffic stabilized and its per-ticket comparable sales increased.  Until the impact of the Covid-19 crisis, CHI was outperforming its business plans and its comparable sales had increased over the same time last year, such that CHI projected an enhanced EBITDA for FY 2020.

10.    Because CHI was in covenant (but not payment) default with its primary secured lender in 2019, CHI had retained the investment banking firm of Houlihan Lokey ("HL") in an effort to raise capital or refinance its existing debt. The Ratner family also invested over $7 million into CHI in the form of subordinated debt an effort to provide it working capital. In addition, as a condition to CHI's pre-petition senior secured lenders entering into a forbearance arrangement with it, Dennis Ratner provided CHI additional credit support and a limited guaranty secured by

marketable securities up to four million dollars.  HL approached strategic buyers in order to gauge the ability to sell CHI.   HL widely "shopped" CHI over a one year period and provided information, due diligence or other offering materials to over 100 entities, including private equity firms, strategic buyers and investors. HL was unable to find any entity willing to buy, invest in or provide financing to CHI on a secured or unsecured basis.

11.     In March 2020, various states, starting with Pennsylvania began ordering the closing of retail locations such as CHI.  By the third week of March, CHI, without any real warning, was forced to close all of its locations and furlough most of its employees.  At that point in time, CHI only had sufficient funds to meet its payroll obligations for the two-week period ending March 14, 2020.  Due to the sudden government-ordered closures of its locations, CHI could not meet a lag payroll in the approximate amount of $2.9 million for the one week period after March 15, 2020 (the "Lag Payroll") and through March 21, 2020, the date CHI was finally required to close all of its locations.

12.     Because CHI had virtually no liquidity after closing its salons, it continued to search for third party investors to provide it liquidity or acquire is assets, so that once the Covid-19 crisis subsides and salons are allowed to reopen, there will be an operating company where the thousands of CHI's salon professionals can resume their careers and provide services to its customers.

13.     The Ratner family realized that saving CHI and the thousands of jobs of its employees meant that they would have to relinquish control and ownership over the business they have spent decades building.   Furthermore, to ensure the transactions described herein, Dennis Ratner agreed to monetize and pay the $4M pledge to CHI's pre-petition lenders, bringing the Ratner families total recent investment into CHI to over $11 million.

Therefore, through the extensive efforts of the Debtors and their professionals, they were able to achieve a series of transactions, to be implemented through this chapter 11 proceeding that will allow CHI to not only survive, but thrive, and with it protect the jobs of thousands of salon professionals. The Ratner family has been supportive of this process.

## Secured Indebtedness

14.    CHI is indebted to HC Salon Holdings, Inc. ("HC Salon") as successor-in-interest to a bank group comprised of M&T Bank, Eagle Bank and Burke and Herbert Bank    The loan facility (the "Prepetition Secured Loan") is secured by a blanket lien on all of CHI's assets (and guaranteed by Ratner Co) securing a line of credit in the current approximate amount of $36.4 million, plus a Letter of Credit facility in the approximate amount of $4.1million.

## Asset Purchase Agreement

15.    Prior to the Petition Date, the Debtors entered into an Asset Purchase Agreement ("APA") with HC Salon pursuant to which HC Salon has agreed to purchase substantially all of the assets of CHI.  The purchase price offered by HC Salon is the amount of (i) Assumed Liabilities (as defined in the APA) , (ii) a credit bid in an amount up to the value of the Obligations (as defined in the DIP Financing Agreement), and (iii) pay an amount in cash equal to the amount set forth in the Wind Down Budget.   A copy of the APA has been filed simultaneously with the filing of this Declaration.

16.    The APA contemplates that the Debtors will immediately seek approval from the Court of an expedited sale process (including bidding procedures) to ensure that CHI's business will be financially able reopen as soon as the various state and other governmental authorities allow for a loosening of social distancing restrictions.

