IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF MARYLAND
(GREENBELT DIVISION)

| | | |
|---|---|---|
| In re: | * | Chapter 11 |
| **CREATIVE HAIRDRESSERS, INC.,** *et al.*[1], | * | Case Nos. 20-14583, 20-14584-TJC |
| | * | (Jointly Administered) |
| Debtors. | * | |

\* \* \* \* \* \* \* \* \* \* \* \* \*

**DEBTORS' MOTION TO COMPEL HC SALON HOLDINGS INC.
TO COMPLY WITH THE TRANSITION SERVICES AGREEMENT**

Creative Hairdressers Inc. and Ratner Companies, L.C., debtors and debtors in possession (the "Debtors"), by and through their undersigned counsel and pursuant to the Order Authorizing Debtors to Enter into the Transition Services Agreement with HC Salon Holdings, Inc. ("HC Salon") and HC Transition Services LLC ("HC Transition", together with HC Salon ("HC "Parties") (the "TSA Order") [ECF No. 607], the Transition Services Agreement (the "TSA"), and section 105(a) of the Bankruptcy Code, hereby submit this Motion to Compel HC Salon to Comply with the TSA (the "Motion"). In further support of this Motion, the Debtors respectfully state as follows:

**INTRODUCTION**

These Bankruptcy Cases were filed in order to effectuate a sale of the Debtors' business operations. The Stalking Horse bidder HC Salon understood that the Debtors lacked sufficient liquidity to survive to a closing on the sale or to prosecute the cases to conclusion. Therefore, HC

---

[1] The Debtors in these chapter 11 cases are: (i) Creative Hairdressers, Inc. and (ii) Ratner Companies, L.C.

Salon agreed that it would be a DIP Lender, fund the costs of the transition of the business to itself, and also fund the wind down of the cases in order to avoid an administrative insolvency.

HC Salon lacked the necessary infrastructure to immediately operate the over more than 500 salons it was to acquire. Therefore, the Parties entered into the TSA, which allowed HC Salon to use the Debtors' bank accounts, IT systems, employees and other infrastructure while establishing an independent ability to operate the salons. Accordingly, the TSA requires HC Salon to reimburse the Debtors for any costs associated with the services they provided and to thereafter fund the Wind Down costs of these cases. With the TSA now in HC Salon's rear view mirror, it has refused to reimburse the Debtors for a number of expenses incurred in furtherance of the transition and it has flatly refused to provide funds for the Wind Down of these cases. The Debtors require this Court's intervention to enforce HC Salon's obligations under the TSA Order and TSA.

## JURISDICTION AND VENUE

1. The United States Bankruptcy Court for the District of Maryland ( "Court") has jurisdiction over this Chapter 11 case and this matter under 28 U.S.C. §§ 157 and 1334. This is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2). Venue of this Chapter 11 case in this District is proper under 28 U.S.C. §§ 1408 and 1409.

## BACKGROUND

2. Prior to the Petition Date, the Debtors owned and operated approximately 800 hair salon locations. [ECF No. 6] However, the rapid and unforeseen spread of the COVID-19 pandemic during the second and third week of March 2020, forced the Debtors to close all of its salons locations due to, among other things, directives issued by various state and local authorities that all non-essential businesses be closed. [ECF No. 14]. Prior to being forced to suspend their operations, the Debtors employed over 10,000 full and part time employees. [ECF No. 6].

3. As a result of the sudden closure of the Debtors' salons, the Debtors were depleted of virtually all liquidity. Consequently, the Debtors were unable to meet a lag payroll for a one week period ending March 28, 2020 (payable on or about April 7, 2020). Indeed, on the day the Debtors filed these Chapter 11 cases they had less than $125,000 in cash on hand and were unable to maintain any operations without an additional cash infusion. [ECF No. 632-1, at 2].

4. Beginning in April 2020, the Debtors entered into negotiations with Tacit Salon Holdings, LLC ("Tacit")[2] anticipating that Tacit would acquire a $36.4M secured loan facility in which M&T Bank, Eagle Bank and Burke and Herbert Bank were the lenders, and thereafter acquire substantially all of the assets of the Debtors through a Court supervised sale process. Tacit was successful in its negotiations and its affiliate HC Salon became the successor-in-interest to the bank group.

5. Concurrently with HC Salon's acquisition of the loan facility, the Debtors and HC Salon executed an Asset Purchase Agreement dated April 23, 2020 (the "APA"), pursuant to which HC Salon agreed to purchase substantially all of the Debtors' assets. [ECF No 6]. The APA was predicated on the Debtors filing Chapter 11 bankruptcy cases and seeking expedited approval of the contemplated asset sale pursuant to Sections 363(b) and 365 of the Bankruptcy Code. Accordingly, on April 23, 2020 (the "Petition Date"), the Debtors filed with this Court voluntary petitions for relief under chapter 11 of the Bankruptcy Code.[3]

---

[2] Tacit reports that it is a portfolio company of Tacit Capital, LLC, an entity which in turn reports that it manages $80B of assets. *See* https://www.salonholdings.com and https://tacitcap.com. (last visited December 14, 2020).