### Post-Petition Financing and Payment of Lag Payroll

17.     Prior to the Petition Date, HC Salon offered to provide the Debtors with a superpriority, senior secured, debtor in possession loan in the aggregate amount of approximately $[INSERT] (the "DIP Facility") including the roll-up of all obligations outstanding under the Prepetition Secured Loan, secured by all assets of the Debtors (the "DIP Collateral"). The DIP Facility and the APA contain certain milestones that must be met by the Debtors, including the filing of a motion to approve bidding procedures that seek approval of bidding protections for HC Salon (the "Bidding Procedures") no later than two days following the Petition Date, the entry of an order approving the Bidding Procedures no later than fourteen days following the Petition Date, entry of an order approving a sale of substantially all assets of the Debtors no later than thirty-five days following the Petition Date, and consummation of a sale of substantially all assets of the Debtors no later than forty-five days following the Petition Date. The Debtors need the post-petition financing to fund the Lag Payroll, and to consummate the contemplated value maximizing sale of substantially all assets to HC Salon.

18.     A critical component in maintaining the enterprise value of CHI, as demonstrated by the APA, is HC Salon's willingness to pay the Lag Payroll due to CHI's salon professionals and other employees as set forth in the associated Debtor-in-Possession financing being provided by HC Salon.  While CHI is in some respects a retail business, it is in large measure a service business that is dependent on maintaining an engaged and dedicated work force of salon professionals.  These professional are dependent on their pay checks and the Debtors believe that immediately "making good" on the Lag Payroll is imperative to ensure that CHI will be able to reopen and continue on as a going concern.

19.     The Lag Payroll is owed to numerous employees, none of whom is owed more than $13,650, which I have been informed is the priority limit on account of prepetition salaries or wages under section 507(a)(4)of the Bankruptcy Code.

### Evidentiary Support for First Day Motions[3]

20.     Concurrently with the filing of their chapter 11 petitions, the Debtors filed a number of First Day Motions seeking relief they believe is necessary to enable them to operate with minimal disruption and loss of productivity.  The Debtors request that the relief requested in each of the First Day Motions be granted as critical elements in ensuring a smooth transition into these chapter 11 cases and to allow them to stabilize and facilitate their operations going forward.  I have reviewed each of the First Day Motions discussed below, and the facts set forth in each such motion are true and correct to the best of my knowledge, information and belief (with appropriate reliance on other members of the Debtors' management and the Debtors' professional advisors).

21.     Accordingly, on behalf of the Debtors, I respectfully submit that the First Day Motions should be approved.

### Debtors' Motion for Entry of an Order Directing Joint Administration of Their Chapter 11 Cases (the "Joint Administration Motion")

22.     The Debtors request entry of an order directing joint administration of these chapter 11 cases for procedural purposes only, pursuant to Bankruptcy Rule 1015(b). Specifically, the Debtors request that the Court maintain one file and one docket for these chapter 11 cases under the case of Creative Hairdressers, Inc., and also request that an entry be made on the docket of the chapter 11 cases to reflect the joint administration of these chapter 11 cases.

---

[3] Capitalized terms used in this section and not otherwise defined shall have the meanings ascribed to them in the applicable motion.

23.     Given the integrated nature of the Debtors' operations, joint administration of these chapter 11 cases will provide significant administrative convenience without harming the substantive rights of any party-in-interest. Many of the motions, hearings, and orders that will arise in these chapter 11 cases will jointly affect both Debtors.  Among other things, the entry of an order directing joint administration of these chapter 11 cases will reduce fees and costs by avoiding duplicative filings and objections, and will allow the U.S. Trustee and all parties-in-interest to monitor the cases with greater ease and efficiency.

24.     Accordingly, on behalf of the Debtors, I respectfully submit that the Joint Administration Motion should be approved.