[3] The Debtors are authorized to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

6. Therefore, the purpose of these Chapter 11 cases was to (i) effectuate the sale of the Debtors' assets to HC Salon (or a higher and better bidder), (ii) make employees whole for the missed lag payroll, and (iii) create a platform where as many of the Debtors' employees could be rehired as HC Salon decided.

## SALE OF THE DEBTORS' BUSINESSES AND TRANSITION TO HC SALON

7. Because the Debtors had no liquidity and could not operate or complete the sale without an immediate cash infusion, on the Petition Date the Debtors filed the Motion Of the Debtors For Entry Of Interim And Final Orders (I) Authorizing The Debtors To Obtain Postpetition Secured Financing, (II) Authorizing Use Of Cash Collateral, (III) Granting Adequate Protection To Prepetition Secured Parties, (IV) Scheduling A Final Hearing, and (V) Granting Related Relief (the "DIP Motion") [ECF No 23]. Under the DIP Motion and its proposed budget, together with it subsequent amendments (as approved by the Court), HC Salon loaned the Debtors sufficient funds to pay employees for the missed lag payroll and to operate the Debtors' business through a closing on the contemplated sale. The Debtors had no other ongoing source of revenue other than what HC Salon loaned them.[4]

8. On the Petition Date, the Debtors also filed a Motion for Entry of Orders (I)(A) Establishing Bidding Procedures; (B) Approving Expense Reimbursement; (C) Establishing Procedures Relating to Assumption and Assignment of Certain Executory Contracts and Unexpired Leases, Including Notice pf Proposed Cure Amounts; (D) Approving Form And Manner of Notice; (E) Scheduling a Hearing to Consider any Proposed Sale; and (F) Granting Certain Related Relief; and (II)(A) Approving a Sale; (B) Authorizing Assumption and

---

[4] CHI later obtained approximately $735,000 from a settlement of a pre-petition claim and received certain other miscellaneous refunds from vendors and taxing authorities.

4

Assignment of Certain Executory Contracts and Unexpired Leases in Connection with the Sale; and (C) Granting Related Relief (the "Sale Motion") [ECF No. 22].[5] Pursuant to the Sale Motion, HC Salon acted as a Stalking Horse Bidder for the Debtors' assets pursuant to the terms of the APA. [ECF No. 22-1].

9. Section 23 of the April 23, 2020 APA established the Purchase Price for the Debtors' assets as follows:

> The consideration for the Acquired Assets (the "Total Consideration") shall be (i) the Assumed Liabilities, (ii) the credit bid in an amount equal to 90% of the Obligations (as defined in the DIP Financing Agreement) (the "Credit Bid") (as an offset against, and reduction in the amount of Sellers' debt in respect of such Obligations under the DIP Financing Agreement, pursuant to Section 363(k) of the Bankruptcy Code), and (iii) the amount, paid in cash, equal to the amount set forth in the Wind Down Budget (such amount, together with the amount of the Senior DIP NM Term Loan Obligations and the Credit Bid, the "**Purchase Price**"); provided, however, that Purchaser reserves the right to increase the Purchase Price, subject to the Bidding Procedures Order and applicable Law.

[ECF No. 22-1] at 55.

10. The APA defined "Wind Down" as:

> [a]ny and all post-closing actions to be taken for the administrative wind-down of the bankruptcy estate pursuant to the Bankruptcy Code, including but not limited to the preparation, solicitation and confirmation of a plan of liquidation under chapter 11 of the Bankruptcy Code.

[ECF No. 22-1] at 53.

11. Consistent with the structure that the Wind Down expenses to be reimbursed by HC Salon would be set forth in a separate to be agreed upon budget, the APA further provided that

---

[5] Capitalized terms not defined herein shall have the meaning ascribed in the Sale Motion and attached Exhibits, the APA (defined *infra*), or the TSA Motion and attached Exhibits (defined *infra*), unless otherwise indicated herein.

5

the "Excluded Liabilities" for which HC Salon would not be responsible included certain "specified post-closing administrative wind-down expenses of the bankruptcy estates…"[6] [ECF No. 22-1] at 42; definition of Excluded Liabilities at (f).

12. At that time, neither the Wind Down Budget nor the "specified post-closing administrative wind-down expenses" had been agreed upon. The fact that the parties moved forward without finalizing a Wind Down Budget or specifying the excluded administrative costs reflected the level of trust that existed at that point in time between the parties, the fact that the Parties always expected HC Salon to reimburse wind down expenses, and that the Parties understood that formulating a Wind Down Budget would require further analysis once the posture of the Chapter 11 cases became clear and the exact nature of the Debtors' post-closing needs were determined. *See also* ECF No 6 at ¶ 15(iii).