**Debtors' Motion For Authorization To File Consolidated Mailing Matrix And Consolidated List Of 20 Largest Unsecured Creditors (the "Matrix Consolidation Motion")**

25.     Pursuant to Rule 1007-1 of the Local Bankruptcy Rules of the United States Bankruptcy Court for the District of Maryland (the "Local Bankruptcy Rules") a chapter 11 debtor must file a "master mailing matrix" containing the names and addresses of the debtor, all creditors and the taxing authority for each county in which the debtor holds an interest in real estate. Pursuant to Rule 1007(d) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") a chapter 11 debtor must file a list of its 20 largest unsecured creditors.

26.     By this motion, the Debtors seek entry of an order authorizing them to file a consolidated mailing matrix and a consolidated list of their 20 largest unsecured creditors.

27.     The creditors of each of the Debtors will want to be aware of the proceedings of the cases of both Debtors. Therefore, filing a consolidated list of the 20 largest unsecured creditors and a consolidated mailing matrix will be beneficial to creditors by providing comprehensive notice for both chapter 11 cases. A consolidated list of the 20 largest unsecured creditors and a consolidated matrix is also consistent with the joint administration of the Debtors' cases.

28.     Accordingly, on behalf of the Debtors, I respectfully submit that the Matrix Consolidation Motion should be approved.

**Debtors' Motion Pursuant to Sections 1105(a) and 345(b) of the Bankruptcy Code, Fed R. Bankr. P. 2015 Authorizing the Debtors(A) to Continue Existing Cash Management, and (B) To Maintain Existing Bank Accounts and Business Forms (the "Cash Management Motion")**

29.     The Debtors request the authority to: (a) continue to use, with the same account numbers, all of the Bank Accounts in their Cash Management System; (b) treat the Bank Accounts for all purposes as accounts of the Debtors as debtors in possession; and (c) use, in their present form, all correspondence and business forms (including check stock, letterhead, purchase orders, and invoices) and other documents related to the Bank Accounts existing immediately before the Petition Date, without reference to the Debtors' status as debtors in possession.

30.     In the ordinary course of business, the Debtors utilize an integrated Cash Management System to collect, transfer, and disburse funds generated by their operations and maintain current and accurate accounting records of all daily cash transactions.  If the Debtors were required to comply with the U.S. Trustee Guidelines, the burden of opening new accounts, revising cash management procedures, instructing customers to redirect payments, and the immediate ordering of new checks with a "Debtor-in-Possession" legend, would disrupt the Debtors' businesses at this critical time.  The Debtors respectfully submit that parties-in-interest will not be harmed by their maintenance of the existing Cash Management System, including their Bank Accounts, because the Debtors have implemented appropriate mechanisms to ensure that unauthorized payments will not be made on account of obligations incurred prior to the Petition Date.

31.     In addition, the Debtors further request that the Court authorize the Bank to: a accept, honor, and rely upon all representations from the Debtors as to which checks should be honored or dishonored consistent with orders entered by this Court, whether the checks are dated

prior to, on, or subsequent to the Petition Date and whether or not the Bank believes that payment is authorized by some other order of this Court; provided, that the Bank shall not be held liable for improperly honoring or dishonoring any check, draft, or automated clearing house payment presented, issued, or drawn on the Bank Accounts on account of a claim (as such term is defined in 11 U.S.C. § 101(5)) arising before the Petition Date, which, at the direction of the Debtors was requested to be honored or dishonored, as the case may be, unless the Bank's actions were grossly negligent.

32.     The relief requested in the Cash Management Motion is vital to ensuring the Debtors' seamless transition into bankruptcy.  Authorizing the Debtors to maintain their Cash Management System will avoid many of the possible disruptions and distractions that could divert their attention from more critical matters during the initial days of these chapter 11 cases.

33.     I believe that the relief requested in the Cash Management Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors to continue to operate their businesses in chapter 11 without disruption.  Accordingly, on behalf of the Debtors, I respectfully submit that the Cash Management Motion should be approved.