13. As of the Petition Date, all salons were closed, all salon employees were furloughed and the few remaining employees were engaged in "keeping the lights on" so that they could formulate a reopening plan for salons. After the Petition Date, the Debtors' employees collaborated with HC Salon in order to allow HC Salon to have input into virtually every operational decision made by the Debtors as they positioned the business for the salon's reopening and the eventual sale to HC Salon (or a higher and better bidder if one materialized).

14. Azhar Quader and Seth Gittlitz were HC Salon's primary contacts with the Debtors. Messrs. Quader and Gittlitz conducted ongoing meetings (virtual and in person) with the Debtors' employees to consider, and often give their approval to business decisions such as (i) which leases and contracts to assume or reject, (ii) which employees to retain or offer employment to, (iii) the

---

[6] Fees and expense of professionals engaged by the Sellers were also excluded, although HC Salon later agreed to pay those expenses. *See* discussion *infra*.

content of press releases, (iv) messaging to existing customers using the Debtors communication's platforms, (v) operating and DIP budgeting, and (vi) the reopening plan for the salon locations that HC Salon hoped to acquire.

15. On May 1, 2020, the United States Trustee (Region 4) appointed a Committee of Unsecured Creditors (the "Committee") [ECF No. 128].

16. On May 18, 2020, the Committee filed a Supplemental Objection to the DIP Motion in advance of the final hearing thereon. [ECF. No 368]. In its Supplemental Objection the Committee raised objections to, *inter alia*, the terms of the proposed sale to HC Salon, including the bankruptcy estates' ability to satisfy post-closing administrative expenses and provide some basis for recovery to general unsecured creditors. In an attempt to resolve its objections, the Committee entered into negotiations with the Debtors and HC Salon. As part of these tri-party negotiations it was agreed that HC Salon would (i) fund a $50,000 escrow for payment of priority claims, (ii) provide $100,000 toward wind down costs, and (iii) fund a $500,000 reserve to satisfy potential administrative claims of landlords whose leases had been rejected.
*See* Transcript of May 26, 2020 Hearing attached hereto as **Exhibit 1** at pp. 12-16.

17. On May 21, 2020, the Debtors filed a Notice of Successful Bidder, designating HC Salon as the Successful Bidder and providing notice that it would seek the Court's approval of the sale of the Debtors' assets to HC Salon at the hearing scheduled on May 28, 2020.

18. On May 27, 2020, the Debtors filed an Amended and Restated Asset Purchase Agreement (the "Amended APA"). [ECF No. 426], which was later updated and attached to the Sale Order. [ECF No. 465-1]. In order to implement the agreement resolving the Committee's Supplemental Objection, the following terms were added to the Amended APA:

- The Assumed Liabilities (the liabilities of the Debtors assumed by HC Salon) were expanded to include "liabilities under sections 503(b)(9) and 507(a) of the

> Bankruptcy Code, subject to a cap of $50,000." Amended APA § 1.1; [ECF No. 426-2] at 10.

- The Purchase Price was revised to include "$100,000 paid in cash to fund the Wind Down." APA § 2.3; [ECF No. 426-2] at 23. Amended APA § 1.1; [ECF No. 426-2] at 21.

19. The Amended APA retained substantially all of the same terms and provisions as the APA, including a reference to the unspecified post-closing administrative expenses that were to be Excluded Liabilities. However, the Amended APA introduced the new term "Transition Services Agreement", which was defined as

> [T]he Transition Services Agreement between Buyers and Sellers to provide certain transition services following the Closing Date.

[ECF No. 465-1] at 48.

20. Thus, the Amended APA contemplated that HC Salon and the Debtors would enter into a separate, free-standing Transition Services Agreement for the provision of certain services following the Closing Date.

21. On June 2, 2020, the Court entered an Order (A) Approving and Authorizing the Sale of Substantially All of Debtors' Assets Pursuant to the Amended and Restated Asset Purchase Agreement, Free and Clear of All Liens, Claims, Encumbrances and Other Interests, (B) Approving the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases Related Thereto, and (C) Granting Related Relief [ECF No. 465] (the "Sale Order"). The sale to HC Salon closed effective June 4, 2020. A copy of the Sale Order with the Amended APA attached thereto is attached as **Exhibit 2**.[7]

---

[7] In drafting the Motion, the Debtors discovered that the final executed version of the Amended APA is different from the form of agreement attached to the Sale Order. Among other things Section 2.3 of the executed document contains identical language to that set forth in the original APA, not the revised purchase price language agreed to with the Committee. The execution copy of the Amended APA also does not include any provision for a TSA.

22. At the same time, the parties negotiated the terms of the Transition Services Agreement and on June 5, 2020, the Debtors filed a Motion for Authority to Enter Into the Transition Services Agreement with HC Salon and HC Transition Services LLC [ECF No. 484]. The Transition Services Agreement is attached hereto as **Exhibit 3**.