**Debtors' Motion Pursuant to Sections 105(a), 363, and 507(a) for (A) an Order Authorizing the Debtors to (I) Pay Wages, Salaries, and Other Compensation, (II) Maintain Benefits, and (III) Pay Reimbursable Employee Expenses and (B) An Order Authorizing and Directing Bank and Other Financial Institutions to Pay All Checks and Electronic Payment Requests Made by the Debtors Relating to the Foregoing (the "Wages and Benefits Motion")**

34.     The Debtors request the authority, in their sole discretion, to pay prepetition claims, honor obligations, and to continue programs, in the ordinary course of business and consistent with past practices, relating to the Employees and the Benefits.

35.     Prior to closing its operations, the Debtors' workforce was comprised of approximately 10,000 Employees (the "Employees").  As of the Petition Date, the Debtors employed approximately 40 full and part time individuals.  The Employees were paid through

ADP, LLC.  The Debtors' Employees rely on their compensation, benefits, and reimbursement of expenses to satisfy their daily living expenses.  Consequently, the Employees will be exposed to significant financial difficulties if the Debtors are not permitted to honor obligations for unpaid compensation, benefits, and reimbursable expenses.  Moreover, if the Debtors are unable to satisfy such obligations, Employee morale and loyalty will be jeopardized at a time when Employee support is critical to the Debtors.  In the absence of such payments, the Debtors believe their Employees may seek alternative employment opportunities, thereby hindering the Debtors' ability to meet their customer obligations when the Debtors are able to reopen their salons, likely diminishing creditors' confidence in the Debtors and significantly affecting the Debtors' going concern value.  Moreover, the loss of valuable Employees and the recruiting efforts that would be required to replace such Employees would be a substantial and costly distraction at a time when the Debtors should be focusing on stabilizing their operations, especially during the unprecedented Covid-19 crisis.

36.     I believe that the relief requested in the Wages and Benefits Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors to continue to operate their business in chapter 11 without disruption.  Accordingly, on behalf of the Debtors, I respectfully submit that the Wages and Benefits Motion should be approved.

**MOTION OF DEBTORS FOR ENTRY OF ORDERS (I)(A) ESTABLISHING BIDDING PROCEDURES; (B) APPROVING EXPENSE REIMBURSEMENT; (C) ESTABLISHING PROCEDURES RELATING TO ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES, INCLUDING NOTICE OF PROPOSED CURE AMOUNTS; (D) APPROVING FORM AND MANNER OF NOTICE; (E) SCHEDULING A HEARING TO CONSIDER ANY PROPOSED SALE; AND (F) GRANTING CERTAIN RELATED RELIEF; AND (II)(A) APPROVING A SALE; (B) AUTHORIZING ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES IN CONNECTION WITH THE SALE;AND (C) GRANTING RELATED RELIEF**

37.     As noted above, prior to the Petition Date, the Debtors were forced to suspend its operations due to directives issued by various state and local authorities that all non-essential businesses be closed due to the COVID-19 pandemic sweeping the nation.  The Debtors commenced these Chapter 11 Cases with the goal of attempting to effectuate an expeditious sale of their business, as a going concern, to, among other things, save as many jobs of its furloughed employees as possible and preserve the going concern value of the Debtors.  Prepetition, the Debtors and their advisors engaged in a robust marketing process with the goal of finding a buyer outside of chapter 11, however, this process ultimately was unsuccessful.

38.     Immediately prior to the filing of these Chapter 11 Cases, the Debtors received a term sheet from HC Salon Holdings, Inc. (the "Stalking Horse Bidder") to provide them with: (i) an emergency bridge loan; (ii) the DIP Loan; and (iii) the Stalking Horse APA (as defined below).  The Stalking Horse Bidder has provided these facilities and the Stalking Horse APA to fund general corporate needs for the Debtors, to allow for these Chapter 11 Cases to be commenced and to allow for a sale process to be implemented.  The Debtors and the Stalking Horse Bidder entered into that certain Asset Purchase Agreement (the "Stalking Horse APA") for the sale of the Assets, subject to higher or better offers in accordance with the Bidding Procedures.  Immediately thereafter, the Debtors filed these Chapter 11 Cases with the goal of selling the Assets as promptly

as possible in order to maximize the value of the Debtors' Assets and save as many of the jobs of its furloughed employees as possible.