23. As contemplated by the TSA Motion, in June 2020 HC Salon was preparing to begin reopening salons and rehiring Salon Professionals. As a result HC Salon required certain services from the Debtors in conjunction with the Debtors' transfer of its businesses to HC Salon. That is, HC Salon had not, among other things, set up its own software, IT functions or bank accounts. Furthermore, HC Salon needed certain of the Debtors' employees (whom it might offer employment) to provide the day-to-day operational services needed to operate the reopened business. HC Salon turned to the Debtors to provide these services and business back bone which the Debtors were not otherwise obligated to provide. The TSA between the Debtors and HC Salon, and HC Transition memorialized the services to be provided and the consideration therefore.

24. Section 5 of the TSA requires HC Salon to pay the following compensation to the Debtors:

    (a)   5.1 Monthly Fee. In addition to the fees and expenses set forth in Sections 5.1 and 5.2 and the Service Schedule, the Purchaser shall pay the Servicing Party an additional fee of $25,000 per month on the first day of each month of services under this TSA, subject to a minimum of three (3) months.

    (b)   5.2 Reimbursable Expenses. The Purchaser agrees to reimburse the Seller for any and all of its actual, documented, out-of-pocket costs and other *expenses reasonably incurred in connection with the performance of the services hereunder or[8] any wind down costs of seller, including the allowed*

---

[8] Section 10.10 of the TSA provides that the "term 'or' shall be deemed to mean 'and/or'." TSA § 10.1; [ECF No. 484-1] at 13. Thus, under Section 5.2, HC Salon agreed to pay the costs and expenses the Debtors incurred relating to operation of the salons, as well as the future Wind Down expenses of the Debtors. "Wind Down" is defined as the "wind down of the bankruptcy estates of, and the resolution of Bankruptcy Cases relating to the Debtors." TSA § 1.5; [ECF No. 484-1] at 2.

9

> *fees of Sellers' professionals employed under one or more orders of the Bankruptcy Court provided* that the Seller shall, where possible, inform the Purchaser of the actual or reasonably estimated amount of such expenses before they are incurred and shall not incur any such expenses without the Purchaser's prior written consent. All costs incurred must be presented with supporting documentation, such as receipts.
>
> (c) <u>5.3 Trustee Fees</u>. The Purchaser shall be responsible for the payment of any fees payable to the Office of the United States Trustee the Sellers reasonably incurred as a direct result of the Sellers providing services under this Agreement.

[ECF No. 484-1] at 7 (emphasis supplied).

25. On July 9, 2020, the Court entered the TSA Order, which authorized the Debtors to enter into the TSA and provided that this Court "shall retain jurisdiction with respect to all matters arising from or related to the implementation, interpretation, or enforcement of this Order." [ECF No. 607].

26. Thereafter, HC Salon began reopening the salons it acquired under the Sale Order. By letter dated July 14, 2020, HC Salon advised the Debtors that it would be partially terminating the TSA effective July 17, 2020 under Section 9.2 of the TSA".[9] In the July 14, 2020 letter, HC Salon stated:

> Owing to changed business circumstances relating to services provided under the TSA, HC Salon is hereby providing notice that it is terminating all services under the TSA for convenience effective July 17, 2020, except for CHI's continued performance under the following five contracts: Velocity Technical Solutions, ACI, Shortcuts, Retail.net (Salesforce) and Flexential. Pursuant to the terms of the TSA, HC Salon will remain obligated to CHI for all costs relating to these contracts and will work with CHI to reconcile all remaining amounts owed under the TSA.

*See* July 14, 2020 Letter attached hereto as **Exhibit 4**.

27. Notwithstanding the purported partial termination of the TSA, monies associated with HC Salon's operations continued to flow through the Debtors' bank accounts during July and

---

[9] Section 9.4 of the TSA provides that Section 5 survives termination of the TSA.

August 2020, and the Debtors continued to work with HC Salon on the transition. Both before, during and after the time the TSA took effect, HC Salon used the Debtors' IT platforms to operate the reopened salons, communicate with customer and operate the business; used the Debtors' employees who remained on the Debtors' payrolls; moved millions of dollars through the Debtors' bank accounts; and generally used the Debtors' operational platforms.

## HC SALON'S REFUSAL TO COMPLY WITH THE COURT APPROVED TSA

28. Up until the point that HC Salon determined that it no longer needed the Debtors' services HC Salon generally paid the Debtors the compensation they were entitled to under Section 5 of the TSA. However, since that date HC Salon has failed, refused or otherwise not paid the Debtors for a number of reimbursable expenses (the "Reimbursable Expenses") including the following:

(a) <u>US Trustee Fees</u>: US Trustee fees are predicated on disbursements made by a debtor. As reflected in the MOR's filed by the Debtors, they disbursed approximately $16.8 million between May and the end of August, the bulk of which is directly attributable to HC Salon's operation of salons. The Debtors estimate these unreimbursed fees will ultimately be in the amount of $50,000. These amounts are payable under Section 5.3 of the TSA.