39.     The Debtors and their advisors designed the Bidding Procedures to be transparent and competitive in order to attain the highest or otherwise best price for their business.  Under the Bidding Procedures, qualified parties may submit bids that will be analyzed by the Debtors and their respective professionals and will culminate in the Debtors designating the Stalking Horse Bidder or other Successful Bidder (as defined below) to purchase the Assets.  The Debtors believe that the Bidding Procedures, in connection with the Stalking Horse APA, will provide the best opportunity for them to consummate a value-maximizing transaction and save as many jobs as possible in these unprecedented times.  Furthermore, if the Stalking Horse Bidder is the Successful Bidder (as defined below), the Debtors have been informed that it intends to offer employment to substantially all of the Debtors' workforce.

40.     By the referenced Motion, the Debtors are seeking entry of the Bidding Procedures Order and a separate Sale Order approving the sale of the Assets to the Stalking Horse Bidder or the Successful Bidder.  I believe that the relief requested in the referenced sale and bidding procedures motion is in the best interests of the Debtors' estates, their creditors, their employees, including their salon professionals,, and all other parties in interest, and will enable the Debtors to maximize the going concern value of their business by establishing a robust sale and bidding process.  Accordingly, on behalf of the Debtors, I respectfully submit that this motion should be approved.

**Application Pursuant to Section 327(A) of the Bankruptcy Code and Rule 2014 of the Federal Rules of Bankruptcy Procedure for Authorization to Employ and Retain Shapiro Sher Guinot & Sandler as Counsel for the Debtors and the Debtors in Possession (the "SSGS Retention")**

41.     The Debtors seek to employ and retain Shapiro Sher as their bankruptcy counsel with regard to the filing and prosecution of these chapter 11 cases and all related proceedings. Accordingly, the Debtors respectfully request entry of an order pursuant to section 327(a) of the Bankruptcy Code and Bankruptcy Rule 2014 authorizing them to employ and retain SSGS as their bankruptcy co- counsel under a general retainer to perform the legal services that will be necessary during these chapter 11 cases, pursuant to the terms set forth in this Application and the Sher Declaration, effective as of the Petition Date.

42.     The Debtors seek to retain Shapiro Sher as their counsel because of  its extensive experience and knowledge in the field of debtors' and creditors' rights and business reorganizations under chapter 11 of the Bankruptcy Code and because of Shapiro Sher's expertise, experience and knowledge practicing before this Court.  The Debtors seek to retain Shapiro Sher due to its prior representation of and familiarity with the Debtors, as well as its experience and knowledge in the field of debtors' and creditors' rights and business reorganizations under chapter 11 of the Bankruptcy Code.

43.     I believe that the relief requested in the SSGS Retention is in the best interests of the Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors to continue to operate their business in chapter 11 without disruption.  Accordingly, on behalf of the Debtors, I respectfully submit that the SSGS Retention should be approved.

**Application Pursuant to Section 327(A) of the Bankruptcy Code and Rule 2014 of the Federal Rules of Bankruptcy Procedure for Authorization to Employ and Retain Carl Marks Advisors AS  Financial Advisors for the Debtors and the Debtors in Possession (the "CM Retention")**

44.     The Debtors seek to employ and retain Carl Marks Advisors ("CM") as their financial advisors with regard to the filing and prosecution of these chapter 11 cases and all related proceedings.