(b) <u>Epiq</u>: is the noticing agent for the Debtors hired at the request of HC Salon. As part of the sale process to HC Salon, the Debtors were required to issue thousands of notices to parties in interest. Unreimbursed Epiq costs and expenses total approximately $110,000.

(c) <u>Monthly Fee</u>: HC Salon was obligated to pay the Debtors a fee of $25,000 per month for a minimum of three months, or an aggregate of $75,000 through September 4, 2020;

(d) <u>Salesforce</u>: both before and after execution of the TSA, the Debtors, in accordance with the oversight and approval of HC Salon's principals, were employing certain software and services provided by Salesforce that were used, for among other things, implementing messaging campaigns to customers to induce them to return to the salons once they reopened. Salesforce has provided documentation that it claims shows that its software and services were being used extensively from the Petition Date through (and after) the June 19, 2020 rejection date of its contract (a rejection

11

        decision made by HC Salon). Salesforce advised the Debtors that it will amend the Proof Of Claim it previously filed and will seek an administrative payment of $147,404.69;

(e)     <u>Professional Fees</u>: HC Salon has from time to time reimbursed Shapiro Sher, the Debtors Court approved counsel, for its fees and expenses as HC Salon agreed to do. Most recently, on September 28, 2020, HC Salon reimbursed Shapiro Sher $242,465.22, as a partial payment for its Court approved fees that had accrued between April and July 2020, leaving an open and unpaid balance. HC Salon has now refused to pay Shapiro Sher for the prior balance or for any additional fees. As of the date of this Motion those unpaid fees are in the aggregate amount of approximately $321,000. Additional sums will be incurred that HC Salon is obligated to pay. HC Salon has also refused to reimburse the Debtors for fee incurred by Carl Mark (approximately $68,000 is payable) and the Littler firm (the Debtors employment firm that worked on the transition to HC Salon) in the approximate amount of $67,000.

(f)     <u>Miscellaneous</u>. The Debtors believe they will continue receiving demands for payment or claims filed by vendors whose services the Debtors used in connection with HC Salon's operations. These may include vendors such as Velocity, who HC Salon acknowledged in its July 14, 2020 letter that it would remain obligated for.

29.     As contemplated by the TSA, the Debtors provided HC Salon with an estimated wind down budget setting forth additional estimated future expenses that are reimbursable under Section 5.2 of the TSA. The current estimate for the wind down budget is attached hereto as **Exhibit 5**. In addition to those expenses listed above in paragraph 28 above, the Debtors estimate the total additional wind down expenses ("Wind Down Expenses") will be approximately $1.3 Million. These expenses include the costs for (i) ongoing professional fees, (ii) payroll for the wind down staff, (iii) issuance of W-2's, 1099 and other tax filings for employees (the bulk of whom are now employed by HC Salon), (iv) preparation and filing of tax returns, (v) document storage and destruction, (vi) US Trustee fees, (vii) Epiq, and (viii) other miscellaneous costs associated with the wind down of the Debtors' estates.

30. HC Salon has taken the positon that notwithstanding the unambiguous terms of Section 5.2 of the TSA, it is not obligated to pay for these wind down costs. While the Debtors held out hope that they could resolve this dispute with HC Salon, the Debtors have now concluded that the Parties are unable to resolve the dispute. The Court's intervention is needed.[10]

31. The Debtors submit this Motion and respectfully request that the Court compel HC Salon to comply with the plain, unambiguous language of the TSA and reimburse the Debtors for past due reimbursable amounts, as well as their wind down costs as required by the TSA and as needed to avoid an administrative insolvency.

## ARGUMENT

32. "When a contract is clear and unambiguous, it is the court's duty to interpret the contract, as written." *See Palmer & Palmer Co., LLC v. Waterfront Marine Const., Inc.*, 276 Va. 285, 289, 662 S.E.2d 77, 80 (2008). When courts "search for the parties' intent in an unambiguous contract provision, the search ends where it begins—with the plain, usual, and ordinary meaning of the words themselves." *Babcock & Wilcox Co. v. Areva NP, Inc.,* 292 Va. 165, 188, 788 S.E.2d 237, 249 (2016). A contract is "not ambiguous merely because the parties disagree as to the meaning of the terms used." *TM Delmarva Power, L.L.C. v. NCP of Virginia, L.L.C.,* 263 Va. 116, 119, 557 S.E.2d 199, 200 (2002).[11]

---

[10] Presumably HC Salon will now argue that the additional $100,000 it paid as part of its Purchase Price in order to resolve the Committee's Supplemental Objection caps its obligations under the later and separately negotiated TSA.