45.     The Debtors seek to retain CM as their financial advisor because of  its extensive experience  in helping distressed companies in turnaround efforts.  CM was employed by the Debtors pre-petition and were instrumental in assisting the Debtors in formulating and implementing a restructuring plan.  CM has obtained extensive knowledge of the Debtors' operations and its services will be needed to assist the Debtors in meeting their bankruptcy related obligations and in successfully prosecuting this Chapter 11 case.

46.     I believe that the relief requested in the CM Retention is in the best interests of the Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors to continue to operate their business in chapter 11 without disruption.  Accordingly, on behalf of the Debtors, I respectfully submit that the CM Retention should be approved.

**Application Pursuant to Section 327(A) of the Bankruptcy Code and Rule 2014 of the Federal Rules of Bankruptcy Procedure for Authorization to Employ and Retain A&G Realty Advisors as Real Estate Consultants and Advisors for the Debtors and the Debtors in Possession (the "A&G Retention")**

47.     The Debtors seek to retain A&G Realty Advisors ("A&G") as their real estate consultants and advisors because of  its national reputation extensive experience in helping retail companies in negotiating lease accommodations with their landlords.  The Debtors believe that maximizing the value of their assets will depend, in part, on the ability of A&G to negotiate revised favorable lease terms for certain of the Debtors' salon locations.  A&G was employed by the Debtors pre-petition and has obtained extensive knowledge about the Debtors' leases and landlords

and its services will be needed to assist the Debtors in successfully prosecuting this Chapter 11 case.

48.     I believe that the relief requested in the A&G Retention is in the best interests of the Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors to continue to operate their business in chapter 11 without disruption.  Accordingly, on behalf of the Debtors, I respectfully submit that the A&G Retention should be approved.

**Debtors' Motion Pursuant To Bankruptcy Rule 1007(C) For An Extension Of Time To File Schedules Of Assets And Liabilities, Schedules Of Executory Contracts And Unexpired Leases, And Statements Of Financial Affairs (the "Schedules Motion")**

49.     Due to the complexity of their businesses and operations (especially in the face of the Covid-19 crisis), the Debtors anticipate that they will be unable to complete their Schedules in the 15 days provided under Bankruptcy Rule 1007(c).  In view of the amount of work entailed in completing the Schedules and the competing demands upon the Debtors' employees and professionals to assist in the Debtors' chapter 11 cases during the initial post-petition period, the Debtors will not be able to properly and accurately complete the Schedules within the required 15-day time period.

50.     At present, the Debtors anticipate that they will require at least an additional 30 days to complete their Schedules. The Debtors therefore request that the Court extend the 15- day period by an additional 30 days.

51.     The Debtors submit that the complexity of their businesses, the substantial amount of information that the Debtors must assemble and compile, and the number of employee and professional hours required to complete the Schedules, all constitute good and sufficient cause for granting the requested extension of time.

52.     I believe that the relief requested in the Schedules Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors to

continue to operate their business in chapter 11 without disruption.  Accordingly, on behalf of the

Debtors, I respectfully submit that the Schedules Motion should be approved.

**Debtors' Motion For Entry Of An Administrative Order Pursuant To 11 U.S.C. §§ 105, 328
And 331 Establishing Procedures For Interim
Compensation and Reimbursement Of Professionals**

53.     The Debtors request the entry of an order establishing an orderly, regular process

for  the allowance and  payment of  compensation and  reimbursement of  reasonable, necessary

expenses for attorneys and other professionals whose retentions are approved by this Court

pursuant to sections 327, 328, or 1103 of the Bankruptcy Code and who will be required to

file applications for allowance of compensation and reimbursement of expenses pursuant to

sections 330 and 331 of the Bankruptcy Code.

54.     The Debtors believe this will allow them to monitor the costs of administration and

is an efficient and appropriate cash management procedure.  This procedure will also allow the

Court and parties-in-interest to monitor and ensure the reasonableness and necessity of the

compensation and reimbursement sought.   Accordingly, on behalf of the Debtors, I respectfully

submit that the Administrative Fee Motion should be approved.