[11] The TSA contains a choice of law provision for Virginia law. TSA § 10.11; [ECF No. 484-1] at 13. The APA contains a choice of law provision for New York law. APA § 9.8; [ECF No. 426-1] at 47. Like Virginia, under New York law unambiguous contracts are construed and enforced based upon the contract as written. *See Thirty One Dev., LLC v. Cohen*, 104 A.D.3d 1195, 1196, 960 N.Y.S.2d 795, 797 (2013).

33. In Section 5 of the TSA, HC Salon agreed to broadly reimburse the Debtors for expenses *reasonably incurred in connection with* the performance of services. In addition to expenses incurred to date, these reimbursable expenses expressly include "any wind down costs of [the Debtors], including the allowed fees of [the Debtors'] professionals employed under one or more orders of the Bankruptcy Court." TSA § 5.2; [ECF No. 484-1] at 7. The TSA defines "wind down" to mean the "wind down of the bankruptcy estate of, and the resolution of Bankruptcy Cases relating to the Debtors." *Id.* § 1.5; [ECF No. 484-1] at 2. Section 5.2 provides a process for reimbursement of the wind down costs – the Debtors, where possible, are to provide HC Salon with the actual or reasonably estimated amount of the wind down costs, provide supporting documentation, and obtain HC Salon's written consent. *Id.* § 5.2; [ECF No. 484-1] at 7. When the term of the TSA expires or is terminated, HC Salon's obligation to reimburse the Debtors for the wind down costs survives. TSA § 9.4; [ECF No. 484-1] at 10; *see also* § 9.2 (providing that HC Salon may terminate any part of the "Services" to be provided under the TSA in the event of "unforeseeable business circumstances" but will still be responsible to reimburse "all wind-down expenses."). The plain, unambiguous language of the TSA requires HC Salon to reimburse the Debtors for all of their wind down costs.

34. While the TSA was in force and HC Salon relied upon the Debtors (because the Debtors were needed to run the acquired salons), the Parties worked cooperatively to reconcile reimbursable costs that were being incurred by the Debtors on an ongoing basis. In practice getting prior written consent for each reimbursable expense was not required by HC Salon (nor were any reimbursements withheld on that ground); rather the reimbursement process was either done through advance payments or by retroactive reconciliations. HC Salon has now fallaciously

14

advised the Debtors that it will not reimburse certain of the items listed in paragraph 28 above because HC Salon did not give prior written approval.

35. HC Salon's reimbursable and wind down cost obligations are not capped or otherwise limited by the Amended APA or amounts paid by HC Salon under the Amended APA for the Debtors' assets. Section 5.2 of the TSA (or any other provision of the TSA referencing wind down costs) contains no such limitation on HC Salon's wind down reimbursement obligation; Section 5.2 of the TSA does not reference or incorporate any provision of the Amended APA. If HC Salon seeks to construe HC Salon's wind down reimbursement obligation under Section 5.2 of the TSA as being capped by the $100,000.00 paid to settle the Supplemental Objection, it would require the Court to add language to, and change the meaning of, Section 5.2 of the TSA. This is contrary to well-settled rules of contract interpretation. *See Southerland v. Estate of Southerland*, 249 Va. 584, 590, 457 S.E.2d 375, 378 (1995) ("[C]ourts cannot read into contracts language which will add to or take away from the meaning of the words already contained therein."). Further, Section 10.7 of the TSA provides that the TSA, with any Orders issued by the Bankruptcy Court, "represents the entire understanding and agreement between the Parties with respect to the subject matter hereof."[12] The Amended APA (which together with the TSA contemplated a separate Wind Down budget in any event) cannot be used to change and contradict the express language of Section 5.2 of the TSA concerning reimbursable wind down costs.

36. When interpreting contracts, "[e]ffect should be given to every part of the instrument, if possible, and no part thereof should be discarded as superfluous or

---

[12] Section 9.3 of the APA provides that it the APA and the Related Agreements "constitute the entire agreement between the Parties." APA § 9.3 [ECF No. 426-1] at 45. "Related Agreements" are defined as the "Bill of Sale, the Assignment and Assumption Agreement." *Id.* at 19. The APA and the TSA do not constitute a single, unified agreement, but are separate agreements that address distinct subject matters.

15

meaningless." *CNX Gas Co. v. Rasnake*, 287 Va. 163, 168, 752 S.E.2d 865, 867 (2014) (citations omitted). An interpretation that the reimbursable wind down costs under Section 5.2 of the TSA are capped by the $100,000 reference in Section 2.3 of the Amended APA would render all of the provisions in the TSA regarding the reimbursement of wind down costs, the process for that reimbursement, and the survival of that obligation upon termination or expiration of the TSA completely superfluous. It is nonsensical that the Parties, represented by sophisticated counsel, would have included meaningless provisions in the TSA related to the reimbursement of wind down costs if no such costs were capable of existence.

37. In sum, the plain and unambiguous language of the TSA obligates HC Salon to reimburse the Debtors for their wind down costs, as provided in Section 5.2. HC Salon's existing and future wind down cost reimbursement obligation is not capped.