**Debtors' Motion for Entry of an Order (I) Authorizing the Rejection of Certain Unexpired
Leases *Nunc Pro Tunc* to the Petition Date, (II) Establishing Rejection Procedures for the
Rejection of Certain Leases of Non-Residential Real Estate, and (III) Authorizing the
Debtors to Take All Actions Necessary to Implement the Rejection Procedures, Including
the Rejection of the Leases and the Abandonment of the Remaining Property (the "Lease
Rejection Motion")**

55.     As explained above, prior to the outbreak of COVID-19, the Debtors undertook

strategic initiatives to enhance their profitability.  As part of this initiative, in order to reduce the

Debtors' risk and provide optionality under certain of their approximately 800 non-residential

salon leases (the "Leases"), the Debtors retained real estate advisory group A&G to negotiate rent

concessions on behalf of the Debtors with certain of the Debtors' landlords.  In December 2019,

A&G reached out to approximately 170 of the Debtors' landlords and began negotiations to restructure the Debtors' obligations under their Leases. While A&G was able to reach agreements for rent concessions for approximately 100 of the Debtors' Leases, the Debtors believe additional concession agreements will be needed  On or about March 21, 2020, the Debtors were forced to shut down their salons due to the restrictions put in place to control the COVID-19 outbreak. In light of the lasting effects that COVID-19 will likely have on the economy even after governments lift, revise or relax "shelter in place" orders – especially for the salon services business, which require employees and customers to be in close, physical contact – the Debtors are likely to have to close certain of their salons. As of the Petition Date, the Debtors have strategically identified 49 salons that will likely not recover from the shutdown, and have made the difficult decision to seek rejection of such leases, with such rejection to be effective *nunc pro tunc* to the Petition Date (the "Rejected Leases"). Through the Lease Rejection Motion, the Debtors seek to (i) reject 49 Rejected Leases, effective *nunc pro tunc* to the Petition Date, and (ii) establish procedures for future lease rejections.

56.    While the Debtors have designated the Rejected Leases, due to the uncertainty of the economy during this unprecedented and tremendous financial upheaval, the Debtors are seeking approval of the Rejection Procedures for if and when the Debtors determine that they should reject any of the remaining Leases. The Rejection Procedures allow the Debtors to streamline the rejection process for the remaining Leases, eliminate unnecessary administrative burdens, and conserve resources of the Debtors' estates.

57.    I believe that the relief requested in the Lease Rejection Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest. Accordingly, on behalf of the Debtors, I respectfully submit that the Lease Rejection Motion should be approved.

**Emergency Motion of the Debtors for Entry of an Order (I) Approving Relief Related to the Interim Budget, (II) Temporarily Adjourning Certain Motions and Applications for Payments, and (III) Granting Related Relief (the "Mothball Motion")**

58.     Without the ability to generate revenue through the operation of their salons during the pendency of the "shelter in place" restrictions, the only way that the Debtors may preserve liquidity and give the Debtors the ability to sell their business as a going concern is to drastically reduce the costs associated with their salons.  Prior to the Petition Date, the Debtors, in consultation with their real estate advisor, A&G began working with the Debtors' landlords in order to attempt to come to a consensual solution that could ease the Debtors' mounting lease expenses while they experienced liquidity concerns. While certain of these efforts have been successful, with the commencement of these chapter 11 cases, immediate steps are required to prevent irreparable harm to the Debtors' business.  Therefore, for the Limited Operation Period, the Debtors seek court authority to:

      (a)      continue to pay certain critical expenses specifically outlined in the proposed Initial DIP Budget;

      (b)      temporarily cease making rent payments to landlords who have not voluntarily consented to a rent deferral;