38. The Debtors respectfully request that the Court compel HC Salon to comply with the TSA and reimburse the Debtors (i) for the Debtors' out-of-pocket costs and other expenses detailed herein as well as any other expenses reasonably incurred in connection with the performance of the services, and (ii) for their wind down costs as provided in **Ex. 5**.

## WAIVER OF MEMORANDUM OF POINTS AND AUTHORITIES

39. Pursuant to Local Bankruptcy Rule 9013-2, the Debtors state that, in lieu of submitting a memorandum in support of this Motion, they will rely solely upon the grounds and authorities set forth herein.

## CONCLUSION

WHEREFORE, the Debtor respectfully request that this Court enter the order, substantially in the form attached hereto, granting the relief requested in this Motion, and grant such other and further relief as this Court may deem just and proper.

| | |
|---|---|
| Dated: December 14, 2020 | /s/ *Joel I. Sher* |
| | Joel I. Sher, Bar No. 00719 |
| | Richard M. Goldberg, Bar No. 07994 |
| | Daniel J. Zeller, Bar No. 28107 |
| | Anastasia L. McCusker, Bar No. 29533 |
| | SHAPIRO SHER GUINOT & SANDLER |
| | 250 W. Pratt Street, Suite 2000 |
| | Baltimore, Maryland 21201 |
| | Tel: 410-385-4277 |
| | Fax: 410-539-7611 |
| | Email: jis@shapirosher.com |
| |       rmg@shapirosher.com |
| |       djz@shapirosher.com |
| |       alm@shapirosher.com |
| | |
| | *Counsel for Debtors and Debtors in Possession* |

## **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on this 14th day of December, 2020, a copy of the *foregoing* was served on the parties listed below by electronic mail:

Richard A. Chesley, Esquire
DLA Piper LLP (US)
444 West Lake Street
Chicago, IL 60606-0089
*Counsel for HC Salon Holdings, Inc.*

Jeanette Rice**,** Assistant United States Trustee
Lynn A. Kohen, Esquire
OFFICE OF THE UNITED STATES TRUSTEE
6305 Ivy Lane
Suite 600
Greenbelt, MD 20770

Keith Costa, Esquire
FAEGRE DRINKER BIDDLE & REATH LLP
1177 Avenue of the Americas, 41st Floor
New York, NY 10036-2714
*Counsel to Official Committee of Unsecured Creditors*

I HEREBY FURTHER CERTIFY that on the 14th day of December, 2020, I reviewed the Court's CM/ECF system and it reports that an electronic copy of the *foregoing* will be served electronically by the Court's CM/ECF system on the following:

- **Aaron Solomon Applebaum**   aaron.applebaum@saul.com, catherine.santangelo@saul.com
- **GWYNNE L BOOTH**   GLB@GDLLAW.COM
- **Steven M Berman**   sberman@shumaker.com
- **Alan Betten**   abetten@sagallaw.com
- **Peter D Blumberg**   heather.williams@fedex.com
- **Joshua D. Bradley**   jbradley@rosenbergmartin.com, lfeigh@rosenbergmartin.com
- **Jodie E. Buchman**   jbuchman@silvermanthompson.com, efiling@silvermanthompson.com
- **Donald F. Campbell**   dcampbell@ghclaw.com
- **Katie Lane Chaverri**   kchaverri@tlclawfirm.com, dtayman@tlclawfirm.com
- **Maria Ellena Chavez-Ruark**   maria.ruark@saul.com
- **Kevin Davis**   kdavis@capdale.com
- **Monique Bair DiSabatino**   monique.disabatino@saul.com, robyn.warren@saul.com
- **Alan D. Eisler**   aeisler@e-hlegal.com, mcghamilton@gmail.com