      (c)      automatically adjourn any motions, applications, or demands for payment on account of unpaid invoices or otherwise to the next scheduled omnibus hearing that is no less than 45 days after the end of the Limited Operation Period or such date as the Court may determine, unless such payment is to be provided pursuant to the Interim Budget;

      (d)      automatically adjourn any motions seeking to lift the automatic stay and motions to compel rejection, assumption, or assumption and assignment of any unexpired leases or executory contracts, for the same time period; and

      (e)      schedule a monthly hearing to (i) provide all parties in interest an update on the sale process and business reopening timeline, (ii) resolve any material disputes related to the Proposed Order to the Mothball Motion, and (iii) determine if the relief granted by Proposed Order to the Mothball Motion, if and when granted, should remain in place or be modified in response to changing circumstances.

59.     The relief requested will only be for the duration of the "Limited Operation Period", which shall commence upon entry of the order approving the Mothball Motion and terminate upon the earlier of Debtors filing a notice of such termination upon the re-opening of one or more salons and/or their operations generally, or at such other time as is ordered by the Court.

60.     I recognize that the relief requested in the Mothball Motion is extraordinary, but as the Debtors are facing extraordinary circumstances, I believe that the relief requested by the Mothball Motion will allow the Debtors to survive this unprecedented crisis, for the benefit of their employees, stakeholders and creditors—including their landlords. Thus, on behalf of the Debtors, I respectfully submit that the Mothball Motion should be approved.

**Motion Of The Debtors For Entry Of Interim And Final Orders (I) Approving The Debtors' Proposed Form Of Adequate Assurance Of Payment, (II) Establishing Procedures For Resolving Objections By Utility Companies, And (III) Prohibiting Utility Companies From Altering, Refusing, Or Discontinuing Service ("Utilities Motion")**

61.     In connection with the operation of their business, the Debtors obtain various Utility Services from a number of Utility Companies. I believe that the provision of uninterrupted postpetition Utility Services is necessary to allow for a smooth resumption and operation of the Debtors' business.

62.     In the Utilities Motion, the Debtors request that the Court (i) determine that the Utility Services are adequately assured of payment for future services by the procedures proposed by the Debtors, (ii) establish procedures for the Utility Companies requesting further assurance of payment, and (iii) prohibit the Utility Companies from altering, refusing, or discontinuing their services to the Debtors. I believe the relief requested in the Utilities Motion is necessary and appropriate because it will ensure that there is a streamlined process in place to address any demands by Utility Companies for adequate assurance or threats to alter, refuse, or discontinue Utility Services, thereby ensuring that any disruptions to the Debtors' business operations are

minimized. I am informed that the proposed adequate assurance procedures are consistent with procedures that are typically approved in chapter 11 cases in this district.

### Debtors' Application For Order Appointing Epiq Corporate Restructuring, LLC As Claims, Noticing, Solicitation, And Administrative Agent ("Epiq Application")

63.     Through the Epiq Application, the Debtors seek the appointment of Epiq Corporate Restructuring, LLC ("Epiq") as claims and noticing agent for these chapter 11 cases.  As the claims, noticing, solicitation and administration agent, Epiq will assume responsibility for the a number of administrative tasks including distribution of notices and service of motions and other pleadings to creditors and other parties in interest, maintenance of creditor lists, maintenance of the public docket and repository of other case information, and the maintenance, processing and docketing of proofs of claim filed in these chapter 11 cases. Given the complexity of these chapter 11 cases and the number of creditors and other parties in interest involved, I believe that the appointment of Epiq will maximize the value of the Debtors' estates for all of their stakeholders and will help to facilitate the efficient administration of these chapter 11 cases. Accordingly, I respectfully submit that the Claims Agent Application should be approved.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing statements are true correct.

Dated: April 23, 2020

CREATIVE HAIRDRESSERS, INC.
on behalf of itself and its affiliated Debtors
and Debtors in Possession

By: /s/ *Phil Horvath*
    Name: Phil Horvath
    Title: President & COO