- **John T. Farnum**    jfarnum@milesstockbridge.com, jfarnumecfnotices@gmail.com
- **William Henry Fisher**    hank@cccoateslaw.com
- **Jeremy S. Friedberg**    jeremy@friedberg.legal, ecf@friedberg.legal
- **Stanford G. Gann**    sgannjr@levingann.com
- **Alan M. Grochal**    agrochal@tydingslaw.com, mfink@tydingslaw.com;jmurphy@tydingslaw.com
- **William L. Hallam**    WHallam@rosenbergmartin.com, kmartin@rosenbergmartin.com
- **Robert Hanley**    rhanley@rmmr.com
- **Catherine Harrington**    charrington@bregmanlaw.com
- **Jessica Hepburn-Sadler**    sadlerjh@ballardspahr.com, andersonn@ballardspahr.com
- **James M. Hoffman**    jhoffman@offitkurman.com, mmargulies@offitkurman.com
- **Patricia B. Jefferson**    pjefferson@milesstockbridge.com
- **Ira T Kasdan**    kdwbankruptcydepartment@kelleydrye.com; MVicinanza@ecf.inforuptcy.com
- **Lawrence A. Katz**    lkatz@hirschlerlaw.com, lrodriguez@hirschlerlaw.com
- **Patrick J. Kearney**    pkearney@sgrwlaw.com, jnam@sgrwlaw.com
- **Nicole C. Kenworthy**    bdept@mrrlaw.net
- **C. Kevin Kobbe**    kevin.kobbe@dlapiper.com, docketing-baltimore-0421@ecf.pacerpro.com
- **Lynn A. Kohen**    lynn.a.kohen@usdoj.gov
- **Leonidas Koutsouftikis**    lkouts@magruderpc.com, mcook@magruderpc.com
- **Joyce A. Kuhns**    jkuhns@offitkurman.com
- **Jeffrey Kurtzman**    kurtzman@kurtzmansteady.com
- **Robert L. LeHane**    KDWBankruptcyDepartment@kelleydrye.com
- **Stephen E. Leach**    sleach@hirschlerlaw.com, ndysart@hirschlerlaw.com;kburgers@hirschlerlaw.com;plaura@hf-law.com
- **Richard Edwin Lear**    richard.lear@hklaw.com, kimi.odonnell@hklaw.com
- **Steven N. Leitess**    sleitess@mdattorney.com, efiling@silvermanthompson.com
- **Michael J. Lichtenstein**    mjl@shulmanrogers.com, tlockwood@shulmanrogers.com
- **Marissa K Lilja**    mlilja@tydingslaw.com, edondero@tydingslaw.com
- **Keith M. Lusby**    klusby@gebsmith.com
- **Kimberly A. Manuelides**    kmanuelides@sagallaw.com
- **Michelle McGeogh**    mcgeoghm@ballardspahr.com, stammerk@ballardspahr.com; cromartie@ballardspahr.com; bktdocketeast@ballardspahr.com
- **Stephen A. Metz**    smetz@offitkurman.com, mmargulies@offitkurman.com
- **Brittany Mitchell Michael**    brittany.michael@stinson.com, jess.rehbein@stinson.com,jayme.masek@stinson.com
- **Pierce C Murphy**    pmurphy@mdattorney.com, rscaffidi@silvermanthompson.com;e_file@mdattorney.com
- **Michael Stephen Myers**    michaelsmyerslaw@gmail.com
- **Kevin M. Newman**    knewman@barclaydamon.com, kmnbk@barclaydamon.com
- **Tracey Michelle Ohm**    tracey.ohm@stinson.com, porsche.barnes@stinson.com
- **Jeffrey M. Orenstein**    jorenstein@wolawgroup.com
- **Leo Wesley Ottey**    otteyjr@gmail.com
- **Jeffrey Rhodes**    jrhodes@blankrome.com, kbryan@blankrome.com
- **L. Jeanette Rice**    Jeanette.Rice@usdoj.gov, USTPRegion04.GB.ECF@USDOJ.GOV

- **Bradshaw Rost**    brost@tspclaw.com
- **Michael Schlepp**    mschlepp@s-d.com
- **Joel I. Sher**    jis@shapirosher.com, ejd@shapirosher.com
- **J. Breckenridge Smith**    jsmith@foxrothschild.com
- **David Sommer**    dsommer@gejlaw.com, ceyler@gejlaw.com;gomara@gejlaw.com
- **Aryeh E. Stein**    astein@meridianlawfirm.com, aryehsteinecf@gmail.com;steinar93219@notify.bestcase.com
- **Ashley Elizabeth Strandjord**    astrandjord@chasenboscolo.com
- **Matthew S. Sturtz**    matt.sturtz@nelsonmullins.com, gary.freedman@nelsonmullins.com
- **Matthew G. Summers**    summersm@ballardspahr.com, branchd@ballardspahr.com;heilmanl@ballardspahr.com;mcgeoghm@ballardspahr.com;ambroses@ballardspahr.com;buhrmank@ballardspahr.com;roglenl@ballardspahr.com;zarnighiann@ballardspahr.com;carolod@ballardspahr.com
- **Lisa Bittle Tancredi**    ltancredi@gebsmith.com
- **Jonathan Harold Todt**    jonathan.todt@faegredrinker.com
- **US Trustee - Greenbelt**    USTPRegion04.GB.ECF@USDOJ.GOV
- **Maurice Belmont VerStandig**    mac@mbvesq.com, lisa@mbvesq.com
- **Irving Edward Walker**    iwalker@coleschotz.com, jdonaghy@coleschotz.com;pratkowiak@coleschotz.com
- **Mitchell Bruce Weitzman**    , statum@jackscamp.com;iluaces@jackscamp.com
- **Craig B. Young**    craig.young@kutakrock.com, jeremy.williams@kutakrock.com;lynda.wood@kutakrock.com;david.fox@kutakrock.com;pamela.germas@kutakrock.com

*/s/ Joel I. Sher*
Joel I. Sher