## EXHIBIT B



# Transcript of Lester D. Mardiks, Corporate Designee

**Date:** January 19, 2021
**Case:** Creative Hairdressers, Inc., et al., In Re:

**Planet Depos**
**Phone:** 888.433.3767
**Email::** transcripts@planetdepos.com
**www.planetdepos.com**

WORLDWIDE COURT REPORTING & LITIGATION TECHNOLOGY

1           UNITED STATES BANKRUPTCY COURT

2           FOR THE DISTRICT OF MARYLAND

3             (Greenbelt Division)

4  In Re:                ) Chapter 11

5  CREATIVE HAIRDRESSERS, INC.,  ) Case Nos.

6  et al.,             ) 20-14583

7        Debtors        ) 20-14584-TJC

8            -----------

9      Videoconference 30(b)(6) Deposition of

10         CREATIVE HAIRDRESSERS, INC.

11    By and through its Designated Representative

12          LESTER D. MARDIKS

13        Tuesday, January 19, 2021

14          9:31 a.m. EDT

15

16

17

18

19

20  Job No.:  347176

21  Pages:  1 - 125

22  Reported By:  Dawn M. Hart, RPR/RMR/CRR

Transcript of Lester D. Mardiks, Corporate Designee
Conducted on January 19, 2021                        2

```
1        Pursuant to Notice, before Dawn M. Hart,

2   RPR/RMR/CRR and Notary Public.

3                 A P P E A R A N C E S

4        ON BEHALF OF HC SALON HOLDINGS, INC.:

5             C. KEVIN KOBBE, ESQUIRE

6             DLA PIPER LLP(US)

7             The Marbury Building

8             6225 Smith Avenue

9             Baltimore, Maryland 21209

10            (410) 580-3000

11

12            JAMILA JUSTINE WILLIS, ESQUIRE

13            1251 Avenue of the Americas

14            New York, New York 10020

15            (212) 335-4500

16            (via videoconference)

17

18

19

20

21

22
```

Transcript of Lester D. Mardiks, Corporate Designee
Conducted on January 19, 2021                          3

```
1          A P P E A R A N C E S (Continued)

2    ON BEHALF OF THE DEBTORS:

3         JOEL I. SHER, ESQUIRE

4         SHAPIRO SHER GUINOT & SANDLER

5         250 West Pratt Street, Suite 2000

6         Baltimore, Maryland 21201

7         (410) 385-4277

8         (via videoconference)

9

10

11

12

13

14

15

16

17

18   ALSO PRESENT:  Rodger Jacobson

19                  Emily D'Alessandro, Paralegal

20                  Leybert Sharp, AV Technician

21

22
```

Transcript of Lester D. Mardiks, Corporate Designee
Conducted on January 19, 2021                    4

1                    C O N T E N T S

2   EXAMINATION OF LESTER D. MARDIKS                    PAGE

3        By Ms. Willis                                     7

4        By Mr. Sher                                      92

5                    E X H I B I T S

6        (Exhibits are attached to the transcript.)

7   MARDIKS DEPOSITION EXHIBITS                         PAGE

8    Exhibit 14   Notice of Deposition                   14

9    Exhibit 15   Debtors' Motion to Compel to           19

10                Comply with Transitions Services

11                Agreement

12   Exhibit 16   Sale Order                             21

13   Exhibit 17   Transition Services Agreement          38

14   Exhibit 18   Notice re TSA termination 7/17/20      46

15   Exhibit 19   Wind Down Budget                       73

16   Exhibit 20   Email 8/31/20 Hansen to Mardiks        83

17   Exhibit 21   Motion 4/23/20                         94

18   Exhibit 22   DIP Amended Monthly Operating          101

19                Statement 8/31/20

20   Exhibit 23   Transition Expenses                    112

21   Exhibit 24   Wire Transfer Statement 9/28/20        115

22                HC Salon to Shapiro Sher

Transcript of Lester D. Mardiks, Corporate Designee
Conducted on January 19, 2021                    5

1              E X H I B I T S  (Continued)

2          (Exhibits are attached to the transcript.)

3    MARDIKS DEPOSITION EXHIBITS                      PAGE

4     Exhibit 25    Email 5/17/20 Chesley to Sher     117

5     Exhibit 26    Email Costa to Chesley and Sher   118

6     Exhibit 27    Budgets re DIP 5/28/20            120

7     Exhibit 28    Stanton Invoice re 3/25 - 4/6/20  122

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

Transcript of Lester D. Mardiks, Corporate Designee
Conducted on January 19, 2021                    6

1                    P R O C E E D I N G S

2            MR. SHER:  Because it's a 30(b)(6), I think

3    I -- we had a meet-and-confer last week, and

4    Ms. Willis and Ms. Kobbe, I think we agreed that I'm

5    going -- we'll have the following designations.

6            They have nine deposition topics, I believe,

7    in their Notice.  What we agreed was that Mr. Mardiks

8    would be designated initially for Items 1, 2, 3 --

9    well, some of 4, and 5 and 6.  There's also in my mind

10   certain of those topics have crossover to

11   Mr. Jacobson, depending on how it goes.  So I would

12   see Mr. Jacobson also being able to testify to certain

13   parts of 3, 4 primarily, 6, 7, and 8.  I don't

14   think -- I think there's overlap on some of their --

15   some of the questions.

16           So that's sort of, I think the best we can

17   do.  I think that's what we discussed, but I thought

18   it made sense to put that on the record at the

19   beginning of the deposition.

20                    LESTER D. MARDIKS

21           being first duly sworn or affirmed to

22   testify to the truth, the whole truth, and nothing but

1    the truth, was examined and testified as follows:

2      EXAMINATION BY COUNSEL FOR HC SALON HOLDINGS, INC.

3    BY MS. WILLIS:

4          Q     Good morning.  My name is Jamila Willis.

5    I'm with the law firm of DLA Piper, and I represent HC

6    Salon Holdings in the Chapter 11 cases of Creative

7    Hairdressers, Inc. and Ratner Companies LC.  This

8    deposition is being recorded and transcribed by the

9    Court Reporter.  Please answer all questions verbally

10   and not with physical movements, like a nod or a

11   shrug, so that the Court Reporter can record your

12   answers.

13           Can you please state your full name for the

14   record?

15         A     Lester D. Mardiks.

16         Q     Are you aware you are being deposed in

17   connection with the contested matter in the Chapter 11

18   cases of Creative Hairdressers, Inc. and Ratner

19   Companies LC?

20         A     Yes, I am.

21         Q     Have you ever been deposed before?

22         A     No.

Transcript of Lester D. Mardiks, Corporate Designee
Conducted on January 19, 2021                    8

1      Q     There are a few differences between a

2   deposition and a typical conversation that I want to

3   make you aware of.  Please let me know if you

4   understand each of them.

5            Do you understand that you are testifying

6   under oath and under the penalty of perjury?

7      A     Yes, I do.

8      Q     Do you understand that this means that you

9   are sworn to tell the truth?

10     A     Yes.

11     Q     Is there any reason, such as a physical or

12  mental condition or being under the influence of any

13  medication or substances, that may affect your memory?

14     A     No.

15     Q     Is there any reason that may affect your

16  ability to testify truthfully?

17     A     No.

18     Q     Is there any reason that may affect your

19  ability to read documents that I may show you during

20  the course of this deposition?

21     A     As long as I can wear my reading glasses,

22  none whatsoever.

Transcript of Lester D. Mardiks, Corporate Designee
Conducted on January 19, 2021                    9

1       Q    As a reminder, please wait until I've

2   finished my question before responding.  If you need

3   to have a question repeated, let me know and the Court

4   Reporter can read it back to you.  If you don't

5   understand the question, or don't understand a term I

6   may have used, or if you need me to otherwise rephrase

7   the question, please let me know.

8            Please also let me know if you need a break

9   and we can take one, but know that we will not be able

10  to take a break while a question is pending.

11           Beginning with high school, can you please

12  describe your education?

13      A    I went to high school in suburban Kansas

14  City.  I was an undergrad at Washington University in

15  St. Louis.  I went to law school, Washburn University

16  in Topeka, Kansas.

17      Q    Do you have any professional certifications,

18  licenses or other credentials?

19      A    I have a license to practice law in Kansas,

20  Washington, DC, and the Commonwealth of Virginia.

21      Q    And have you ever been subject to any

22  disciplinary action by a licensing body?

Transcript of Lester D. Mardiks, Corporate Designee
Conducted on January 19, 2021                    10

1        A     No.

2        Q     Have you ever been subject to any

3    disciplinary action by any court or tribunal?

4        A     No.

5        Q     Can you please describe your work experience

6    starting after law school?

7        A     After law school, I was -- in law school I

8    was clerking for a two-person law firm in Topeka,

9    Kansas.  I worked there for a year practicing general

10   law, pretty much anything that, that came into the

11   practice that we could handle, and went into business

12   with one of my clients after that first year in a

13   small restaurant business.  We opened five of them,

14   and that was the largest it was ever going to get.

15            He was on the Board of Directors at a

16   company called Payless Shoes, then Volume Shoe

17   Corporation, and he helped me to land a position there

18   as real estate counsel.  I was there for four years,

19   primarily working on all matter of real estate

20   acquisition, investment, and administration,

21   purchases, ground leases, leases in shopping centers,

22   urban -- urban environments, mixed use developments.

Transcript of Lester D. Mardiks, Corporate Designee
Conducted on January 19, 2021                     11

1              And from there I went -- I came to the
2    Washington, DC area, met Dennis Ratner and went to
3    work as real estate counsel for Ratner Companies --
4    then it was simply Creative Hairdressers, Inc. --
5    helping to open, open hair salons, and the position
6    evolved into more responsibility.  I became General
7    Counsel, Vice President and Senior Vice President.
8         Q    Okay.  Can you give a year or around a year
9    when you met Dennis Ratner?
10        A    1987, February.
11        Q    Are you currently employed?
12        A    Pardon me?
13        Q    Are you currently employed?
14        A    Yes, I am.
15        Q    By whom are you currently employed?
16        A    Ratner Companies.
17        Q    And when did you begin working for Ratner
18   Companies?
19        A    I was a consultant with Ratner from March of
20   '87 until July of '87, and I returned as an -- had to
21   move from the Midwest.  So I went back for a month,
22   took care of things, and started back in July as an

Transcript of Lester D. Mardiks, Corporate Designee
Conducted on January 19, 2021                               12

1    employee of Ratner Companies.

2         Q    And during the course of your employment

3    with Ratner Companies what positions or job titles

4    have you held?

5         A    Real estate counsel, Vice President and real

6    estate counsel, Vice President/General Counsel, Senior

7    Vice President/General Counsel.

8         Q    In those roles, what were your job duties or

9    responsibilities?

10        A    Initially as real estate counsel it was to,

11   to work on real estate matters, including the leasing

12   of spaces in shopping centers, closing stores,

13   renewing leases for stores, consulting on real estate

14   matters.  I had one employee at the time and an

15   assistant, and then later gained additional

16   responsibility for the general legal work of the

17   company, and that involved, in addition to real

18   estate, supervising outside counsel and over time,

19   bringing things in-house as we gained expertise and

20   the ability to do it, the licenses to do it.

21        Q    Have you ever been disciplined or suspended

22   during your employment with Ratner Companies?

Transcript of Lester D. Mardiks, Corporate Designee
Conducted on January 19, 2021                          13

1        A      No.

2        Q      And to whom did you report during your

3   employment at Ratner Companies?

4        A      For a very short time to our Chief Operating

5   Officer, Norman Pozez.  And that's spelled P-O-Z-E-Z.

6   Norman was responsible for bringing me to, to Ratner

7   Companies.  He'd been -- his family started Payless

8   Shoes and he was working as a consultant with Dennis

9   Ratner, so he knew me from Payless and introduced me

10  to Dennis.  So Norman was on his way out as I entered

11  the company and was starting a construction and

12  development business.

13              At that point I worked for the Chief

14  Financial Officer, Ron Segal, until Ron's retirement

15  in around 2009.  And after Ron, I worked for the

16  President of the company, Susan Gustafson.  Subsequent

17  to Susan's departure, for Phil Horvath, and then niche

18  financial officer, Rich Gatti.  I had a dotted line,

19  always a dotted line reporting relationship with

20  Dennis Ratner.

21       Q      And for the record can you spell Susan's

22  last name?

```
1        A     I can.  G-U-S-T-A-F-S-O-N.

2        Q     How would you characterize your relationship

3   with Dennis Ratner?

4        A     He treated me like I was a member of his

5   family.

6        Q     And you understand that you've been

7   designated by Creative Hairdressers and Ratner

8   Companies -- who I may throughout the course of this

9   deposition call the Debtors -- to testify on specific

10  topics today, correct?

11       A     Sure.

12             MS. WILLIS:  Can we pull up Exhibit A, which

13  will be marked as Exhibit 14.

14             (Exhibit 14 was marked for identification

15  and is attached to the transcript.)

16             AV TECHNICIAN:  One second, please.

17             And for the record this is Exhibit 14.

18             THE WITNESS:  Okay.  If you see me on the

19  video looking to my right it's because I have a larger

20  monitor there.  I'm not trying to be rude, I can just

21  see it a little easier.

22             (Simultaneous speaking.)
```

Transcript of Lester D. Mardiks, Corporate Designee
Conducted on January 19, 2021                    15

1      Q    Take a moment to review Page 2 of Exhibit A.

2    It's the last page of this document.

3           MS. WILLIS:  If we can turn over control to

4    the witness.

5           AV TECHNICIAN:  Okay, perfect.  Give me one

6    second.

7      A    So you want me to scroll to the last page?

8      Q    Yes, please.

9      A    Okay.

10     Q    Do you recognize this document?

11     A    I do.

12     Q    What is it?

13     A    It's a Notice for the deposition today.

14     Q    And to confirm the topics that you're

15   prepared to testify about, are you prepared to testify

16   about the Deposition Topic No. 1 listed on this

17   Notice?

18     A    Yes.

19     Q    Are you prepared to testify about Deposition

20   Topic No. 2?

21     A    Yes.

22     Q    Are you prepared to testify about Deposition

Transcript of Lester D. Mardiks, Corporate Designee
Conducted on January 19, 2021                    16

1    Topic No. 3?

2          A    Yes, I am.

3               MR. SHER:  I'm going to object -- by the

4    way, I'm going to object to the form of these

5    questions.  We've already designated, but you can go

6    ahead.  I'm just objecting to this, the form of the

7    questions you're asking in light of the record I put

8    on at the beginning of the deposition, but please

9    continue.

10         Q    Are you prepared to testify about Deposition

11   Topic No. 4?

12         A    Yes.

13         Q    Are you prepared to testify about Deposition

14   Topic No. 5?

15         A    Yes.

16         Q    Are you prepared to testify about Deposition

17   Topic No. 6?

18         A    Yes.

19         Q    Are you prepared to testify about Deposition

20   Topic No. 7?

21         A    To a lesser extent, yes.

22         Q    Are you prepared to testify about Deposition

Transcript of Lester D. Mardiks, Corporate Designee
Conducted on January 19, 2021                    17

1   Topic No. 8?

2       A    It's to a lesser extent on the financial

3   component of the topics, but yes on all of them.

4       Q    What did you do to prepare for this

5   deposition?

6       A    Well, I had meetings with Mr. Sher and

7   Richard Goldberg, his partner, and Emily D'Alessandro.

8   We had in some of those meetings, pretty much most of

9   those meetings, Rodger Jacobson, who's also on this,

10  on this session this morning, who is our financial

11  officer, Chief Financial Officer, and we went over

12  many, many documents and emails.

13      Q    Aside from Mr. Sher and his associates,

14  partners, and colleagues, and Mr. Jacobson, were there

15  any other people who were present at those meetings?

16      A    No.

17      Q    And how often did you meet to prepare for

18  this deposition, or how many times did you meet?

19      A    How many times?  Under six.  Somewhere

20  between, you know, three, four, five, six.  Some of

21  them were short sessions, some of them longer.  And we

22  spent -- I should say that I spent considerable amount

Transcript of Lester D. Mardiks, Corporate Designee
Conducted on January 19, 2021                    18

1    of time on my own going over, reading things.

2         Q    How much time would you say that you spent

3    preparing for this deposition?

4         A    In the last week, well over 20 hours.

5    Probably 30 plus.

6         Q    And did you take any notes during the

7    meetings or while you were reading documents to

8    prepare for this deposition?

9         A    I'm sorry, could you say that again, please,

10   ask that again?

11        Q    Did you take any notes during the meetings

12   while you were preparing for the deposition?

13        A    Yes, I did.

14        Q    Did you review any documents to prepare for

15   this deposition?

16        A    Yes.

17        Q    Which documents did you review?

18             MR. SHER:  Objection.

19        A    Many, many.  Hundreds of emails with

20   attachments.  I mean the key, the key ones were the

21   APA, the TSA.  Asset Purchase Agreement is what I mean

22   by APA, and Transition Services Agreement, TSA.  But

Transcript of Lester D. Mardiks, Corporate Designee
Conducted on January 19, 2021                         19

1    there were, there were discussions had around those

2    and other, other documents.  It would be in the

3    hundreds.

4              MS. WILLIS:  I'd like to ask the Court

5    Reporter to pull up Exhibit B which will be marked as

6    Exhibit 15, I believe.

7              AV TECHNICIAN:  Yes, one second, please.

8              (Exhibit 15 was marked for identification

9    and is attached to the transcript.)

10             AV TECHNICIAN:  Exhibit No. 15 for the

11   record.  Thank you.

12             And, sir, you have access now.

13             THE WITNESS:  Okay.

14       Q    Do you recognize this document?

15       A    I do.

16       Q    What is it?

17       A    Debtors' Motion to Compel HC Salon Holdings

18   Inc. -- took the title away.  Just a second.

19             MR. SHER:  Can we give Mr. Mardiks control

20   of the document, please.

21             AV TECHNICIAN:  Yeah, he has control.

22             MR. SHER:  Okay.  Thank you.

Transcript of Lester D. Mardiks, Corporate Designee
Conducted on January 19, 2021                    20

1       A    And the rest of what I was saying is, to

2   Comply with the Transition Services Agreement.

3       Q    Are you generally familiar with the relief

4   the Debtors are seeking by this motion?

5       A    I am.

6       Q    Can you turn to Page 3 of this document and

7   review Paragraph 5.

8            AV TECHNICIAN:  Let me help you real quick.

9       A    You said Paragraph 5 on Page 3.

10           Okay, yes.

11      Q    Are you familiar with any Asset Purchase

12  Agreements between the Debtors and HC Salon?

13      A    Yes, I am.

14      Q    Can you describe what role, if any, you had

15  with respect to preparation, negotiation and execution

16  of the Asset Purchase Agreement?

17           MR. SHER:  Objection.  You can answer.

18      A    Almost none.  Very little.

19      Q    Okay.  Can you turn to Page 1 of this

20  document and review the first paragraph.

21      A    Of this document that we're currently

22  looking at?

Transcript of Lester D. Mardiks, Corporate Designee
Conducted on January 19, 2021                        21

```
1        Q     Yes, of this document.

2        A     (Reviewing.)

3              First paragraph?

4        Q     On Page 1.

5        A     Okay.  Yes.

6              MR. SHER:  For the record, Ms. Willis, are

7    you talking about the Introduction, or Paragraph 1?

8              MS. WILLIS:  The first paragraph, so before

9    the Introduction.

10             MR. SHER:  Before the Introduction.  Oh,

11   thank you.

12       Q     Are you familiar with any Transition

13   Services Agreements between the Debtors and HC Salon?

14       A     Yes, I am.

15             MS. WILLIS:  Can I ask the Court Reporter --

16   we're going to come back to this Exhibit, but may I

17   ask the Court Reporter now to pull up Exhibit C, which

18   will be marked as Exhibit 16.

19             (Exhibit 16 was marked for identification

20   and is attached to the transcript.)

21             AV TECHNICIAN:  Exhibit 16 for the record.

22       Q     Do you recognize this document?
```

Transcript of Lester D. Mardiks, Corporate Designee
Conducted on January 19, 2021                    22

```
 1        A     Yes, I do.

 2        Q     What is it?

 3        A     Order approving and authorizing the sale of

 4    substantially all of Debtors' assets pursuant to the

 5    Amended/Restated Asset Purchase Agreement, free and

 6    clear of all liens, claims, encumbrances and other

 7    interests; B, approving the assumption and assignment

 8    of certain executory contracts and unexpired leases

 9    relating thereto; and C, granting related relief.

10             MS. WILLIS:  Can we also make sure that the

11    witness has control of the document if he doesn't

12    already.

13             AV TECHNICIAN:  He does.

14             Sir, if you click on the document, you will

15    be able to -- there you go, so you do have access.

16             THE WITNESS:  Okay, thank you.

17             AV TECHNICIAN:  You're welcome.

18        Q     Can you turn to Page 30 of this document?

19        A     (Complying.)

20             Easier this way.

21             Yes, here it is.

22        Q     Do you recognize this document?
```

1        A      It's the Amended Asset Purchase Agreement.

2        Q      I'd like to ask you some questions about the

3   Asset Purchase Agreement, if I may call this document

4   the Asset Purchase Agreement.  You were not involved

5   in drafting the Asset Purchase Agreement or its

6   disclosure schedules; is that correct?

7        A      I probably did have a minor role in putting

8   together information for schedules, but I was not

9   involved in the preparation or negotiation of the body

10  of the document.

11       Q      Did you review the Asset Purchase Agreement

12  or any previous version of the Asset Purchase

13  Agreement prior to --

14       A      I have.

15       Q      -- execution?

16       A      I'm sorry.  I have.  I didn't mean to step

17  on your question.

18       Q      Did you have any discussions with

19  representatives or advisors of the Debtors regarding

20  any changes or prior versions of the Asset Purchase

21  Agreement?

22       A      I don't believe so.

Transcript of Lester D. Mardiks, Corporate Designee
Conducted on January 19, 2021                    24

1        Q     Did you discuss or negotiate the Asset

2    Purchase Agreement, or any prior versions of the Asset

3    Purchase Agreement, directly with any representative

4    of HC Salon?

5        A     I don't think so.

6        Q     Did you review the Amended and Restated

7    Asset Purchase Agreement, this version of the Asset

8    Purchase Agreement, after it was executed?

9        A     Yes.

10       Q     What, if any, role did you have with respect

11   to consummating the sale transaction or closing the

12   Asset Purchase Agreement on June 4?

13       A     Helping with due diligence primarily,

14   gathering information.

15       Q     What, if any, role did you have with respect

16   to performance under the Asset Purchase Agreement?

17             MR. SHER:  Objection.  You can answer.

18       A     I'm not sure I understand the question.

19       Q     I'll rephrase.

20       A     I'm sorry.  Could you either repeat it or

21   restate?

22             MR. SHER:  Mr. Mardiks, let her rephrase.

Transcript of Lester D. Mardiks, Corporate Designee
Conducted on January 19, 2021                    25

1    If you don't understand a question, please tell her

2    that and she'll rephrase her questions.

3              THE WITNESS:  Yeah, that's what I did say.

4              MR. SHER:  Thank you.

5         Q    Yeah, I can rephrase the question.

6              Did you have -- did you review the Asset

7    Purchase Agreement in order to counsel people with

8    respect to performance under the Asset Purchase

9    Agreement?

10             MR. SHER:  Objection.

11        A    I -- we are performing under the Asset

12   Purchase Agreement, and did at the time.

13        Q    Have you reviewed the definitions under the

14   Asset Purchase Agreement?

15        A    Yes.

16        Q    In your opinion, is there any ambiguity in

17   the Asset Purchase Agreement as it relates to the

18   payment of wind down costs?

19        A    No.

20        Q    I'd like to turn to Page 4 of the Asset

21   Purchase Agreement.

22             AV TECHNICIAN:  Sorry, let me help you real

Transcript of Lester D. Mardiks, Corporate Designee
Conducted on January 19, 2021                    26

1    quick.

2         Q    It's -- for ease, it's on Page 37 of the

3    document.

4              AV TECHNICIAN:  Page 37 of the PDF?

5              MR. SHER:  Maybe, Ms. Willis, you could just

6    go to a section or a reference.  That might sometimes

7    be easier with the paginations.

8              MS. WILLIS:  Right.

9         Q    I'd like you to review on this page the

10   definition of assumed liabilities.

11        A    (Complying.)

12             You want me to read it?

13        Q    Just review it briefly.  You don't have to

14   read it.

15        A    Okay.

16        Q    What is your understanding of what an

17   assumed liability refers to?

18        A    A liability that the purchaser is going to

19   assume, take on, be responsible for.

20        Q    Can you point to where it says in this

21   document that the purchaser has assumed the wind down

22   costs of the Debtor?

Transcript of Lester D. Mardiks, Corporate Designee
Conducted on January 19, 2021                    27

```
 1       A    At the time of this document I'm not sure
 2  the wind down costs, or the concept of the wind
 3  down --
 4            (Court Reporter clarification.)
 5       A    -- were known at this point in time, or we
 6  didn't, we didn't have a budget for wind down because
 7  we didn't know what it would be.  It was discussed,
 8  but it was certainly not concrete at that point in
 9  time.
10       Q    And can you turn to Page 8 of the APA, which
11  is Page 41 of the PDF.
12       A    (Complying.)
13       Q    There, there is no section reference on this
14  page, but we're going to be discussing the definition
15  of excluded liabilities.
16       A    Okay.
17       Q    What is your understanding of what an
18  excluded liability refers to?
19       A    It's not in front of me on the page, but an
20  excluded liability would be one that would not be
21  assumed by the purchaser.  Excluded from, from the
22  transfer.
```

Transcript of Lester D. Mardiks, Corporate Designee
Conducted on January 19, 2021                    28

1      Q    Okay.  I'm also not seeing the full page of

2  this document.  I'm not sure if there's a way --

3           AV TECHNICIAN:  Let me help you.

4      Q    It looks like it's been cut off.

5           AV TECHNICIAN:  -- with the document real

6  quick.  It's going to be from the PDF Page No. 41.

7  Are we on there?

8           MS. WILLIS:  Yes.

9           AV TECHNICIAN:  And what part of the

10  document?

11          MS. WILLIS:  Can we turn to the next page.

12  I'm going to ask the witness about section --

13  subsection (f).

14          AV TECHNICIAN:  Okay.  Let me -- sir, you

15  have access now again.

16          THE WITNESS:  Okay, thank you.

17          AV TECHNICIAN:  You're welcome.

18     Q    Can you review subsection (f) on this page?

19     A    Yes.

20          (Reviewing.)

21     Q    What is your understanding of what this

22  provision provides?

Transcript of Lester D. Mardiks, Corporate Designee
Conducted on January 19, 2021                    29

1        A      Well, this is one of several provisions

2   defining what liabilities would be excluded from the

3   transfer, the sale.

4        Q      And what is included in this provision, your

5   understanding?

6        A      Liabilities for fees, costs and expenses

7   that had been incurred, or that are incurred or owed

8   by sellers in connection with this agreement or the

9   administration of the bankruptcy cases, including all

10  fees and expenses of professionals engaged by sellers,

11  and administrative expenses and priority claims

12  accrued through the closing date, and specified

13  post-closing administrative wind down expenses of the

14  bankrupt estates pursuant to the Bankruptcy Code,

15  which such amounts shall be paid by sellers from the

16  proceeds collected in connection with the excluded

17  assets, and all costs, expenses incurred in connection

18  with the, 1, negotiation, execution and consummation

19  of the transactions contemplated under this agreement

20  and each of the other documents delivered in

21  connection herewith; 2, the negotiation, execution and

22  consummation of the DIP financing agreement; and 3,

Transcript of Lester D. Mardiks, Corporate Designee
Conducted on January 19, 2021                              30

1   the consummation of the transactions contemplated by

2   this agreement, including any retention bonuses,

3   success fees, change of control payments, and any

4   other payment obligations of sellers payable as a

5   result of the consummation of the transactions

6   contemplated by this agreement and the documents

7   delivered in connection herewith.

8       Q    And can you turn to Page 17 of the Asset

9   Purchase Agreement, which is Page 50 of the PDF,

10  Section 2.3.

11          AV TECHNICIAN:  Let me assist with the

12  document, please.

13          Okay, sir, you have access.

14      Q    Do you recall how much HC Salon paid in cash

15  to fund what's referred to here as the wind down?

16      A    At this point in time?

17      Q    Yes.

18      A    This section calls for the, a fund of --

19  funding of $100,000.

20      Q    And the term wind down is capitalized in

21  this section.  What is your understanding what a

22  capitalized term means in this document?

Transcript of Lester D. Mardiks, Corporate Designee
Conducted on January 19, 2021                         31

1      A    It's a defined term elsewhere in the
2  agreement.
3      Q    Do you have an understanding of what wind
4  down means in the context of this agreement in your
5  own words?
6      A    Well, in my words wind down is bringing to a
7  conclusion through process the existence of the
8  bankrupt companies.
9      Q    And the $100,000 that you mentioned, that
10 amount was paid, correct?
11     A    To my knowledge.
12     Q    Are you aware of anywhere in the APA that
13 provides that HC Salon will pay wind down costs in
14 excess of $100,000?
15     A    Indirectly, yes.
16     Q    Can you point to that provision?
17     A    Where, where the Transition Services
18 Agreement is referenced, it's, it's in here, and the
19 fact that the word fund is used here implies that it's
20 not the end of it.  In Section 2.3, the fact that we
21 only excluded specified, specified portions of the
22 liabilities related to wind down that weren't

1    specified.  That would be the company's position.

2         Q    Are you aware of anywhere in the APA that it

3    states that the reimbursable or wind down cost

4    obligations are not capped or limited other than what

5    you just referenced?

6         A    No.

7              MR. SHER:  Can I have a point of order with

8    Mr. Kobbe and Ms. Willis?  I'm assuming the standard

9    protocol is you reserve all objections except for

10   form, correct?

11             MR. KOBBE:  That is correct.

12             MR. SHER:  I just want to make sure we have

13   the same protocol.  I just -- thank you.

14             MR. KOBBE:  We do.

15             MR. SHER:  Thank you.

16             MS. WILLIS:  Okay.  I don't believe that

17   there is a question pending, but I'm going to ask the

18   Court Reporter to pull up Exhibit 15, the Debtors'

19   Motion to Compel, and turn to Paragraph 35 on Page 15.

20             AV TECHNICIAN:  Is everybody able to see the

21   document, just to make sure?

22             THE WITNESS:  I can see it.

Transcript of Lester D. Mardiks, Corporate Designee
Conducted on January 19, 2021                    33

1              AV TECHNICIAN:  Thank you.

2        Q    The last sentence of this paragraph

3   contemplates a separate wind down budget.

4        A    The last sentence -- I'm not sure I can see

5   the last sentence.  The bottom of my page says the

6   Amended APA.  Is that the last sentence?

7              MS. WILLIS:  Can we scroll down just a bit.

8        A    There we go.

9        Q    The beginning of the last sentence.

10             AV TECHNICIAN:  Let me -- sorry, it just --

11  Mr. Mardiks, you have access to my computer right now

12  so let me get a second.

13       A    I can see the entire sentence now.

14       Q    Is it your understanding that HC Salon

15  agreed to fund in full the wind down budget that would

16  be included in a separate budget?

17       A    Yes, that's the company's position.

18       Q    Where is that contained in the APA?  Is

19  there any support for that interpretation?

20       A    Well, it refers to the Transition Services

21  Agreement yet to be developed, which would address the

22  wind down.

Transcript of Lester D. Mardiks, Corporate Designee
Conducted on January 19, 2021                    34

1      Q    And aside from the APA and the Transition
2  Services Agreement, are there any other documents that
3  would support that interpretation?
4      A    Per likely some of the conversations that
5  were held in emails that were sent back and forth
6  between attorneys for companies, parties to these
7  agreements.
8      Q    Do you have any communication with
9  representatives of HC Salon that support this view?
10     A    Representatives?  To certain aspects of it,
11  yes, I do.
12          MS. WILLIS:  Can the Court Reporter turn
13  back to Exhibit 16, which is the Sale Order attaching
14  the Asset Purchase Agreement, and turn to Page 51 of
15  the document, which is Page 18 of the Asset Purchase
16  Agreement, Section 2.5.
17     Q    Is it your understanding that the Transition
18  Services Agreement was a closing deliverable under the
19  Asset Purchase Agreement?
20     A    (Reviewing.)
21          Give me just a second, please.
22          If it was to be, it's not mentioned in 2.5.

Transcript of Lester D. Mardiks, Corporate Designee
Conducted on January 19, 2021                    35

1        Q     Is it your understanding that the Asset

2   Purchase Agreement specifically contemplated that the

3   parties would enter into a Transition Services

4   Agreement?

5        A     Yes, it does.

6        Q     Why was a Transition Services Agreement

7   necessary in your view?

8        A     In my view, because -- several reasons, but

9   chiefly because all of this was occurring during the

10  beginning of the pandemic.  Salons that the company

11  operated, the sellers operated, were shut down, many

12  employees were furloughed.  The primary objective was

13  to get an agreement, get people paid.  Funds were

14  dwindling.  That was critical.

15             And the transition services were because the

16  purchasers weren't equipped at that moment in time to

17  step in and effectively operate salons which would be

18  opening at some point soon down the road that had to

19  be planned for.  They needed our systems, our bank

20  accounts, our people, pretty much everything you would

21  need to run a company of this size.

22             MS. WILLIS:  Can the Court Reporter turn to

Transcript of Lester D. Mardiks, Corporate Designee
Conducted on January 19, 2021                    36

1    Page 40 of this document, which is Page 7 of the Asset

2    Purchase Agreement, with the defined term excluded

3    assets.

4         A    Okay.  It starts here and goes on to the

5    next page.

6         Q    Are you familiar with the term excluded

7    asset?

8         A    Yes.

9         Q    What is your understanding of what an

10   excluded asset is under the APA?

11        A    Are we looking at the Asset Purchase

12   Agreement here?

13        Q    Yes.

14        A    Okay.  Excluded assets would be those that

15   are not to transfer, are not being sold as a part of

16   this agreement.

17        Q    If I were to say that excluded assets

18   include assets to which HC Salon would otherwise be

19   entitled but determined to leave with the Debtors,

20   would you agree?

21        A    Probably comes pretty close if not exact.

22   I'd have to think about it to say with certainty, but

Transcript of Lester D. Mardiks, Corporate Designee
Conducted on January 19, 2021                          37

1    I think that's a pretty good definition.

2         Q    Can we turn to Page 14 of this document,

3    which is Page 14 of the Sale Order, Paragraph 7.

4              What is your understanding of this provision

5    of the Sale Order, what it says?

6         A    This relates to settlement from, from

7    litigation to which the seller was entitled, involved

8    Visa and MasterCard and it involved the merchant fees

9    being excessive.  And so the proceeds from the suit

10   were paid to those who were damaged, the merchant, the

11   sellers were in that group.  And the reason it's

12   excluded is because it was unencumbered by M&T Bank

13   and the rest of the companys' assets that were

14   included in the sale were part of that lien, part of

15   the M&T liens.

16        Q    You said that the proceeds were unencumbered

17   by M&T Bank?

18        A    Yes.

19        Q    Were they unencumbered in general, were

20   there no liens on those proceeds?

21        A    There was no viable lien because there was

22   none specifically filed.

Transcript of Lester D. Mardiks, Corporate Designee
Conducted on January 19, 2021                    38

1        Q     Did HC Salon have a lien or any legal rights

2     to the settlement proceeds in your view?

3        A     In negotiation, no.  It's excluded here in

4     this agreement.  It was agreed to be excluded.

5              MS. WILLIS:  Pull up Exhibit D, which will

6     be Exhibit 17.

7              AV TECHNICIAN:  One second, please.

8              (Exhibit 17 was marked for identification

9     and is attached to the transcript.)

10             AV TECHNICIAN:  Exhibit 17.

11       Q     Can we turn to the second page.

12             Do you recognize this document?

13       A     Transition Services Agreement.

14             Second page --

15       Q     Were you involved -- I'm sorry.

16       A     I am, too.  I stepped on your words.  Going

17    to the second page.

18       Q     Apologies.

19             Not the second page of the Transition

20    Services Agreement, the second page of the document so

21    that you can see its title.  Can we just --

22             AV TECHNICIAN:  Let me help.  Let me go

Transcript of Lester D. Mardiks, Corporate Designee
Conducted on January 19, 2021                    39

1   back.

2                THE WITNESS:  Give me a hand.

3                AV TECHNICIAN:  Yeah.

4        Q    Were you involved in the drafting of the

5   Transition Services Agreement or its schedule?

6        A    Other than, than helping with, with the

7   margins with some items for schedules, I don't think I

8   was at all.

9        Q    Can you describe with specificity the roles

10  you had with respect to drafting, negotiation and

11  execution of the Transition Services Agreement or its

12  schedule?

13               You mentioned at the margins.  What does

14  that mean?

15       A    Well, if, for instance, anything related to

16  rejecting or moving forward with locations, salon

17  locations, I was involved in some of those decisions

18  in putting together schedules related to that, or

19  related to the contracts that were being assumed and

20  being rejected.  But not the, not the words of the

21  body of the agreement, nothing with the concepts.

22       Q    Did you review the Transition Services

Transcript of Lester D. Mardiks, Corporate Designee
Conducted on January 19, 2021                                    40

1    Agreement or its schedule prior to its execution?

2         A    Probably.  I probably did see it before it

3    was signed.

4         Q    Did you have any discussions with

5    representatives or advisors of the Debtors regarding

6    the Transition Services Agreement prior to its

7    execution?

8         A    If I did, and I probably did, they were

9    minor, not relating to major aspects of the agreement.

10        Q    Without revealing any privileged

11   information, can you describe the nature of those

12   discussions?  If you remember them.

13        A    You know, it would be creating them.

14   It's -- they're not things that I remember.  It was a

15   busy point in time and I was asked to help put

16   schedules together about things that I was directly

17   working on or people that worked for me were directly

18   working on.

19            It was, it was a collaboration of a lot of

20   little parts.  And to describe the discussions about

21   it, they were mostly had by counsel on both sides,

22   people with expertise to put something like this

Transcript of Lester D. Mardiks, Corporate Designee
Conducted on January 19, 2021                           41

1    together.

2         Q    Did you discuss or negotiate the Transition

3    Services Agreement with any representative of HC

4    Salon, including their counsel?

5         A    No, I did not.

6         Q    What, if any, role did you have, did you

7    have or do you have, with respect to performance under

8    the Transition Services Agreement?

9              MR. SHER:  Objection.

10        A    I'm one of those few people that are now

11   responsible for the wind down of Ratner Companies and

12   Creative Hairdressers, Inc.  I'm an officer of the

13   company.

14        Q    When you say responsible for the wind down

15   of Creative Hairdressers and Ratner Companies, Inc.,

16   what do you mean?

17        A    Well, taking care of remaining

18   administrative affairs and making decisions, signing

19   documents, addressing issues, dealing with

20   correspondence, with people through the mail, through

21   email, phone calls, taking care of every, every

22   remaining step that will be required to satisfy our

Transcript of Lester D. Mardiks, Corporate Designee
Conducted on January 19, 2021                              42

1   fiduciary obligations to the company and those who are

2   interacting with it.

3        Q    When you say addressing issues, what do you

4   mean?  What sort of issues are you addressing?

5        A    There are -- there are people that contact

6   us with questions, whether it be former employees,

7   employees that were employed by Ratner Companies,

8   Creative Hairdressers, Inc., that are no longer

9   employed by HC, people who are employed by both,

10  vendors, similar kinds of circumstances, that had

11  relationships in the past, some that have

12  relationships that continued on that need help from us

13  dealing with matters that are before the Court,

14  preparing and managing budgets.

15            In doing our job, we're doing it in such a

16  way that we try to do it as efficiently, meaning doing

17  it well, but inexpensively, things of that nature.

18       Q    Do you believe that there's any ambiguity in

19  the Transition Services Agreement as it relates to

20  payment of wind down costs and expenses?

21       A    No, I don't.

22       Q    What is your understanding of the purpose of

Transcript of Lester D. Mardiks, Corporate Designee
Conducted on January 19, 2021                    43

1    the TSA?

2        A    The purpose of the TSA was to cover a

3    transitional period of time in which the buyers needed

4    help from the sellers to run the business and to get

5    themselves -- the buyer to get itself up-to-speed to

6    do everything that needed to be done in its own

7    behalf.  And so during the course of the transition,

8    the seller would become decreasingly involved until no

9    longer needed.

10       Q    Can you review on this page the recitals of

11   the Transition Services Agreement, specifically the

12   second recital.

13       A    (Complying.)

14            I'm sorry, the second what?

15       Q    Recital.

16       A    Oh, okay.

17       Q    The second whereas paragraph.

18       A    (Reviewing.)

19            Okay, I just read it.

20       Q    Is this consistent with your understanding

21   of the purpose of the Transition Services Agreement --

22       A    Yes, it is.

Transcript of Lester D. Mardiks, Corporate Designee
Conducted on January 19, 2021                                    44

1          Q       -- this recital?

2                  Does it state anywhere in this second

3    recital or the recital just before it that the purpose

4    of the Transition Services Agreement is that HC Salon

5    would be paying for all wind down costs to avoid

6    administrative insolvency of the Debtors?

7          A       In these two paragraphs does it say

8    specifically that?

9                  (Reviewing.)

10                 It doesn't say specifically that.  It just

11   refers to the APA which talks about wind down and it's

12   elaborated on more in the Transition Services

13   Agreement.

14         Q       Was your understanding that upon execution

15   of this Transition Services Agreement that HC Salon

16   lacked the necessary infrastructure to operate salons

17   it acquired under the Asset Purchase Agreement?

18         A       I'm sorry, the first part of your question,

19   if you could just repeat the whole thing it would help

20   me.

21         Q       I can repeat it.

22                 Is it your understanding that HC Salon

Transcript of Lester D. Mardiks, Corporate Designee
Conducted on January 19, 2021                          45

1    lacked the necessary infrastructure to operate the

2    salons it had acquired under the Asset Purchase

3    Agreement?

4         A    You mean as of now or as of then?

5         Q    As of the entry into this agreement, this

6    Transition Services Agreement.

7         A    Yeah, that was the purpose of this

8    agreement, to help, help the buyer run the business.

9    You know, when I say help, that includes using our

10   systems, our banks, our -- our people.  Our being the

11   seller.  It was, it was a collaborative situation for

12   a period of time.

13        Q    And just to clarify on the record, when you

14   say the seller, you mean the Debtors, Creative

15   Hairdressers, Inc. and Ratner Companies LC?

16        A    Yes.  Yes.

17        Q    What was your understanding of how long the

18   Transition Services Agreement was intended to last?

19        A    Three months, unless terminated sooner.

20        Q    Can we turn to Page 9 of the Transition

21   Services Agreement, which is Page 10 of the document,

22   Section 9.1.

Transcript of Lester D. Mardiks, Corporate Designee
Conducted on January 19, 2021                    46

1              And to clarify, the term was three months

2    from what date?

3         A    What date was -- I think the date that this

4    became effective was June 4.

5         Q    So that would be September 4th, 2020,

6    correct?

7         A    Correct.

8              You wanted Section 9.1 up?

9         Q    Yes, Section 9.1.

10             And the document contemplates that the

11   Transition Services Agreement in its term can be

12   terminated prior to the three months, correct?

13        A    Yes.

14             MS. WILLIS:  Can we pull up Exhibit E, which

15   will be marked as Exhibit 18.

16             AV TECHNICIAN:  Sure.

17             (Exhibit 18 was marked for identification

18   and is attached to the transcript.)

19             AV TECHNICIAN:  Exhibit 18 for the record.

20   One second.

21             Sir, you have now access to the document.

22             THE WITNESS:  Okay.

Transcript of Lester D. Mardiks, Corporate Designee
Conducted on January 19, 2021                    47

1        Q    Do you recognize this document?

2        A    Yes, I do.

3        Q    What is it?

4        A    It's a notice sent to the company, sent to

5    me on behalf of the company, stating that the TSA

6    would be terminated effective July 17th, with

7    exception of stated contracts that would continue on.

8        Q    What was your understanding of the effect of

9    the delivery of this document?

10        A    It's clear on its face, I think, that HC

11    wished to terminate the services, except for

12    continuing to use these, these contracts, which is

13    what it says.  Now whether or not that's how it was

14    played out is another matter, but that's what we were

15    told in this letter.

16        Q    What is your understanding of how, to use

17    your term, how it played out?

18        A    I don't see our bank accounts listed here,

19    Our services from some of the people who were still

20    employed in helping HC directly.  There were things

21    that it carried over for a period of time other than

22    these agreements that are listed.

Transcript of Lester D. Mardiks, Corporate Designee
Conducted on January 19, 2021                          48

1      Q    Aside from bank accounts and employment

2   services, what other things carried over?

3      A    Some of the other systems were still being

4   used; IT-related particularly, some storage services,

5   some things related to the bankruptcy.  Use of the

6   bank accounts alone triggered fees for the U.S.

7   Trustee, noticing services.  There were a number of

8   things.  I couldn't necessarily say that I could give

9   you all of them at the moment, but there were a number

10  of these kinds of things that some -- some were ceased

11  and some weren't.

12     Q    Okay.  I want to go through what you just

13  described just to clarify the record and make sure I'm

14  understanding.

15          Are you saying that following delivery of

16  the letter, that various IT systems were used by HC

17  Salon, various of the Debtors' IT systems?

18     A    Yes.  Yes, I am saying that.

19     Q    Okay.  Are you saying that following the

20  delivery of this letter HC Salon used the Debtors'

21  bank accounts?

22     A    Yes.

Transcript of Lester D. Mardiks, Corporate Designee
Conducted on January 19, 2021                    49

1      Q    Are you saying that following the delivery

2   of this letter HC Salon used services from the

3   Debtors' employees for its benefit?

4      A    Since July 14 -- yes, yes, I do know that at

5   least one.

6      Q    When you mentioned storage services, are you

7   referring to data storage, electronic storage?

8      A    Some paper files storage.

9      Q    And are you saying that following the

10  delivery of this letter HC Salon used the Debtors'

11  storage services?

12     A    I don't think that contract was rejected.

13     Q    Do you know the contact counter party of

14  that contract?

15     A    I -- I could get that information for you.

16  I don't have it in front of me.

17     Q    Are you saying that following the delivery

18  of this letter HC Salon used the Debtors' noticing

19  services?

20     A    Well, actually it was at their

21  recommendation that we were using that company, and it

22  does -- it did continue.

Transcript of Lester D. Mardiks, Corporate Designee
Conducted on January 19, 2021                              50

1       Q       Which company was at the recommendation --

2       A       Epiq.  Epiq.

3       Q       And what services did Epiq provide?

4       A       Noticing in the bankruptcy.

5       Q       Did HC Salon require noticing in the

6   bankruptcy following July 14, 2020?

7       A       I'm not sure, but I could -- again, I could

8   get that information for you.

9       Q       Are the Debtors obligated by statute or

10  court rules that you know to hire a noticing agent in

11  their bankruptcy case?

12      A       I don't -- I don't know the answer to that.

13      Q       Are the Debtors seeking payment of any

14  expenses or fees for services that were provided after

15  July 14, 2020?

16      A       Say again, or did what occur after July 14?

17      Q       Are the Debtors seeking services for the

18  reimbursement of fees or expenses for services

19  provided after July 14, 2020?

20      A       It's a mix of things.  It's probably mostly

21  wind down, but there were services that were provided

22  after July 14th.

Transcript of Lester D. Mardiks, Corporate Designee
Conducted on January 19, 2021                              51

1      Q    At any point during the pendency of the
2  Transition Services Agreement did the Debtors believe
3  that HC Salon was in breach of the Transition Services
4  Agreement?
5      A    I'm not aware of any.  There may have been
6  little things that I wouldn't call breach; slow
7  payment, things like that.
8      Q    And the Debtors never accused or called a
9  breach under the Transition Services Agreement; is
10  that correct?
11     A    Not that I know of.
12     Q    What is your understanding of when the
13  Transition Services Agreement terminated?  What date.
14     A    September 4, 2020.
15          MS. WILLIS:  I'd like to go back to Exhibit
16  17, the Transition Services Agreement.
17          AV TECHNICIAN:  One second, please.
18          MS. WILLIS:  And can we go to Page 16 of the
19  Transition Services Agreement, which is Page 17 on the
20  document.
21     Q    Do you know what this document is, this
22  portion of the document?

Transcript of Lester D. Mardiks, Corporate Designee
Conducted on January 19, 2021                    52

1        A      I do, Schedule of Services.

2        Q      Is it your understanding that the transition

3    services were limited to the services listed on this

4    document?

5        A      By the terms of the agreement it would be.

6    As to whether or not there was cooperation outside of

7    this, it could have occurred, but this was pretty

8    encompassing.

9        Q      Are you aware of any cooperation outside of

10   this document?

11       A      I'd have to review this agreement and go

12   back through, through just memory and notes and emails

13   to say if there was anything.  If there was anything,

14   it would have been somewhat minor.  This anticipated

15   the scope.

16              MS. WILLIS:  And does the witness have

17   control of this document so he can scroll through if

18   needed?

19              AV TECHNICIAN:  Yes.

20              THE WITNESS:  Okay.  Yes, I do.

21       Q      Do you generally have an understanding of

22   the payments HC Salon made under the Transition

Transcript of Lester D. Mardiks, Corporate Designee
Conducted on January 19, 2021                53

1    Services Agreement?

2        A    Other than from budgets I don't.  I mean I

3    didn't receive or process checks or electronic

4    payments so I don't know when it occurred or -- if it

5    weren't for financial reports, I wouldn't know if they

6    occurred.

7        Q    Do you have any reason to believe that HC

8    Salon did not fully reimburse the Debtors for the

9    services listed on the Schedule of Services?

10       A    I -- at present the services under the

11   Transition Services Agreement, I think if anything is

12   unpaid, it's not, it's not something significant.

13   It's -- except -- come after the Transition Services

14   Agreement.

15            So I know that during this time there were

16   things that we had to discuss and we had to ask to be

17   paid that I believe for the most part, if not the

18   entire part, they were paid.

19       Q    You previously mentioned, I guess we can

20   call them areas of coordination that you believed HC

21   Salon owed the Debtors reimbursement for.  For

22   example, one was noticing services.  Are those listed

Transcript of Lester D. Mardiks, Corporate Designee
Conducted on January 19, 2021                        54

1    on the Schedule of Services?

2         A    I'd have to look at it.

3              MR. SHER:  Objection.

4         Q    I'll give you --

5         A    I don't see it specifically here, and it --

6    it may be one of those things that goes beyond the

7    TSA, into the wind down.

8         Q    When you say beyond the TSA, into the wind

9    down, what do you mean?

10        A    Well, after the specified services here were

11   no longer needed and the Transition Services Agreement

12   no longer in effect, there's still the wind down to

13   consider.  Companies are not wound up yet and the

14   duties that we discussed earlier are being performed.

15        Q    I'm sorry, could you repeat that last part?

16   I didn't hear --

17        A    I said there's a point in time when the

18   Transition Services Agreement is no longer in effect,

19   and then some of these things that were going on

20   during the transition services period, during its

21   term, were still going on and they become part of the

22   wind down and they may not be specified here.  They're

Transcript of Lester D. Mardiks, Corporate Designee
Conducted on January 19, 2021                         55

1    wind down expenses.

2              So you asked me specifically about noticing.

3    I don't see it specifically mentioned here.  That was

4    the answer to your question.

5         Q    This is where virtual depositions get a

6    little bit difficult because I'm going to ask you to

7    look at two documents.

8              MS. WILLIS:  Can we turn back to Exhibit B,

9    which is Exhibit 15, Paragraph 29, which is on Page 12

10   of the document.

11             MR. SHER:  Sorry, which one, Ms. Willis?

12             MS. WILLIS:  This is the Motion to Compel.

13             MR. SHER:  Okay, thank you.

14        Q    The last sentence of this paragraph

15   describes categories of fees and costs.  I'm going to

16   ask you to review those categories of fees and costs

17   and let me know where in the Schedule of Services they

18   appear, if at all.

19        A    Okay.

20             (Reviewing.)

21             MS. WILLIS:  And for the technician, we may

22   need to go back to Exhibit 17, Page 17 through 19 of

Transcript of Lester D. Mardiks, Corporate Designee
Conducted on January 19, 2021                          56

1   that document, or rather Page 17 through 20 of that

2   document.

3               AV TECHNICIAN:  Okay.  Let me know when you

4   want to go there and I can go there.

5               Sorry.  You said Page 17, or Page 19,

6   counsel?

7               MS. WILLIS:  Page 17 of Exhibit D, Exhibit

8   17.

9               AV TECHNICIAN:  Okay.

10              MR. SHER:  Is there --

11              AV TECHNICIAN:  Just to make sure, the

12   witness has access to this document.

13              THE WITNESS:  Okay.

14       Q    The question is whether or not the

15   categories of fees and costs listed in Paragraph 29 of

16   the motion are listed in the Schedule of Services of

17   the TSA.

18       A    I think they're two different things.  One

19   discusses wind down, and this discusses the actual

20   transition.

21       Q    Could you describe what you mean by that,

22   two different things?

Transcript of Lester D. Mardiks, Corporate Designee
Conducted on January 19, 2021                    57

1      A    Well, I -- in this Schedule of Services,

2  these are services during the transition, not the wind

3  down.

4      Q    Are all of the amounts that the Debtor is

5  seeking related to wind down costs?

6           MR. SHER:  Objection.

7      A    That's -- that's much of it, but I'm not --

8  I'm not prepared to say that some of it isn't part of

9  the transition.  I think it's, it's generally the wind

10  down, though.

11     Q    And are these wind down costs -- have any of

12  them arisen since the termination of the Transition

13  Services Agreement?

14          MR. SHER:  Objection.

15     A    Have any of what?

16     Q    Any of the wind down costs that you

17  described.

18     A    Yes.

19     Q    On what basis is HC Salon responsible for

20  costs for a period following the termination of the

21  Transition Services Agreement?

22     A    Because they agreed to -- signed an

Transcript of Lester D. Mardiks, Corporate Designee
Conducted on January 19, 2021                               58

1    agreement with -- agreeing to fund the reasonable

2    costs of the wind down.

3         Q    Can you point me to where on the agreement

4    it says that?

5         A    It's in the Transition Services Agreement.

6    Section 5.2, I believe.

7              MS. WILLIS:  Can we turn to Section 5.5 of

8    the Transition Services Agreement, which is on Page 8

9    of this document.

10             AV TECHNICIAN:  Let me get access back.

11             Okay, sir, you have access now.

12        Q    Were any invoices provided to HC Salon

13   pursuant to this provision?

14        A    Budgets were provided to serve as invoices,

15   essentially, and we adhered to them.  And there's a

16   course of dealing between the parties where many

17   things were being done throughout based on

18   conversation, based on email, based on understanding,

19   based on presenting budgets and being given a nod

20   without specific written response necessarily, that

21   that was the course of dealing.

22        Q    How often were budgets provided instead

Transcript of Lester D. Mardiks, Corporate Designee
Conducted on January 19, 2021                    59

```
 1   of --
 2        A    Monthly.
 3        Q    Who prepared those budgets?
 4        A    We did.
 5        Q    When you say we, who are you referring to?
 6        A    Rodger Jacobson, with assistance from, from
 7   myself and from, from counsel.
 8        Q    And what was the process after the monthly
 9   budget was provided?  How did you go about seeking
10   payment?
11        A    I think primarily Mr. Sher would talk with
12   his counterpart Mr. Chesley.
13        Q    And were those budgets, these monthly
14   budgets, provided to counsel, to HC Salon or to a
15   representative of HC Salon?
16        A    I believe to a representative of HC Salon.
17        Q    Do you have copies of these budgets?
18        A    I do.
19        Q    Do you know approximately how many budgets
20   were prepared over the course of --
21        A    Well, some were -- some were prepared for,
22   for review and approval, and some were final, but they
```

Transcript of Lester D. Mardiks, Corporate Designee
Conducted on January 19, 2021                    60

1   were pretty consistent.  Things didn't vary much, and

2   actual costs didn't vary much from them; I'm pleased

3   to say that.  But how many?  I don't know, half a

4   dozen.  That's an estimate.

5       Q    When you say review and approval, whose

6   review and whose approval?

7       A    There were two people, you know, that I was

8   primarily in communication with regularly; Rodger

9   every day and Joel Sher a few times each week.

10      Q    And was it Rodger and Joel who would review

11  and approve the budget?

12      A    Well, we would discuss it, the three of us

13  would discuss them, typically.

14      Q    Were only final budgets sent to HC Salon?

15      A    I -- I can't say.  I don't -- I was not the

16  one doing it.

17      Q    Do you know who was the one sending it to HC

18  Salon?

19      A    I -- probably Mr. Sher.

20      Q    You mentioned that approximately six budgets

21  were prepared.  Would that be six final budgets and

22  then there were other versions of those budgets prior,

Transcript of Lester D. Mardiks, Corporate Designee
Conducted on January 19, 2021                            61

1    or in total six budgets?

2         A    Yeah, we were looking at different versions

3    of budgets.  It was close to the time to review them,

4    so -- and changes would be made, and then there would

5    be back-and-forth emails and phone calls regarding

6    items that were in question.

7         Q    Are there any non-privileged emails that

8    show changes made to budgets?

9         A    I don't think so.

10        Q    Is it the Debtors' position that HC Salon is

11   responsible for paying all remaining professional fees

12   in connection with the wind down?

13        A    Absolutely.

14        Q    And is it the Debtors' position that HC

15   Salon is responsible for paying the payroll of all the

16   Debtors' remaining staff?

17        A    Yes.

18        Q    Is it the Debtors' position that HC Salon is

19   also responsible for paying the cost of issuance of

20   W-2s?

21        A    Yes.

22        Q    Is it the Debtors' position that HC Salon is

Transcript of Lester D. Mardiks, Corporate Designee
Conducted on January 19, 2021                    62

1    responsible for paying the cost of the Debtors' tax

2    returns?

3          A     Not the taxes, but preparing them, yes.

4          Q     Is it the Debtors' position that HC Salon is

5    responsible for paying miscellaneous costs associated

6    with winding down the Debtors' estate, for example,

7    the noticing and claims agent fees?

8          A     Yes.  Yes.

9          Q     Are there any costs that the Debtors believe

10   they are responsible for paying?

11         A     Are there any -- I'm sorry, are there any

12   costs --

13         Q     That the Debtors believe -- any wind down

14   costs that the Debtors believe they are responsible

15   for paying.

16         A     Without any compensation?

17         Q     Correct.

18         A     The only thing that would be in that

19   category would be such costs that are unreasonable.

20         Q     Are there unreasonable costs in your view?

21         A     No, no, we've been diligent about -- well --

22               MR. SHER:  I think he broke up again, Madam

1  Reporter.

2      A    What I said was I think there are none, and

3  I think that we've been diligent managing this well

4  with few people.

5      Q    Are there any communications with

6  representatives of HC Salon that support the Debtors'

7  view?

8      A    I know of one off the top of my head, an

9  email saying that, that the fees of Shapiro Sher would

10 be paid, but they haven't.

11     Q    Do you know who that email was sent by?

12     A    Yes, Rick Chesley.

13     Q    Does that email discuss payroll for the

14 Debtors' remaining staff?

15     A    Not that email.

16     Q    Are there any emails that discuss --

17     A    Yeah, there was -- yeah, there was -- I can

18 think of one.  There were probably several that did

19 question the staffing.

20     Q    And in the emails questioning the staffing,

21 who sent those emails?

22     A    The one that I can directly think of was

Transcript of Lester D. Mardiks, Corporate Designee
Conducted on January 19, 2021                    64

1    Phil Horvath.

2         Q    Is Phil Horvath a representative of HC

3    Salon?

4         A    At that point in time I think he was acting

5    as the representative of HC Salon, yeah, even though

6    his employer wasn't HC.

7         Q    What was his relationship to HC Salon at

8    that point in time?

9         A    Well, I think he believed he was going to

10   continue to be Chief Operating Officer or President or

11   some combination thereof.

12        Q    And Mr. Horvath sent an email taking the

13   position that HC Salon was responsible for the --

14   paying the payment of all payroll of remaining staff?

15        A    No.  He was, he was trying to make it less

16   costly by limiting the pay of individuals.  The

17   opposite.

18        Q    Do you have an idea of when, maybe a month,

19   in which the email was sent?

20        A    That was probably in June.

21        Q    Was it following the execution of the TSA on

22   June 4, 2020?

Transcript of Lester D. Mardiks, Corporate Designee
Conducted on January 19, 2021                                    65

1      A      Probably.  If you want to give me a second

2  and allow me to look at a note I can probably pinpoint

3  the date.

4              MS. WILLIS:  Can you produce that email to

5  us?

6              MR. SHER:  We'll review any requests for

7  documents at the conclusion of the depositions today.

8  We're not going to do it seriatim.

9      Q      Are you aware of any communications with

10 representatives of HC Salon that support the Debtors'

11 view that HC Salon is responsible for paying the costs

12 of the issuance of the Debtors' W-2s or the cost of

13 preparation of the Debtors' tax returns?

14     A      Am I aware of anything from HC saying that

15 they're responsible for that?

16     Q      Correct.

17     A      Their signature on this agreement.  It

18 doesn't specify those items necessarily, but it's part

19 of the reasonable costs of the wind down of a company

20 to honor its legal obligations to its employees.  And

21 some of those employees are employed by HC now.

22             MS. WILLIS:  Can we turn to Section 5.2 of

Transcript of Lester D. Mardiks, Corporate Designee
Conducted on January 19, 2021                    66

1    the TSA, which is Page 7 of the document just before

2    this one.

3         Q    Is it your belief that this provision

4    supports the Debtors' view that HC Salon is required

5    to pay the entirety of the Debtors' wind down costs?

6         A    I think it does -- well, the entire

7    reasonable costs, yes.

8         Q    Even if those costs were incurred after the

9    termination of the TSA?

10        A    That's when the -- most of the wind down

11   occurs, yes.

12        Q    How much cash do the Debtors have on hand,

13   approximately?

14        A    Approximately somewhere in the neighborhood

15   of $2 million, but you can ask Mr. Jacobson in his

16   deposition.

17        Q    So going back to Section 5.2 of the

18   Transition Services Agreement, which is up here, is

19   written consent required, is HC Salon's written

20   consent required?

21        A    In the -- that last sentence it says -- I'm

22   just -- where possible, inform the purchaser -- where

Transcript of Lester D. Mardiks, Corporate Designee
Conducted on January 19, 2021                    67

1    possible, inform the purchaser of the actual

2    reasonable -- reasonably estimated amount, such

3    expenses before they are incurred, and shall not incur

4    such expenses without the purchaser's prior written

5    consent, but that refers back to where possible.  All

6    costs incurred must be presented with supporting

7    documentation, such as receipts.  So that's my answer.

8        Q    Just to clarify, your understanding is that

9    written consent is only required where such written

10   consent is possible?

11       A    Yeah.  And we were working with HC for

12   months on a trust basis as well.  We were presenting

13   budgets, and more recently the presentation of a

14   budget fell on -- we received no response.  And that's

15   not in the spirit of this agreement to, to reimburse

16   us for the reasonable costs of the wind down.

17       Q    Where would written consent not be possible?

18   When would written consent not be possible?

19       A    Well, it's probably possible, but I'll give

20   an example.  If I go and send 15 tax returns to the

21   states and I expense the postage and it's $50, that's

22   something that the CEO of HC wants to have presented

Transcript of Lester D. Mardiks, Corporate Designee
Conducted on January 19, 2021                    68

1   to him for signature?  I just -- there's a practical

2   manner of working through handling these expenses,

3   which in each individual one may not be much, but in

4   aggregate they do add up.

5          And I would say in presenting a budget,

6   that's notice we'd like your consent, and we have

7   lived within the budgets.

8       Q    And if you did not receive consent?

9       A    If it was time sensitive.  If it wasn't time

10  sensitive, you know, I think one course of action

11  would be to say when are you going to consent.  We've

12  asked for this repeatedly.  And at some point in time

13  you can interpret that as consent or no consent,

14  absolutely not.  But some of these items are

15  reasonable.  They're all reasonable.

16      Q    Did HC Salon ever provide written consent

17  for any of the six or so budgets that were sent to it?

18      A    I'm not aware.  I'm not aware of any.

19      Q    Did HC Salon provide written consent for the

20  payment of payroll for the wind down staff?

21      A    They knew it was ongoing.  I don't know what

22  to say about it other than that.  There may be some

Transcript of Lester D. Mardiks, Corporate Designee
Conducted on January 19, 2021                    69

1    email that I haven't seen, but -- no.

2        Q    Did HC Salon provide written consent for the

3    payment of the issuance of W-2s, 1099s, other tax

4    filings?

5        A    Not in writing that I know of, but I was

6    involved in discussions around that.

7        Q    Did HC Salon provide other non-written

8    consent?

9        A    The non-written consent was more or less

10   ongoing.  I don't think there was, there was a

11   tremendous amount of friction in any of this until

12   more recently.

13       Q    Can you describe some of the ongoing

14   non-written consent?

15       A    We were, we were doing our job and counsel

16   was speaking with HC's counsel and we understood what

17   we were up to, and I never heard a word that any of

18   this was, we were being told we shouldn't do it or

19   couldn't do it or needed to adjust, because if we ever

20   did feel the need to adjust or were told to adjust

21   something, we looked at it.

22            You know, for instance, just the management

Transcript of Lester D. Mardiks, Corporate Designee
Conducted on January 19, 2021                    70

1    of the payroll, we're not keeping people on that are

2    no longer needed just to charge, charge HC.  We're

3    limiting the hours, we're limiting the people that are

4    in that budget.

5         Q    Did HC Salon ever provide written consent

6    for the payment of Epiq, the noticing and claims

7    agent?

8         A    Not that I'm aware of.  Other than they did

9    recommend Epiq to begin with to us.

10        Q    Is it your understanding that that

11   recommendation is sufficient to require reimbursement?

12        A    Whether it's sufficient, I don't know, but

13   it's certainly an endorsement of here's who we want

14   you to use and we're okay with it.

15        Q    Is HC Salon required to pay for any advisor

16   that they endorsed?

17        A    Is HC Salon required to pay -- I would say

18   if it's a reasonable cost of the wind down, then yes.

19        Q    Did HC Salon provide written consent for the

20   payments of U.S. Trustee fees?

21        A    In a way, yes, because they continued to use

22   our bank accounts which generated those fees.

Transcript of Lester D. Mardiks, Corporate Designee
Conducted on January 19, 2021                    71

1      Q    Can we look to Section 5.3, which is before
2    you on Page 6 of the Transition --
3      A    Trustee fees, yes.
4      Q    Can you let me know when you're finished
5    reading that sentence?
6      A    I've read it.
7      Q    Is it your understanding that the payment of
8    Trustee fees is limited in any way?
9      A    Reasonably incurred as a result of -- direct
10   result of sellers providing services under this
11   agreement.
12     Q    Once the TSA was terminated on September 4,
13   2020, would there be any reason HC Salon should pay
14   for U.S. Trustee fees under continued --
15     A    Continued --
16          MR. SHER:  Objection.
17          Excuse me, Mr. Mardiks, I'm noting an
18   objection.  You can answer.
19     A    Well, based on continued use of the Debtors'
20   bank account.
21     Q    Do you know when HC Salon's use of the
22   Debtors' bank accounts ended?

Transcript of Lester D. Mardiks, Corporate Designee
Conducted on January 19, 2021                      72

1        A    Still ongoing.

2        Q    In what way is HC Salon using the Debtors'

3   bank accounts?

4        A    Well, I just heard that this morning so I

5   think perhaps it's a small usage, but it still

6   continues.  That's what I was told.

7        Q    Can you describe what you were told without

8   communication --

9        A    Maybe it would --

10            (Simultaneous speaking.)

11       A    Maybe it would be easier to ask Mr. Jacobson

12   who sees the transactions.

13       Q    Can you identify with whom you had

14   discussions regarding payment of the payroll,

15   representatives of HC Salon that were not Mr. Horvath?

16       A    I didn't have conversation with HC about the

17   payroll.  All my dealing with our staff was between

18   myself and Mr. Sher and Mr. Jacobson.

19            MS. WILLIS:  Can we go Exhibit S, the wind

20   down budget, which would be Exhibit 19.

21            AV TECHNICIAN:  Yes, ma'am.  One second,

22   please.

Transcript of Lester D. Mardiks, Corporate Designee
Conducted on January 19, 2021                    73

```
 1              (Exhibit 19 was marked for identification

 2    and is attached to the transcript.)

 3              AV TECHNICIAN:  And for the record this is

 4    Exhibit 19.

 5              And you have access now.

 6        Q    Do you recognize the document?

 7        A    I do.  It's the wind down budget.

 8        Q    When was this prepared?

 9        A    This week.

10        Q    Who prepared it?

11        A    Primarily Mr. Jacobson, with input.

12        Q    With input from who?

13        A    From me and from Mr. Sher.

14        Q    For what purpose was it prepared?

15        A    To -- to -- well, to reconcile where we are

16    as of this point in time and what we are both likely

17    to see, or possibly see going forward.

18        Q    Are there prior versions of this document?

19        A    Yep, there are prior versions.

20        Q    Did you have any involvement in the

21    preparation of those prior versions?

22        A    Pretty much the same as I just described for
```

Transcript of Lester D. Mardiks, Corporate Designee
Conducted on January 19, 2021                                    74

1    this one.  These were prepared with dialogue between

2    the three of us.

3        Q    Do you know when this was provided to HC

4    Salon?

5        A    I believe yesterday.

6        Q    In providing this budget to HC Salon were

7    you seeking approval of the amounts listed in the

8    budget?

9        A    Well, at this stage we were seeking to

10   discuss it here and introduce it as part of the

11   motion.  But we would love to have approval of it.

12   It's the way we've been running the wind down, and it

13   looks like the way it would continue.  If there's

14   discussion, we've yet to have it.

15       Q    Are there documents that support the amounts

16   listed in this wind down budget that you know of?

17       A    That I know of?  I'm pretty certain that

18   there would be documents around most all, if not all,

19   of this, except maybe the administrative, copier,

20   phone, et cetera, that's not a contract.  But most of

21   these -- a lot of these are contractual and there is

22   some documentation.

Transcript of Lester D. Mardiks, Corporate Designee
Conducted on January 19, 2021                          75

1        Q    Do you know if those documents have been
2    provided to HC Salon or a representative of HC Salon?
3        A    I'd have go through them one at a time.
4    Some of them, yes, and some of them, no.
5        Q    The first line item of this budget says wind
6    down staff.  Do you know who is included in wind down
7    staff?
8        A    I am.  Latarice McKinney has been handling
9    some of the HR functions.  She had, at one point in
10   time, a woman who was dealing with benefits, and we
11   were working with an IT consultant.  And those latter
12   two are no longer part of the staff.  It's, it's
13   Latarice and myself and someone who's handling
14   accounting/bookkeeping who continue on at this point
15   in time, and that will be further reduced going
16   forward as soon as we can.  Those are the individuals.
17       Q    That's about five individuals, correct?
18       A    All told.  But at this point in time we
19   have -- one, two, three -- we're down to three, and
20   we'll soon be down to two, two I think.
21       Q    And over the course of time the amount for
22   wind down staff has changed.  For example, it's

Transcript of Lester D. Mardiks, Corporate Designee
Conducted on January 19, 2021                    76

1    $27,325 in August.  In September that amount goes up

2    to $104,546.  Can you let me know why that amount has

3    changed?

4         A    Because some of the people who are now part

5    of our staff are working for HC, and then they helped

6    us.  And when they quit working for HC, they had to be

7    paid.

8         Q    Do you know how many people were paid under

9    Wind Down Staff, or are to be paid under Wind Down

10   Staff for the month of September?

11        A    It shows here.  The only thing I know is

12   what's on this report.

13        Q    Does it show the amount of people for wind

14   down?

15        A    Oh, the amount of people?  I think there's

16   some detail that I don't see in front of me.  But all

17   of these budgets were provide -- there are pages of

18   detail down to that level.

19        Q    You mentioned that now only three people are

20   included in the wind down staff.

21        A    Yeah.

22        Q    Going forward, it looks like between March

Transcript of Lester D. Mardiks, Corporate Designee
Conducted on January 19, 2021                77

1    and April there's a decrease in the amount for the

2    wind down staff.  Do you know how many people are

3    included in the April wind down staff budget?

4         A    That might -- that's probably -- it's

5    probably more than I said just a moment ago.  That

6    looks like three people.  It may be a partial

7    reduction of one.  I'm not sure what's in that number.

8         Q    Do you know how many are included in May?

9              MR. SHER:  I'm going to also object to this

10   line of questioning.  I'm not sure this was within

11   what he was designated for, but -- I mean I'm not

12   going to stand on ceremony here because of the, sort

13   of the crossover between designations, but it's not

14   altogether clear that this is the right person to be

15   asking these questions.  So for that reason I'll

16   object, but continue on.

17        A    I mean, I can't say who's in May, I would be

18   speculating about it, but there is, there is detail.

19   And when you speak with Mr. Jacobson I'm sure he has

20   that.

21             And we did discuss reducing staff and at

22   least reducing time, so it could be a combination of

Transcript of Lester D. Mardiks, Corporate Designee
Conducted on January 19, 2021                    78

1    those two things.  And that's in line with the wind

2    down.  As needs become fewer and fewer and ultimately

3    none, the staffing winds down, too.

4         Q    And do you know what services are provided

5    to achieve the wind down of the companies aside from

6    benefits, IT consulting and accounting?

7         A    Correspondence, dealing with whoever needs

8    us for whatever reason, responding to it; dealing with

9    contractors, vendors, signing documents, preparing

10   budgets, doing the accounting, dealing with the bank,

11   making sure that we pay, pay items that are our

12   responsibility to pay.  Various -- it's all

13   administrative at this point.  Dealing with the

14   bankruptcy.

15        Q    Do you have an idea of how much longer the

16   wind down will take?

17        A    Well, we anticipated it could be done before

18   the end of March.  But if it, if it lags, delays for

19   whatever reason, you see these additional months in

20   here.

21        Q    Are you aware of any reasons for which it

22   might lag or delay?

Transcript of Lester D. Mardiks, Corporate Designee
Conducted on January 19, 2021                        79

1        A    No.  It would be pure speculation.  There's

2    nothing looming that's making me think that.

3        Q    Do you know if any earlier versions of the

4    wind down budget were provided to HC Salon, this wind

5    down budget provided to HC Salon --

6        A    This particular one --

7        Q    Yes.

8        A    -- that we're looking at?

9             This was not prepared more than two days

10   ago, so I don't think so.  I think there were earlier

11   versions of this that were provided, but not of the

12   same, not of the same document I'm looking at on the

13   screen.

14       Q    Were any versions of the wind down budget

15   prepared before the TSA was terminated on September 4,

16   2020?

17       A    Don't -- I'm not sure, but I believe so.  I

18   believe we were doing those then.

19       Q    Are you aware of any versions of the wind

20   down budget that were prepared and sent to HC Salon

21   before July 14, 2020?

22       A    I'm not aware of any, but -- I'm not aware

Transcript of Lester D. Mardiks, Corporate Designee
Conducted on January 19, 2021                    80

1   of any.  We were contemplating the wind down at that

2   point in time.

3        Q    Is your position that even if the wind down

4   were to lag HC Salon would be responsible for the

5   payment of all amounts through the end of June or

6   beyond?

7        A    Only if they were reasonable, including any

8   delay.  If we were causing the delay, I would say

9   that's not reasonable.

10       Q    Is it your position -- is it the Debtors'

11  position that only the Debtors causing a delay would

12  be unreasonable?

13       A    Only the Debtors causing a delay?  Well,

14  certainly if, if HC were causing the delay, they

15  should pay for it.  I just -- it's -- that would be

16  unreasonable or -- I'm sorry, those would be

17  reasonable costs in that case.  And other, other

18  factors could determine it.  If one of these

19  contractors is no longer able to perform, then we have

20  to bring in somebody else that has to get up-to-speed,

21  that could cause a delay, and that's really nobody's

22  fault and it's perfectly reasonable.

Transcript of Lester D. Mardiks, Corporate Designee
Conducted on January 19, 2021                          81

1          But it's a matter of situation and

2    circumstance in determining what is not reasonable.

3    We would like to wrap this up.  That's our job.

4          Q    How do the Debtors intend to bring their

5    bankruptcy cases to a close?

6          A    Well, hopefully not catastrophically.  I

7    don't know how to answer that question.

8          Q    Have the Debtors prepared a Plan of

9    Reorganization or a Plan of Liquidation to file in the

10   bankruptcy cases?

11         A    Not that I'm aware of.

12         Q    Do you know why the Debtors haven't prepared

13   or filed a Plan of Reorganization or a Plan of

14   Liquidation in the bankruptcy cases?

15         A    Well, that's something that counsel would

16   advise me on at the time, and we would address it

17   then.  And I'm sure it's forthcoming.  It's part of

18   the process.  It's just nothing we've worked on

19   together yet.

20         Q    Do you know why the Debtors haven't

21   converted the cases to cases under Chapter 7?

22              MR. SHER:  Objection.

```
 1        A    Yeah, I don't know.

 2             MS. WILLIS:  So we've been going on for

 3   about two hours.  Do you think now, Mr. Sher, is a

 4   good time to take, say a five-minute break?

 5             MR. SHER:  It's your deposition.  You run

 6   the show.  I'll do what you say.

 7             MS. WILLIS:  Okay.  Yeah, I think we should

 8   take just a few minutes' bathroom break now.

 9             MR. SHER:  We don't have to say what it's

10   for, we could just say we're taking a break.

11             MS. WILLIS:  -- water break, a break and go

12   off the record, and you and I can -- I may have just a

13   few more questions --

14             MR. SHER:  Okay.

15             MS. WILLIS:  -- for the witness, but I don't

16   think it will take too long.

17             MR. SHER:  All right.  Thank you.

18             (A discussion was held off the record.)

19             (A recess was taken at 11:27 a.m.)

20             (Back on the record at 11:41 a.m.)

21             MS. WILLIS:  Can we pull up Exhibit H, which

22   will be marked as --
```

Transcript of Lester D. Mardiks, Corporate Designee
Conducted on January 19, 2021                    83

```
1              AV TECHNICIAN:  No. 20.

2              MS. WILLIS:  -- Exhibit 20.

3              AV TECHNICIAN:  Yes, ma'am.  One second.

4         You said H, right?

5              MS. WILLIS:  Correct, the Wind Down Systems

6    email.

7              AV TECHNICIAN:  There you go.  Perfect.

8    Just double-checking.

9              MR. SHER:  Wind Down Systems email.

10             AV TECHNICIAN:  Exhibit 20 for the record.

11             (Exhibit 20 was marked for identification

12   and is attached to the transcript.)

13             MS. WILLIS:  Can we give control to the

14   witness, please.

15             AV TECHNICIAN:  Ah, yes.  I'm sorry, yeah.

16   One second.

17             (A discussion was held off the record.)

18             AV TECHNICIAN:  He has access now.

19        Q    Can you scroll down to the next page so that

20   you can see the initial email sent on August 31st.

21        A    Okay.  This is, yeah, to me from Brad

22   Hansen.
```

Transcript of Lester D. Mardiks, Corporate Designee
Conducted on January 19, 2021                              84

1      Q     Do you recognize this document?

2      A     Yeah, I think I saw it during the last week

3  of reviewing emails, I think it was in that group.

4      Q     Do you recall the call that you had with

5  Brad Hansen?

6      A     We had several regarding needs going

7  forward.  This particular one, I mean I can't say with

8  that -- specificity that I remember this particular

9  call, but we did talk, I know that.

10     Q     And it mentions here in the first bullet

11 point, HC Salon Holdings will no longer have a need,

12 and no longer be using, the Lawson/Infor and Velocity

13 systems.

14     A     Right, I remember that part of the

15 conversation.  And Lawson was the repository for a lot

16 of documents.  And Velocity was the hosting component.

17 We had servers in a couple of locations.

18     Q     And after August 31st, 2020, what were

19 Lawson/Infor and Velocity systems used for?

20     A     For records and email.  And Velocity was the

21 host, had the servers.  And the information that was

22 stored in there was important to transition and the

Transcript of Lester D. Mardiks, Corporate Designee
Conducted on January 19, 2021                    85

1   wind down, some of the information anyway.  So that

2   was the nature of our discussion; I need access to

3   these systems to do our job.

4        Q    Can you clarify that for me?  Who were they

5   important for?  Were they important for the Debtors,

6   were they important for HC Salon Holdings, were they

7   important for both parties?

8        A    Possibly both.  I can say certainly to the

9   Debtors, yeah.

10       Q    Do you know if HC Salon Holdings used the

11  Lawson/Infor, Velocity systems following August 31st?

12       A    I don't know.  I have no way of knowing

13  that.

14       Q    Have the Debtors rejected the Velocity

15  agreement or the Lawson agreement?

16       A    At this point?  I should -- I'd have to get

17  back to you on that.

18       Q    Do the Debtors still have a need for the

19  Lawson agreement or the Velocity agreement?

20       A    No.

21       Q    Does HC Salon benefit in any way from -- at

22  this current moment from the Lawson agreement or the

Transcript of Lester D. Mardiks, Corporate Designee
Conducted on January 19, 2021                    86

1    Velocity agreement?

2        A    I couldn't say what HC benefits from at this

3    point.  I don't know.

4        Q    Do you believe that HC Salon benefited after

5    August 31st from the Lawson agreement or the Velocity

6    agreement?

7        A    As I say, I don't have information to answer

8    that.

9        Q    I'm sorry, could you say that again?  I

10   couldn't hear you.

11       A    I said I would need more information to

12   answer that.  I'm sorry, I can't say if they -- you

13   know, if they benefited after August 31st.

14       Q    At the very top of this email there is a

15   response from Mr. Sher.  In his last sentence it says,

16   "We will however work to resolve these issues

17   quickly."  Do you know if the issues he refers to have

18   been resolved as of the date here?

19       A    As of today?  Let me just -- please let me

20   read the comments.

21       Q    Yes.  Please, take your time.

22       A    Okay, so the question was?  I'm sorry, Ms.

Transcript of Lester D. Mardiks, Corporate Designee
Conducted on January 19, 2021                    87

1    Willis, the question was?

2         Q    The question was whether or not these

3    issues, as it's referred to in that last sentence,

4    have been resolved, the issues with respect to the

5    Velocity --

6         A    Yeah, at this point in time I think this --

7    for records information, we've come up with

8    alternative means of accessing information so I would

9    say it's resolved.

10        Q    Okay.  We spoke earlier about a series of

11   budgets that were sent from the Debtors to HC Salon.

12   We spoke earlier about consent from HC Salon.  Is it

13   the Debtors' position that the parties developed a

14   course of conduct with respect to consent for certain

15   costs and reimbursement of those fees and expenses?

16        A    To a degree, yes.

17        Q    Could you explain what you mean by to a

18   degree, yes?

19        A    Well, I mean, there was a course of conduct,

20   and we were -- we were working together fairly well

21   with a pretty good understanding about things.

22   Sometimes not immediately, but things that needed to

Transcript of Lester D. Mardiks, Corporate Designee
Conducted on January 19, 2021                    88

1   be paid for by HC were paid for ultimately.  And then

2   it got to where there was no response, no response, no

3   action, no payment.

4        Q    And could you, for my benefit, describe the

5   course of conduct a bit better?  A budget was sent and

6   HC Salon simply paid?  What exactly was the course of

7   conduct?

8        A    Yeah, for starters nobody ever said to us,

9   you know, we're not paying you, you didn't get it from

10  us in writing.  It's -- those things were paid.  And,

11  and there were -- there was dialogue between Mr. Sher

12  and, and HC's counsel that I -- maybe there were other

13  channels, but that's the one I'm aware of -- where

14  things would be presented and worked out.

15       Q    When you say worked out, what do you mean?

16       A    If there was any questioning of what -- of

17  what we were asking, showing them or asking for

18  reimbursement of or planned to do.

19       Q    And is it your understanding that HC Salon

20  never sent written consent for the payment of wind

21  down or transition --

22       A    That, I don't -- I didn't say that.  I don't

Transcript of Lester D. Mardiks, Corporate Designee
Conducted on January 19, 2021                    89

1    see everything, so it's quite possible there exists

2    some of those circumstances where it was put in, in

3    some form of writing.  It could have been an email,

4    but I don't know.

5        Q    If I were to categorize expenses in

6    transition services which would be included in the

7    schedule of the TSA or wind down costs, which may not

8    be included in the schedule of that TSA, would you

9    understand what I was referring to if I categorized

10   things in that way?

11       A    Well, you're not talking about this wind

12   down budget, you're talking about some other document?

13       Q    I'm talking about the Schedule of Services

14   that's attached to the TSA.

15       A    Oh, yeah.

16       Q    If I were to call those transition services

17   and if I were to call everything else wind down

18   expenses --

19       A    Yeah, that's, that's one way to do it.

20   Unfortunately, there's a little bit of fuzziness

21   between transition and wind down, but for the most

22   part that's how I would look at it.

Transcript of Lester D. Mardiks, Corporate Designee
Conducted on January 19, 2021                    90

1      Q    Could you let me know what you mean by

2   there's a bit of fuzziness?  What's that fuzziness?

3      A    It's just some things that -- if it was for

4   the benefit -- the way I would look at is if it was

5   for the benefit of HC, it's transition.  If it's not

6   for the benefit of HC but needs to be done, that would

7   go into wind down.

8      Q    If it's not for the benefit of HC but needs

9   to be done --

10     A    To wind down the companies, that would be

11   the wind down.  That would be the distinction that I

12   would -- that's how I would -- if I had to put

13   everything in A bucket or B bucket, that's how I would

14   do it.

15     Q    Okay.  So if we say that anything for the

16   benefit of HC is in transition services, and if I -- I

17   want to then ask, has HC Salon paid for all transition

18   services, anything that was to their benefit?

19     A    If I answered that no, you'd -- I don't

20   know.  I'd have to confer with Rodger to see what

21   might be left over.  But I think that most of the

22   transition services we've been compensated because

Transcript of Lester D. Mardiks, Corporate Designee
Conducted on January 19, 2021                    91

1    they occurred months ago.

2         Q    And has HC Salon paid for, to your knowledge

3    paid for any of the wind down services or wind down

4    expenses?

5         A    To my knowledge, no.

6              MS. WILLIS:  Those are all the questions

7    that I have for the witness.

8              MR. SHER:  Thank you.

9              Why don't we leave up -- I wasn't

10   necessarily -- I'm going to start tracking your

11   Exhibit numbers, but I would like you to leave up

12   on -- we're going to ask questions about the

13   Transition Services Agreement.  And I think you also

14   had up there the Sale Order with the APA in it, right?

15             MS. WILLIS:  Yes, Exhibit 15 and 17.

16             MR. SHER:  Okay.  And then that's sort of it

17   for now.  You can put the rest of them down.

18             AV TECHNICIAN:  So we have Exhibit 15 here,

19   and then let me know when you need to go through 17.

20             MR. SHER:  Yes.  So Exhibit 16 and 17, and

21   18, I'm going to ask questions about that.

22             AV TECHNICIAN:  Okay.

Transcript of Lester D. Mardiks, Corporate Designee
Conducted on January 19, 2021                    92

```
1              MR. SHER:  And actually 19 now while we're
2    at it.  So you might as well leave them all up.
3    Ms. D'Alessandro is wonderful.  She just sent me the
4    list of your Exhibits so I can follow it now.
5              EXAMINATION BY COUNSEL FOR THE DEBTORS
6    BY MR. SHER:
7       Q    Why don't we first turn our attention to
8    Exhibit 16, Section 2.5 of the APA that's attached.
9    And for the life of me --
10             MR. SHER:  You have to give me control.  We
11   have to go to the Asset Purchase Agreement that's
12   attached.  I don't have the page numbers.
13      Q    So, Mr. Mardiks, if you'll go to the Asset
14   Purchase Agreement.
15             AV TECHNICIAN:  Sorry, this is the host.
16   I'm trying to find the page.
17             THE WITNESS:  I was trying to move it.
18             MR. SHER:  It's way down, it's way down.
19             There we go.  Little further.  Go down,
20   please, to Section 2.5, please.
21             They're very long documents, I apologize.
22             AV TECHNICIAN:  Okay, we're getting there.
```

Transcript of Lester D. Mardiks, Corporate Designee
Conducted on January 19, 2021                    93

1    2.5.  And let me give him access.

2           Okay, sir, you have access now.

3      Q    Okay, Mr. Mardiks, earlier today when Ms.

4    Willis was questioning you she asked you whether or

5    not you believed that the Transition Services

6    Agreement was a deliverable under the APA.  I want

7    you -- I think you were looking at Section 2(a), and I

8    want you to look at Section 2.5(a).  Take a look at

9    Section 2.5(b), if you will, and please read that.

10     A    Sure.  (b), at the closing the applicable

11   buyer will deliver to the applicable seller the bill

12   of sale -- it's 1, the bill of sale duly executed by

13   such applicable buyer; 2, the assignment and

14   assumption agreement duly executed by such applicable

15   buyer, and 3, the Transition Services Agreement, and

16   4, duly executed certificate from an officer of such

17   applicable buyer to the effect that each of the

18   conditions specified in 7.2(a) and 7.2(b) are

19   satisfied.

20     Q    Does that refresh your recollection as to

21   whether or not the Transition Services Agreement was a

22   deliverable at closing?

Transcript of Lester D. Mardiks, Corporate Designee
Conducted on January 19, 2021                    94

1        A     Yeah, it was contemplated, and here it is.

2        Q     Okay.  And to the best of your knowledge,

3   was an asset -- was a Transition Service Agreement

4   signed on or about the closing of the transaction?

5        A     Yeah, June 4th, I believe.

6        Q     Okay.  I want to -- I want to now put up on

7   the screen what we're going to mark as Exhibit 21

8   which is --

9              MR. SHER:  And I think we uploaded it,

10  Mr. Sharp, to you just a few moments ago.

11             AV TECHNICIAN:  Yes, sir.  What document

12  number are you --

13             MR. SHER:  21.

14             AV TECHNICIAN:  So your document is Document

15  21 and by coincidence is going to be also Exhibit 21.

16             MR. SHER:  That is pure coincidence.

17             (Exhibit 21 was marked for identification

18  and is attached to the transcript.)

19             AV TECHNICIAN:  For the record, Exhibit 21

20  is on the screen.

21        Q     All right.  Now, for the record, Exhibit 21

22  is the motion filed with the Bankruptcy Court, Docket

Transcript of Lester D. Mardiks, Corporate Designee
Conducted on January 19, 2021                    95

1    22 --

2            MR. SHER:  I need to see the top of the

3    screen, please.

4        Q    -- Docket 22 filed April 23rd, 2020, the

5    petition date.  And this is -- without reading the

6    whole thing into the record, this is the motion

7    pursuant to which the Debtors sought to sell the

8    assets -- its assets to HC Salon or a higher or better

9    bidder.  Attached to this motion, I believe, should be

10   a copy of the original Asset Purchase Agreement.

11           MR. SHER:  And I don't know,

12   Ms. D'Allesandro, do we attach -- do we have the

13   attached -- is that a different Exhibit?  Would that

14   have been 22-1?

15           MS. D'ALESSANDRO:  Yes, it's part of the

16   document.

17           MR. SHER:  Can we go see if that's attached

18   here, please?  I don't think it's attached.

19           MS. D'ALESSANDRO:  It is.

20           MR. SHER:  It is.

21           Okay, keep going then.

22       Q    Mr. Mardiks, if you have control, why don't

Transcript of Lester D. Mardiks, Corporate Designee
Conducted on January 19, 2021                    96

1    you scroll down.  I apologize.  Let's look for the

2    Exhibit which is the Asset Purchase Agreement.

3              Sometimes I get lost in these virtual

4    depositions, I'm sorry.

5         A    (Reviewing.)

6         Q    Keep going.

7         A    It's way down there.  It's going slowly.

8         Q    It's down a ways.

9         A    I think this might be it.

10             Yes.  Okay.

11        Q    I want you to turn your attention to

12   Schedule B, all the way at the back.

13             Okay.  Schedule B, I'm going to have to

14   shortcut it.  If you take -- for purposes of this

15   question we can go back up into the documents, but

16   this is -- Schedule B was the other excluded assets.

17   And if you want, we can go back up to the definition

18   of excluded assets.  And you see that one of the

19   assets that's excluded from the purchased assets is

20   the claims against Visa and MasterCard.  You remember

21   you testified about that earlier?

22        A    Yes, I do.

Transcript of Lester D. Mardiks, Corporate Designee
Conducted on January 19, 2021                    97

1        Q    Do you know why the parties agreed to
2    exclude that from the assets that were being sold to
3    HC?
4        A    I think it was because it was not an
5    encumbered asset by M&T Bank, and the assets that were
6    encumbered by M&T Bank were part of the buyout of
7    debt.
8        Q    To the best of your recollection HC bought
9    the loan documents and the security agreements of M&T
10   Bank?
11       A    Yes.
12       Q    So they were a successor in interest to the
13   liens of M&T Bank?
14       A    Correct.
15       Q    And if M&T didn't have a lien on it, they
16   didn't have a lien on it, and therefore the Debtor was
17   not selling it to them, correct; is that your
18   testimony?
19       A    That's correct.
20       Q    And that was in the original APA?
21       A    It was in the original APA -- I --
22       Q    You'll see this is dated --

```
1              (Simultaneous speaking.)

2       Q    Let me back you up.  This is the Asset

3  Purchase Agreement filed with the Court on the

4  petition date.

5       A    This is original.  Then, yes, it was in

6  here.

7       Q    And when Ms. Willis showed you the Sale

8  Order APA, this same provision was carried over into

9  that agreement, correct?

10      A    It remained, yes.

11      Q    Okay.

12           MR. SHER:  You can take that down.

13      Q    Do you recall in the negotiations leading up

14 to the execution of the Sale Order and the TSA working

15 with a law firm by the name of Littler?

16      A    Yes.

17      Q    Were you involved in conversations and

18 negotiations with the Debtors and Littler in the runup

19 to the sale hearing and the execution of the TSA?

20      A    I was.

21      Q    And do you know what services were provided

22 by Littler in contemplation of the TSA and the Sale
```

Transcript of Lester D. Mardiks, Corporate Designee
Conducted on January 19, 2021                    99

1    Order?

2        A    Littler is a nationwide labor firm, and we

3    engaged them to help us around the transitioning of

4    the employees, whether they would be furloughed or

5    kept, and anything related to them.  And they raised

6    the issue of WARN Act notices, W-A-R-N, helped us to

7    comply.

8        Q    Prior to March of 2020 approximately how

9    many employees did the Debtors have?

10       A    Before March of 2020?  It was in the range

11   of 10,000 plus, maybe 11.

12       Q    And of those 10,000, do you know

13   approximately how many were offered employment by HC?

14       A    This is an approximation, Mr. Sher, but it

15   was probably in the neighborhood of five to 6,000.

16       Q    So is it your understanding that three to

17   4,000 employees were never rehired?

18       A    Were never rehired because they were in

19   salons that didn't reopen, yeah.

20       Q    And as part of the Sale Order and the TSA

21   the Debtor was required to work with HC to try to, try

22   to make sure that there were no WARN Act violations?

Transcript of Lester D. Mardiks, Corporate Designee
Conducted on January 19, 2021                    100

```
1        A    Right.

2        Q    And you were involved in those negotiations,

3   correct?

4        A    Yes, I was.

5        Q    Thank you.

6             Next, I want to take a look at the --

7   Exhibit 17, the TSA.

8             AV TECHNICIAN:  One second, please.

9             (Document displayed.)

10            MR. SHER:  Good.

11            Oh, I'm sorry.  I'm talking about Exhibit --

12   you can leave it up -- Exhibit 18, which is the

13   termination letter.

14            AV TECHNICIAN:  Okay, 18.

15       Q    Ms. Willis asked you questions about this

16   letter, and you, I believe, said you have seen it

17   before and were familiar with it, correct?

18       A    Yes, I did.

19       Q    Under this letter it says that they want CHI

20   to continue performance under five contracts.  Do you

21   see those five?

22       A    I do.
```

Transcript of Lester D. Mardiks, Corporate Designee
Conducted on January 19, 2021                    101

1      Q    Do you recall approximately when -- well, do
2  you recall if the Debtors were ever requested by HC to
3  terminate or reject those contracts?
4      A    Not until in September.
5      Q    And do you recall approximately when the
6  motion to reject those contracts was filed?
7      A    I believe it was September 8.
8      Q    Okay.  You also testified that
9  terminating -- this was a termination, but that's not
10 the way things played out, I think was your testimony.
11     A    I think that's correct.
12     Q    Is it your understanding that after July,
13 let's say July and August HC still maintained use of
14 the Debtors' bank accounts?
15     A    Absolutely.
16          MR. SHER:  We want to mark as Exhibit 22, I
17 think --
18          AV TECHNICIAN:  Yes, sir.
19          MR. SHER:  -- what I sent to you yesterday,
20 which was Exhibit 12 in my list.
21          (Exhibit 22 was marked for identification
22 and is attached to the transcript.)

Transcript of Lester D. Mardiks, Corporate Designee
Conducted on January 19, 2021                                    102

1              AV TECHNICIAN:  One second, please.

2              Exhibit 22.

3              And, sir, you have access now.

4        Q    Exhibit 22, for the record, is the Debtor In

5   Possession Amended Monthly Operating Statement for the

6   period ending August 31, 2020.  Can you go to the

7   actual statement, sir?

8              Stop right there.  Go to Page 1.  Is that

9   your -- you reviewed and signed this?

10       A    That's my signature.

11       Q    I want you to go to the back and look at

12  some of the bank statements attached.

13             Wait, stop there for a second.

14             How much in disbursements went through the

15  Debtors' bank accounts just in August from, quote,

16  operations?

17       A    Okay, let me look on this form and see where

18  that is.

19             MR. SHER:  If I may shortcut it, everyone,

20  it's No. 3 is disbursements.

21       A    Okay, there it is.  $793,010.05.

22       Q    Go to the back and look at the bank

Transcript of Lester D. Mardiks, Corporate Designee
Conducted on January 19, 2021                                    103

1    statements, if you will.  It's -- they're all the way

2    in the back.

3         A    I know.  I can't get it to move right now.

4         Q    Oh, I'm sorry.

5         A    Sorry, it's just sitting there.

6         Q    Yeah, well --

7              You stuck?

8         A    It fits and starts.  Bear with me.  Maybe I

9    can get it to where we need it.

10        Q    Go back up.  I want to look at the

11   disbursements for a second.

12             The next page, please.

13             AV TECHNICIAN:  Let me help you here.

14             MR. SHER:  Yeah.  Let's go page by page.

15   I'll tell you when to stop, Mr. Sharp.

16             AV TECHNICIAN:  What page of your PDF file

17   is?

18             MR. SHER:  Hold on, please.

19             AV TECHNICIAN:  That way is easier.

20             MR. SHER:  No, that's great.

21             AV TECHNICIAN:  You don't have that?

22             No worries.  What page of the document?

Transcript of Lester D. Mardiks, Corporate Designee
Conducted on January 19, 2021                    104

1              MR. SHER:  Why don't we go to Page 8 of 58,

2    which is up on the top of the -- so two pages down.

3              AV TECHNICIAN:  Okay, he's there now.

4      Q     I'm not going to go through every page, Mr.

5    Mardiks, but this is, this is the cash receipt detail;

6    is that correct?

7      A     This is the bank statement?

8      Q     Yes -- no, this is a report.  This isn't a

9    bank statement, this is Mr -- this is a cash receipt

10   detail statement.

11     A     Okay.

12     Q     And do you see that there are deposits

13   almost every day from HC Salon?

14     A     HC Salon Holdings, Inc., yes.

15     Q     And do you see a funding request deposit on

16   8/5 for $438,000?

17     A     8/5 -- yes -- you said 838,000 or 4 --

18     Q     No, 438,000.

19     A     Yeah, 438.

20     Q     Okay.  And so is it your understanding that

21   this was from the operations of HC -- of the salons

22   that HC acquired and not anything the Debtor itself

Transcript of Lester D. Mardiks, Corporate Designee
Conducted on January 19, 2021                    105

1    was doing?

2         A    Yes, that, that would be correct based on

3    the date.

4         Q    All right.  And -- thank you.

5              And is it your understanding that the U.S.

6    Trustee fees are based on disbursements that are made

7    by a Debtor?

8         A    Yes, that's how it was explained to me.

9         Q    All right.  Let's now turn your attention

10   to -- and I think we testified a moment ago that

11   disbursements were approximately how much, 793?  Was

12   that your --

13        A    793 and change.

14        Q    If you go to the next page, which is 10 of

15   58.  I think Mr. Sharp will take you to the next page.

16             AV TECHNICIAN:  Page No. 9.

17             MR. SHER:  Yes, sir -- or 10, go to 10.

18             AV TECHNICIAN:  Okay.

19        Q    And this is -- you see that these are

20   disbursements being made throughout August?

21        A    Yes.

22        Q    And were these disbursements made for the

1    benefit, or by -- as a result of HC running the

2    businesses and using the Debtors' bank accounts?

3         A    Yes.

4         Q    And this was after the July 17 supposed

5    termination date in Mr. Gittlitz's letter which was

6    marked as Exhibit 18?

7         A    Yes, it was the middle to late August, yes.

8              MR. SHER:  You can take that down.

9              Let's go to the TSA for a second.  And that

10   is Exhibit 17, please.  Put that on the screen, and

11   let's go to Section 5.

12             AV TECHNICIAN:  One second, please.

13             (Document displayed.)

14             AV TECHNICIAN:  Exhibit 17.

15             MR. SHER:  5.

16             AV TECHNICIAN:  No. 5.

17             MR. SHER:  Let's have the whole page.  Okay.

18        Q    Now, Mr. Mardiks, look at Section 5.3.

19        A    5.3, Trustee Fees.

20        Q    To the best of your knowledge, has HC paid

21   the Debtor for the U.S. Trustee fees incurred as a

22   result of those disbursements, for instance, in

Transcript of Lester D. Mardiks, Corporate Designee
Conducted on January 19, 2021                    107

1    August?

2         A    To the best of my knowledge, no.

3         Q    Okay.  Section 5.1.  You can read it.  You

4    don't have to read it into the record, just read it.

5         A    Okay, I'm familiar with it.

6         Q    Okay.  To the best of your knowledge, has HC

7    paid $25,000 per month on the first day of June, July,

8    August, or September 2008 [sic]?

9         A    No with certainty they haven't.

10        Q    And is it the Debtors' position that even --

11   that HC is obligated under the TSA to pay four monthly

12   payments of $25,000?

13        A    Based on the usage of our services, yes.

14        Q    And is it the Debtors' position that under

15   the TSA they're obligated to pay all U.S. Trustee fees

16   that arise because they used our bank accounts?

17        A    Yeah, that's clear to me.

18        Q    Now, a little while ago Ms. Willis asked you

19   about Epiq.  Do you know who Epiq is?

20        A    Yes, I do.

21        Q    Do you recall who at the Debtor [sic] put us

22   in touch with Epiq and told us to use them?

```
1         A    Yes, I recall it's Mr. Chesley.

2         Q    Okay.  And Epiq, do you know what Epiq does?

3         A    They, they provide notice to a myriad of

4    people involved in the bankruptcy.

5         Q    And as a result of the sale, did the Debtor

6    have to send out thousands of notices to its

7    creditors?

8         A    Yeah, many, many.  We have -- no, never

9    mind, go on.

10        Q    You also recall that under the APA, the

11   Debtor, or excuse me, HC funded $500,000 to pay,

12   quote, stub rent for rejected leases?

13        A    Yes.

14        Q    And did Epiq have to send out notices --

15             (Simultaneous speaking.)

16        A    -- bank account.

17        Q    And did Epiq have to send out notices for

18   that?

19        A    Yes.

20        Q    And do you recall if, if the Debtor actually

21   ultimately paid that $500,000 in claims?

22        A    I believe we had, we had to run it through
```

Transcript of Lester D. Mardiks, Corporate Designee
Conducted on January 19, 2021                    109

1    our bank account.  We did pay it.

2         Q    And do you recall if that was in September,

3    August?  Do you know when we paid it?

4         A    I believe September.

5         Q    Okay.  I want to talk for a moment about --

6    I was confused and I want to see if I can clarify some

7    confusion here.

8              Section 5.2, there was this discussion about

9    invoices and budgets, and I want to see if we can

10   parse through what you intended by invoices and

11   budgets, okay?

12             Do you recall if the Debtor sent HC, quote,

13   budgets for the wind down?

14        A    I believe budgets were sent and discussed --

15        Q    Okay.

16        A    -- with HC.

17        Q    And when you talk about those budgets, are

18   invoices that are referred to in 5.2 different in your

19   mind-set than the budgets for the wind down?

20        A    I would say yes.  A budget is different than

21   an invoice, but it can serve as the same after the

22   fact.

Transcript of Lester D. Mardiks, Corporate Designee
Conducted on January 19, 2021                    110

1       Q    Yes.  But during the course of the TSA --

2    and we'll leave open when exactly it terminated -- I

3    mean -- let me take a step back.  You said that under

4    the terms of the TSA it was to terminate on

5    September 4th, correct?

6       A    Yes.

7       Q    But is it our -- the Debtors' position that

8    even though it was supposed to terminate on

9    September 4th, the Debtor kept providing services

10   throughout September of 2020?

11      A    That's correct.

12      Q    And most of those services were in

13   allowing, allowing them to continue using our bank

14   accounts?

15      A    Yes, correct.

16      Q    Okay.  Now, do you recall whether or not

17   from time to time HC would fund money to the Debtors

18   to help pay for the costs and expenses of running the

19   business in the, quote, transition period?

20      A    During the transition, yeah, they were -- I

21   believe they were funding costs of running the

22   business.

Transcript of Lester D. Mardiks, Corporate Designee
Conducted on January 19, 2021                    111

```
1        Q    Did they require every single time an
2    invoice to be provided to them, or was it just a
3    course of dealing between the parties?
4        A    It was a course of dealing.  I don't recall
5    one time when they requested an invoice.
6             MR. SHER:  I want to show you what we sent
7    to, Mr. Sharp, you yesterday, which is our Exhibit --
8    no, no, let me take a step back for a moment -- their
9    Exhibit 19, which is the revised budget.
10            AV TECHNICIAN:  One second.  Exhibit 19.
11            (Document displayed.)
12       Q    This document was provided to HC's counsel
13   yesterday; is that correct, Mr. Mardiks?
14       A    Yes.
15       Q    But this wasn't the first budget that was
16   ever sent to them, was it?
17       A    No, no.
18       Q    So if there's some confusion, it wasn't as
19   if the Debtor just for the first time yesterday asked
20   to have these things paid?
21       A    It goes back to at least September.
22       Q    Thank you.
```

Transcript of Lester D. Mardiks, Corporate Designee
Conducted on January 19, 2021                              112

1              MR. SHER:  I want to now have the witness

2      look at what we marked yesterday as No. 14.

3              AV TECHNICIAN:  One second.

4              For the record, this is going to be

5      Exhibit 23.

6              (Exhibit 23 was marked for identification

7      and is attached to the transcript.)

8          Q    This was provided to the Debtor yesterday,

9      was it not, Mr. Mardiks?

10         A    Correct, it was.

11         Q    Ms. Willis had some questions about whether

12     or not there were expenses that -- whether or not HC

13     paid for all of the services that were rendered during

14     the transition period.  Do you remember --

15         A    I do remember that.

16         Q    And I think you thought -- answered her

17     question that they had, in fact, paid for all of the

18     expenses that we believe were due under the TSA.

19         A    Yeah, I think I said it was likely, yes.

20         Q    Okay.  Well, let's go through this list.

21     Had they -- have they paid the monthly fees of 25,000

22     a month?

Transcript of Lester D. Mardiks, Corporate Designee
Conducted on January 19, 2021                              113

```
 1       A    That's right, they have not.

 2       Q    Have they paid the U.S. Trustee fees?

 3       A    No, they have not.

 4       Q    Do you remember who Stanton was?

 5       A    Stanton was a public relations firm that was

 6   used by Ratner Companies, and subsequently by HC

 7   during the transition.

 8       Q    And did Stanton do press releases related to

 9   the sale of the assets to HC?

10       A    Yes.

11       Q    And do you recall whether or not HC reviewed

12   and approved the press releases before they went out?

13       A    Absolutely did.

14       Q    Has HC paid for Stanton's fee, $30,000?

15       A    No.

16       Q    Okay.  Putting aside whether or not the --

17   they agree or not agree, has HC paid all the fees and

18   expenses of Carl Marks that were accrued?

19       A    No, they haven't.

20       Q    Have they paid all the fees of my law firm

21   that were accrued?

22       A    I know they haven't.
```

Transcript of Lester D. Mardiks, Corporate Designee
Conducted on January 19, 2021                    114

1       Q     Have they paid for Littler's work --

2       A     They haven't.

3       Q     -- in regard to negotiating the TSA and the

4    Sale Order?

5             Let's talk about W-2s for a moment.  The

6    W-2s that the Debtor is sending out, is it W-2s that

7    have to go out to both -- to all of the Debtors'

8    employees?

9       A     It's all employees.

10      Q     And is it also those employees who HC now

11   has hired?

12      A     Yes, those who are -- yes, it would include

13   those.

14      Q     And so the Debtor has to issue W-2s to HC's

15   own employees, correct?

16      A     Correct.

17      Q     And that is in the wind down budget, is it

18   not?

19      A     Yes, it is.

20      Q     Has HC agreed to pay for that?

21      A     Well, I think they did agree to pay for it.

22      Q     Well, did they pay for it?

1        A     No, they did not pay for it.

2        Q     Okay.  By the way, when you gave HC, and

3    when we delivered the budgets to HC, was that our

4    request that they fund all the expenses under the wind

5    down?

6        A     Well, I mean it was -- I don't know what was

7    requested of them at that moment, but that -- it was

8    requested of them in that they do fund the wind down.

9              MR. SHER:  Let's take this down.  I want to

10   show you what was -- what I think I sent up yesterday

11   as No. 3.

12             AV TECHNICIAN:  For the record, Exhibit 24.

13             (Exhibit 24 was marked for identification

14   and is attached to the transcript.)

15       Q     And this, sir, is a copy of a wire transfer

16   to my law firm from HC Salon Holdings.  Have you seen

17   this before?

18       A     I saw -- I think I've seen this recently.

19   Looking for a date on it.

20       Q     It's dated --

21       A     It's in September.  I see it.

22       Q     Okay.  This -- you were aware that HC was

1   paying my law firm's legal fees?

2        A    Yes.

3        Q    And are you also aware that they have ceased

4   paying my law firm?

5        A    Yes, I'm aware of that, both.

6        Q    And this was paid after the termination,

7   supposed termination of the TSA?

8        A    This was September 28th, after the

9   termination of the TSA on September 4.

10       Q    Okay.  Why don't we go back to just the Sale

11  Order, and the TSA -- the APA and the Sale Order.  And

12  the Sale Order is -- hold on.

13            MR. SHER:  I'm sorry.  Exhibit 16, let's put

14  that back up on the screen.

15            AV TECHNICIAN:  Give me one second.

16            (Document displayed.)

17            AV TECHNICIAN:  Okay, Exhibit 16.

18            MR. SHER:  And I am going to go try and find

19  it, so just stay with me for a second, please.

20       Q    I'd like to turn your attention to Section

21  2.3 of the Sale Order.  You see that?  Take -- you can

22  take a quick review of this provision, please.  You

Transcript of Lester D. Mardiks, Corporate Designee
Conducted on January 19, 2021                           117

1    don't have to read it into the record.

2         A    Okay.  Yes, I've read it.

3         Q    In preparing for this deposition today, did

4    you review any documents that discussed the intent of

5    the hundred-thousand-dollar cash, quote, to fund the

6    wind down?

7         A    There were, there were numerous emails and

8    revisions and -- to the --

9         Q    Do you recall emails with the Creditors

10   Committee concerning this issue?

11        A    Yes, I do.

12        Q    And what is your -- what do the records of

13   the Debtors show the Committee was asking for?

14        A    There was a tradeoff between this amount and

15   some four to $500,000 from rents, and the Creditors

16   Committee attorneys wanted to make sure that they were

17   covered and that, I believe, what -- was the genesis

18   of this $100,000.

19        Q    One second.  I'm going to show you what we

20   marked yesterday as No. 7.

21             (Exhibit 25 was marked for identification

22   and is attached to the transcript.)

1            MR. SHER:  And you can also put No. 8 up at

2    the same time from yesterday.

3            AV TECHNICIAN:  Oh, you want No. 8 as well?

4            MR. SHER:  Yes, sir.

5            AV TECHNICIAN:  Okay.  One second.

6            (Exhibit 26 was marked for identification

7    and is attached to the transcript.)

8            AV TECHNICIAN:  No. 8 is going to be, for

9    the record, Exhibit 25 -- I'm sorry, No. 7, Document

10   No. 7 is Exhibit 25, and 8 is Exhibit 26.

11       Q    Look at 25 first, which is an email dated

12   Sunday, May 17 from Mr. Chesley to myself.

13           AV TECHNICIAN:  And you have access now,

14   sir.

15       Q    And please take a look at the Exhibit

16   attached to the email.  Do you see the reference there

17   to the wind down budget?

18       A    Yes, I do.

19       Q    And does this refresh your recollection,

20   what was the original intention of this, quote, wind

21   down budget?

22       A    It was at the point in time when we didn't

Transcript of Lester D. Mardiks, Corporate Designee
Conducted on January 19, 2021                         119

1   know what the wind down would entail.  It was to

2   fund --

3        Q    I'm asking about this particular term sheet,

4   sir.  What was the intention of this term sheet of the

5   budget?

6        A    Okay.  It was for the Committee.

7        Q    And was the Committee asking for money for

8   their legal fees at this time?

9        A    I mean that was what, essentially what the

10  Committee wanted to cover, I know that.  But it's a

11  wind down budget of 175, which amount the Committee in

12  consultation with the Debtors shall utilize in

13  furtherance of their fiduciary obligations.

14       Q    Look at the next Exhibit.

15            MR. SHER:  I lost track.

16            AV TECHNICIAN:  26.

17       Q    And this is an email from Mr. Costa to

18  Mr. Chesley and me, and read the last paragraph.

19       A    You will notice -- you want me to read it

20  into the record?

21       Q    No, please don't read it into the record, I

22  want you to read it.

Transcript of Lester D. Mardiks, Corporate Designee
Conducted on January 19, 2021                          120

1          A      All right.   Okay, I will.

2          Q      A moment ago I think you mentioned a

3     tradeoff.   Was this the tradeoff you were talking

4     about?

5          A      Yes, this is.

6          Q      So the Committee was basically trading off

7     some of their fees to cover the stub rent for the

8     landlords?

9          A      Correct.

10         Q      Lastly I want to show you what I marked as

11    Exhibit 9 yesterday -- not lastly, let me say that.

12                (Exhibit 27 was marked for identification

13    and is attached to the transcript.)

14                AV TECHNICIAN:   Exhibit 27 for the record.

15    Thank you.

16         Q      Exhibit 27, I will state for the record

17    these are the budgets that were attached to the three

18    orders approving the DIP.   Without encumbering this

19    proceeding with too many pages, I just took the last

20    page off.

21                I want to turn your attention to the very

22    last budget, Page 3 of 3.

Transcript of Lester D. Mardiks, Corporate Designee
Conducted on January 19, 2021                    121

1              AV TECHNICIAN:  You have access, sir.

2         Q    You see there's 75,000 there for UCC

3    advisor?

4              AV TECHNICIAN:  You want No. 3?

5              I'm sorry, let me help you.

6         Q    Page 3 of 3.

7         A    This is it.

8              What am I looking for now?

9         Q    In Professional Fees and Costs do you see

10   fees and costs that are being funded under the DIP,

11   such as $350,000?

12        A    Okay, there I am.

13             Okay.  Yeah.

14        Q    And you saw -- a moment ago we saw the

15   beginning of the negotiations over the 100 -- the

16   Committee wanted 175 and then traded down to 100,

17   correct?

18        A    Yes.

19        Q    And you see now they pick up the 75 they

20   traded away in the third DIP Order, correct?

21        A    There it is, yes.

22        Q    And this is dated 5/28/20, is it not?

Transcript of Lester D. Mardiks, Corporate Designee
Conducted on January 19, 2021                    122

```
1        A    I don't see the date.

2        Q    It's on the top of the page.

3             AV TECHNICIAN:  Right there.

4        A    That is the date.

5             MR. SHER:  Okay, one minute just to see if I

6   have any more questions.

7             Mark as exhibit -- what I gave you as

8   Exhibit 20.

9             AV TECHNICIAN:  I'm sorry, you cut out.

10            MR. SHER:  What I marked yesterday as 20.

11            AV TECHNICIAN:  Okay, one second.

12            For the record, Exhibit 28.

13            (Exhibit 28 was marked for identification

14  and is attached to the transcript.)

15       Q    Have you seen this before, Mr. Mardiks?

16       A    I have.

17       Q    Who's Ms. Hodges?

18       A    Pardon me?  What about Ms. Hodges?

19       Q    Who was Liz Hodges?

20       A    Oh.  Senior Vice President of marketing

21  essentially.  She had -- her title was slightly

22  different, but that was her role, marketing.
```

Transcript of Lester D. Mardiks, Corporate Designee
Conducted on January 19, 2021                    123

```
1          Q     And a few moments ago we talked about

2     $30,000 that was due to Stanton that hasn't been paid.

3     Is this the invoice that is referenced?

4          A     That's the invoice.

5          Q     And this is for work done between March 25th

6     and June 6th, correct?

7          A     Yes.

8          Q     And this is regarding press releases

9     associated with the transition to HC, correct?

10         A     That's correct.

11               MR. SHER:  One moment, please.

12               No further questions at this time.

13               AV TECHNICIAN:  Does anybody else have

14    questions or follow-up questions?

15               MS. WILLIS:  Kevin, did you want to just

16    take a two-minute break to discuss --

17               MR. KOBBE:  Yeah, happy to do so.

18               Why don't we reconvene at 12:40, and at that

19    point we can talk about the timing for the afternoon

20    deposition as well.

21               (A recess was taken at 12:34 p.m.)

22               (Back on the record at 12:41 p.m.)
```

1            MS. WILLIS:  Back on the record.

2            We have no further questions of this

3   witness, and we will resume the deposition at 1:45

4   p.m. Eastern time with questioning of Mr. Jacobson.

5            AV TECHNICIAN:  Off the record now.

6            (Off the record at 12:42 p.m.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

Transcript of Lester D. Mardiks, Corporate Designee
Conducted on January 19, 2021                    125

```
 1       CERTIFICATE OF SHORTHAND REPORTER-NOTARY PUBLIC

 2

 3       I, Dawn M. Hart, the officer before whom the

 4   foregoing deposition was taken, do hereby certify that

 5   the foregoing transcript is a true and

 6   correct record of the testimony given; that said

 7   testimony was taken by me stenographically and

 8   thereafter reduced to typewriting under my direction;

 9   that reading and signing was waived; and that I am

10   neither counsel for, related to, nor employed by any

11   of the parties to this case and have no interest,

12   financial or otherwise, in its outcome.

13       IN WITNESS WHEREOF, I have hereunto set my

14   hand and affixed my notarial seal this 20th day

15   of January, 2021.

16   My commission expires:

17   January 2, 2025

18

19

20   _____

21   NOTARY IN AND FOR THE

22   STATE OF MARYLAND
```

Transcript of Lester D. Mardiks, Corporate Designee
Conducted on January 19, 2021                    126

| A |
|---|

**ability**
8:16, 8:19,
12:20
**able**
6:12, 9:9,
22:15, 32:20,
80:19
**about**
15:15, 15:16,
15:19, 15:22,
16:10, 16:13,
16:16, 16:19,
16:22, 21:7,
23:2, 28:12,
36:22, 40:16,
40:20, 44:11,
55:2, 59:9,
62:21, 68:22,
72:16, 75:17,
77:18, 82:3,
87:10, 87:12,
87:21, 89:11,
89:12, 89:13,
91:12, 91:21,
94:4, 96:21,
100:11, 100:15,
107:19, 109:5,
109:8, 109:17,
112:11, 114:5,
119:3, 120:4,
122:18, 123:1,
123:19
**absolutely**
61:13, 68:14,
101:15, 113:13
**access**
19:12, 22:15,
28:15, 30:13,
33:11, 46:21,
56:12, 58:10,
58:11, 73:5,
83:18, 85:2,
93:1, 93:2,
102:3, 118:13,
121:1
**accessing**
87:8

**account**
71:20, 108:16,
109:1
**accounting**
75:14, 78:6,
78:10
**accounts**
35:20, 47:18,
48:1, 48:6,
48:21, 70:22,
71:22, 72:3,
101:14, 102:15,
106:2, 107:16,
110:14
**accrued**
29:12, 113:18,
113:21
**accused**
51:8
**achieve**
78:5
**acquired**
44:17, 45:2,
104:22
**acquisition**
10:20
**act**
99:6, 99:22
**acting**
64:4
**action**
9:22, 10:3,
68:10, 88:3
**actual**
56:19, 60:2,
67:1, 102:7
**actually**
49:20, 92:1,
108:20
**add**
68:4
**addition**
12:17
**additional**
12:15, 78:19
**address**
33:21, 81:16
**addressing**
41:19, 42:3,

42:4
**adhered**
58:15
**adjust**
69:19, 69:20
**administration**
10:20, 29:9
**administrative**
29:11, 29:13,
41:18, 44:6,
74:19, 78:13
**advise**
81:16
**advisor**
70:15, 121:3
**advisors**
23:19, 40:5
**affairs**
41:18
**affect**
8:13, 8:15,
8:18
**affirmed**
6:21
**affixed**
125:14
**after**
10:6, 10:7,
10:12, 13:15,
24:8, 50:14,
50:16, 50:19,
50:22, 53:13,
54:10, 59:8,
66:8, 84:18,
86:4, 86:13,
101:12, 106:4,
109:21, 116:6,
116:8
**afternoon**
123:19
**again**
18:9, 18:10,
28:15, 50:7,
50:16, 62:22,
86:9
**against**
96:20
**agent**
50:10, 62:7,

70:7
**aggregate**
68:4
**ago**
77:5, 79:10,
91:1, 94:10,
105:10, 107:18,
120:2, 121:14,
123:1
**agree**
36:20, 113:17,
114:21
**agreed**
6:4, 6:7,
33:15, 38:4,
57:22, 97:1,
114:20
**agreeing**
58:1
**agreements**
20:12, 21:13,
34:7, 47:22,
97:9
**ah**
83:15
**ahead**
16:6
**al**
1:6
**all**
7:9, 10:19,
17:3, 22:4,
22:6, 29:9,
29:17, 32:9,
35:9, 39:8,
44:5, 48:9,
55:18, 57:4,
61:11, 61:15,
64:14, 67:5,
68:15, 72:17,
74:18, 75:18,
76:16, 78:12,
80:5, 82:17,
90:17, 91:6,
92:2, 94:21,
96:12, 103:1,
105:4, 105:9,
107:15, 112:13,

112:17, 113:17,
113:20, 114:7,
114:9, 115:4,
120:1
**allow**
65:2
**allowing**
110:13
**almost**
20:18, 104:13
**alone**
48:6
**already**
16:5, 22:12
**also**
3:18, 6:9,
6:12, 9:8, 17:9,
22:10, 28:1,
61:19, 77:9,
91:13, 94:15,
101:8, 108:10,
114:10, 116:3,
118:1
**alternative**
87:8
**altogether**
77:14
**always**
13:19
**ambiguity**
25:16, 42:18
**amended**
4:18, 22:5,
23:1, 24:6,
33:6, 102:5
**americas**
2:13
**amount**
17:22, 31:10,
67:2, 69:11,
75:21, 76:1,
76:2, 76:13,
76:15, 77:1,
117:14, 119:11
**amounts**
29:15, 57:4,
74:7, 74:15,
80:5

**another**
47:14
**answer**
7:9, 20:17,
24:17, 50:12,
55:4, 67:7,
71:18, 81:7,
86:7, 86:12
**answered**
90:19, 112:16
**answers**
7:12
**anticipated**
52:14, 78:17
**any**
8:11, 8:12,
8:15, 8:18,
9:17, 9:21,
10:2, 10:3,
17:15, 18:6,
18:11, 18:14,
20:11, 20:14,
21:12, 23:12,
23:18, 23:20,
24:2, 24:3,
24:10, 24:15,
25:16, 30:2,
30:3, 33:19,
34:2, 34:8,
38:1, 40:4,
40:10, 41:3,
41:6, 42:18,
50:13, 51:1,
51:5, 52:9,
53:7, 57:11,
57:15, 57:16,
58:12, 61:7,
62:9, 62:11,
62:13, 62:16,
63:5, 63:16,
65:6, 65:9,
68:17, 68:18,
69:11, 69:17,
70:15, 71:8,
71:13, 73:20,
78:21, 79:3,
79:14, 79:19,
79:22, 80:1,

80:7, 85:21,
88:16, 91:3,
117:4, 122:6,
125:10
**anybody**
123:13
**anything**
10:10, 39:15,
52:13, 53:11,
65:14, 90:15,
90:18, 99:5,
104:22
**anyway**
85:1
**anywhere**
31:12, 32:2,
44:2
**apa**
18:21, 18:22,
27:10, 31:12,
32:2, 33:6,
33:18, 34:1,
36:10, 44:11,
91:14, 92:8,
93:6, 97:20,
97:21, 98:8,
108:10, 116:11
**apologies**
38:18
**apologize**
92:21, 96:1
**appear**
55:18
**applicable**
93:10, 93:11,
93:13, 93:14,
93:17
**approval**
59:22, 60:5,
60:6, 74:7,
74:11
**approve**
60:11
**approved**
113:12
**approving**
22:3, 22:7,
120:18

**approximately**
59:19, 60:20,
66:13, 66:14,
99:8, 99:13,
101:1, 101:5,
105:11
**approximation**
99:14
**april**
77:1, 77:3,
95:4
**area**
11:2
**areas**
53:20
**arise**
107:16
**arisen**
57:12
**around**
11:8, 13:15,
19:1, 69:6,
74:18, 99:3
**aside**
17:13, 34:1,
48:1, 78:5,
113:16
**asked**
40:15, 55:2,
68:12, 93:4,
100:15, 107:18,
111:19
**asking**
16:7, 77:15,
88:17, 117:13,
119:3, 119:7
**aspects**
34:10, 40:9
**asset**
18:21, 20:11,
20:16, 22:5,
23:1, 23:3,
23:4, 23:5,
23:11, 23:12,
23:20, 24:1,
24:2, 24:7,
24:12, 24:16,
25:6, 25:8,

Transcript of Lester D. Mardiks, Corporate Designee
Conducted on January 19, 2021

128

25:11, 25:14,
25:17, 25:20,
30:8, 34:14,
34:15, 34:19,
35:1, 36:1,
36:7, 36:10,
36:11, 44:17,
45:2, 92:11,
92:13, 94:3,
95:10, 96:2,
97:5, 98:2
**assets**
22:4, 29:17,
36:3, 36:14,
36:17, 36:18,
37:13, 95:8,
96:16, 96:18,
96:19, 97:2,
97:5, 113:9
**assignment**
22:7, 93:13
**assist**
30:11
**assistance**
59:6
**assistant**
12:15
**associated**
62:5, 123:9
**associates**
17:13
**assume**
26:19
**assumed**
26:10, 26:17,
26:21, 27:21,
39:19
**assuming**
32:8
**assumption**
22:7, 93:14
**attach**
95:12
**attached**
4:6, 5:2,
14:15, 19:9,
21:20, 38:9,
46:18, 73:2,

83:12, 89:14,
92:8, 92:12,
94:18, 95:9,
95:13, 95:17,
95:18, 101:22,
102:12, 112:7,
115:14, 117:22,
118:7, 118:16,
120:13, 120:17,
122:14
**attaching**
34:13
**attachments**
18:20
**attention**
92:7, 96:11,
105:9, 116:20,
120:21
**attorneys**
34:6, 117:16
**august**
76:1, 83:20,
84:18, 85:11,
86:5, 86:13,
101:13, 102:6,
102:15, 105:20,
106:7, 107:1,
107:8, 109:3
**authorizing**
22:3
**av**
3:20, 14:16,
15:5, 19:7,
19:10, 19:21,
20:8, 21:21,
22:13, 22:17,
25:22, 26:4,
28:3, 28:5,
28:9, 28:14,
28:17, 30:11,
32:20, 33:1,
33:10, 38:7,
38:10, 38:22,
39:3, 46:16,
46:19, 51:17,
52:19, 56:3,
56:9, 56:11,
58:10, 72:21,

73:3, 83:1,
83:3, 83:7,
83:10, 83:15,
83:18, 91:18,
91:22, 92:15,
92:22, 94:11,
94:14, 94:19,
100:8, 100:14,
101:18, 102:1,
103:13, 103:16,
103:19, 103:21,
104:3, 105:16,
105:18, 106:12,
106:14, 106:16,
111:10, 112:3,
115:12, 116:15,
116:17, 118:3,
118:5, 118:8,
118:13, 119:16,
120:14, 121:1,
121:4, 122:3,
122:9, 122:11,
123:13, 124:5
**avenue**
2:8, 2:13
**avoid**
44:5
**aware**
7:16, 8:3,
31:12, 32:2,
51:5, 52:9,
65:9, 65:14,
68:18, 70:8,
78:21, 79:19,
79:22, 81:11,
88:13, 115:22,
116:3, 116:5
**away**
19:18, 121:20

## B

**b**
93:9, 93:10,
93:18
**b) (6**
1:9, 6:2
**back**
9:4, 11:21,

11:22, 21:16,
34:5, 34:13,
39:1, 51:15,
52:12, 55:8,
55:22, 58:10,
66:17, 67:5,
82:20, 85:17,
96:12, 96:15,
96:17, 98:2,
102:11, 102:22,
103:2, 103:10,
110:3, 111:8,
111:21, 116:10,
116:14, 123:22,
124:1
**back-and-forth**
61:5
**baltimore**
2:9, 3:6
**bank**
35:19, 37:12,
37:17, 47:18,
48:1, 48:6,
48:21, 70:22,
71:20, 71:22,
72:3, 78:10,
97:5, 97:6,
97:10, 97:13,
101:14, 102:12,
102:15, 102:22,
104:7, 104:9,
106:2, 107:16,
108:16, 109:1,
110:13
**bankrupt**
29:14, 31:8
**bankruptcy**
1:1, 29:9,
29:14, 48:5,
50:4, 50:6,
50:11, 78:14,
81:5, 81:10,
81:14, 94:22,
108:4
**banks**
45:10
**based**
58:17, 58:18,

**58:19, 71:19,**
105:2, 105:6,
107:13
**basically**
120:6
**basis**
57:19, 67:12
**bathroom**
82:8
**bear**
103:8
**became**
11:6, 46:4
**because**
6:2, 14:19,
27:6, 35:8,
35:9, 35:15,
37:12, 37:21,
55:6, 57:22,
69:19, 70:21,
76:4, 77:12,
90:22, 97:4,
99:18, 107:16
**become**
43:8, 54:21,
78:2
**been**
7:21, 9:21,
10:2, 12:21,
13:7, 14:6,
28:4, 29:7,
51:5, 52:14,
62:21, 63:3,
74:12, 75:1,
75:8, 82:2,
86:18, 87:4,
89:3, 90:22,
95:14, 123:2
**before**
2:1, 7:21, 9:2,
21:8, 21:10,
40:2, 42:13,
44:3, 66:1,
67:3, 71:1,
78:17, 79:15,
79:21, 99:10,
100:17, 113:12,
115:17, 122:15,

125:3
**begin**
11:17, 70:9
**beginning**
6:19, 9:11,
16:8, 33:9,
35:10, 121:15
**behalf**
2:4, 3:2, 43:7,
47:5
**being**
6:12, 6:21,
7:8, 7:16, 8:12,
36:15, 37:9,
39:19, 39:20,
45:10, 48:3,
54:14, 58:17,
58:19, 69:18,
97:2, 105:20,
121:10
**belief**
66:3
**believe**
6:6, 19:6,
23:22, 32:16,
42:18, 51:2,
53:7, 53:17,
58:6, 59:16,
62:9, 62:13,
62:14, 74:5,
79:17, 79:18,
86:4, 94:5,
95:9, 100:16,
101:7, 108:22,
109:4, 109:14,
110:21, 112:18,
117:17
**believed**
53:20, 64:9,
93:5
**benefit**
49:3, 85:21,
88:4, 90:4,
90:5, 90:6,
90:8, 90:16,
90:18, 106:1
**benefited**
86:4, 86:13

**benefits**
75:10, 78:6,
86:2
**best**
6:16, 94:2,
97:8, 106:20,
107:2, 107:6
**better**
88:5, 95:8
**between**
8:1, 17:20,
20:12, 21:13,
34:6, 58:16,
72:17, 74:1,
76:22, 77:13,
88:11, 89:21,
111:3, 117:14,
123:5
**beyond**
54:6, 54:8,
80:6
**bidder**
95:9
**bill**
93:11, 93:12
**bit**
33:7, 55:6,
88:5, 89:20,
90:2
**board**
10:15
**body**
9:22, 23:9,
39:21
**bonuses**
30:2
**bookkeeping**
75:14
**both**
40:21, 42:9,
73:16, 85:7,
85:8, 114:7,
116:5
**bottom**
33:5
**bought**
97:8
**brad**
83:21, 84:5

**breach**
51:3, 51:6,
51:9
**break**
9:8, 9:10,
82:4, 82:8,
82:10, 82:11,
123:16
**briefly**
26:13
**bring**
80:20, 81:4
**bringing**
12:19, 13:6,
31:6
**broke**
62:22
**bucket**
90:13
**budget**
4:15, 27:6,
33:3, 33:15,
33:16, 59:9,
60:11, 67:14,
68:5, 70:4,
72:20, 73:7,
74:6, 74:8,
74:16, 75:5,
77:3, 79:4,
79:5, 79:14,
79:20, 88:5,
89:12, 109:20,
111:9, 111:15,
114:17, 118:17,
118:21, 119:5,
119:11, 120:22
**budgets**
5:6, 42:14,
53:2, 58:14,
58:19, 58:22,
59:3, 59:13,
59:14, 59:17,
59:19, 60:14,
60:20, 60:21,
60:22, 61:1,
61:3, 61:8,
67:13, 68:7,
68:17, 76:17,

Transcript of Lester D. Mardiks, Corporate Designee
Conducted on January 19, 2021

130

78:10, 87:11,
109:9, 109:11,
109:13, 109:14,
109:17, 109:19,
115:3, 120:17
**building**
2:7
**bullet**
84:10
**business**
10:11, 10:13,
13:12, 43:4,
45:8, 110:19,
110:22
**businesses**
106:2
**busy**
40:15
**buyer**
43:5, 45:8,
93:11, 93:13,
93:15, 93:17
**buyers**
43:3
**buyout**
97:6

**C**

**call**
14:9, 23:3,
51:6, 53:20,
84:4, 84:9,
89:16, 89:17
**called**
10:16, 51:8
**calls**
30:18, 41:21,
61:5
**came**
10:10, 11:1
**can't**
60:15, 77:17,
84:7, 86:12,
103:3
**capitalized**
30:20, 30:22
**capped**
32:4

**care**
11:22, 41:17,
41:21
**carl**
113:18
**carried**
47:21, 48:2,
98:8
**case**
1:5, 50:11,
80:17, 125:11
**cases**
7:6, 7:18,
29:9, 81:5,
81:10, 81:14,
81:21
**cash**
30:14, 66:12,
104:5, 104:9,
117:5
**catastrophically**
81:6
**categories**
55:15, 55:16,
56:15
**categorize**
89:5
**categorized**
89:9
**category**
62:19
**cause**
80:21
**causing**
80:8, 80:11,
80:13, 80:14
**ceased**
48:10, 116:3
**centers**
10:21, 12:12
**ceo**
67:22
**ceremony**
77:12
**certain**
6:10, 6:12,
22:8, 34:10,
74:17, 87:14

**certainly**
27:8, 70:13,
80:14, 85:8
**certainty**
36:22, 107:9
**certificate**
93:16, 125:1
**certifications**
9:17
**certify**
125:4
**cetera**
74:20
**change**
30:3, 105:13
**changed**
75:22, 76:3
**changes**
23:20, 61:4,
61:8
**channels**
88:13
**chapter**
1:4, 7:6, 7:17,
81:21
**characterize**
14:2
**charge**
70:2
**checks**
53:3
**chesley**
5:4, 5:5,
59:12, 63:12,
108:1, 118:12,
119:18
**chi**
100:19
**chief**
13:4, 13:13,
17:11, 64:10
**chiefly**
35:9
**circumstance**
81:2
**circumstances**
42:10, 89:2
**city**
9:14

**claims**
22:6, 29:11,
62:7, 70:6,
96:20, 108:21
**clarification**
27:4
**clarify**
45:13, 46:1,
48:13, 67:8,
85:4, 109:6
**clear**
22:6, 47:10,
77:14, 107:17
**clerking**
10:8
**click**
22:14
**clients**
10:12
**close**
36:21, 61:3,
81:5
**closing**
12:12, 24:11,
29:12, 34:18,
93:10, 93:22,
94:4
**code**
29:14
**coincidence**
94:15, 94:16
**collaboration**
40:19
**collaborative**
45:11
**colleagues**
17:14
**collected**
29:16
**combination**
64:11, 77:22
**come**
21:16, 53:13,
87:7
**comes**
36:21
**comments**
86:20

Transcript of Lester D. Mardiks, Corporate Designee
Conducted on January 19, 2021                                131

commission
125:16
committee
117:10, 117:13,
117:16, 119:6,
119:7, 119:10,
119:11, 120:6,
121:16
commonwealth
9:20
communication
34:8, 60:8,
72:8
communications
63:5, 65:9
companies
7:7, 7:19,
11:3, 11:16,
11:18, 12:1,
12:3, 12:22,
13:3, 13:7,
14:8, 31:8,
34:6, 41:11,
41:15, 42:7,
45:15, 54:13,
78:5, 90:10,
113:6
company
10:16, 12:17,
13:11, 13:16,
35:10, 35:21,
41:13, 42:1,
47:4, 47:5,
49:21, 50:1,
65:19
company's
32:1, 33:17
companys
37:13
compel
4:9, 19:17,
32:19, 55:12
compensated
90:22
compensation
62:16
comply
4:10, 20:2,

99:7
complying
22:19, 26:11,
27:12, 43:13
component
17:3, 84:16
computer
33:11
concept
27:2
concepts
39:21
concerning
117:10
conclusion
31:7, 65:7
concrete
27:8
condition
8:12
conditions
93:18
conduct
87:14, 87:19,
88:5, 88:7
confer
90:20
confirm
15:14
confused
109:6
confusion
109:7, 111:18
connection
7:17, 29:8,
29:16, 29:17,
29:21, 30:7,
61:12
consent
66:19, 66:20,
67:5, 67:9,
67:10, 67:17,
67:18, 68:6,
68:8, 68:11,
68:13, 68:16,
68:19, 69:2,
69:8, 69:9,
69:14, 70:5,

70:19, 87:12,
87:14, 88:20
consider
54:13
considerable
17:22
consistent
43:20, 60:1
construction
13:11
consultant
11:19, 13:8,
75:11
consultation
119:12
consulting
12:13, 78:6
consummating
24:11
consummation
29:18, 29:22,
30:1, 30:5
contact
42:5, 49:13
contained
33:18
contemplated
29:19, 30:1,
30:6, 35:2, 94:1
contemplates
33:3, 46:10
contemplating
80:1
contemplation
98:22
contested
7:17
context
31:4
continue
16:9, 47:7,
49:22, 64:10,
74:13, 75:14,
77:16, 100:20,
110:13
continued
3:1, 5:1,
42:12, 70:21,

71:14, 71:15,
71:19
continues
72:6
continuing
47:12
contract
49:12, 49:14,
74:20
contractors
78:9, 80:19
contracts
22:8, 39:19,
47:7, 47:12,
100:20, 101:3,
101:6
contractual
74:21
control
15:3, 19:19,
19:21, 22:11,
30:3, 52:17,
83:13, 92:10,
95:22
conversation
8:2, 58:18,
72:16, 84:15
conversations
34:4, 98:17
converted
81:21
cooperation
52:6, 52:9
coordination
53:20
copier
74:19
copies
59:17
copy
95:10, 115:15
corporation
10:17
correct
14:10, 23:6,
31:10, 32:10,
32:11, 46:6,
46:7, 46:12,

Transcript of Lester D. Mardiks, Corporate Designee
Conducted on January 19, 2021                    132

51:10, 62:17,
65:16, 75:17,
83:5, 97:14,
97:17, 97:19,
98:9, 100:3,
100:17, 101:11,
104:6, 105:2,
110:5, 110:11,
110:15, 111:13,
112:10, 114:15,
114:16, 120:9,
121:17, 121:20,
123:6, 123:9,
123:10, 125:6
**correspondence**
41:20, 78:7
**cost**
32:3, 61:19,
62:1, 65:12,
70:18
**costa**
5:5, 119:17
**costly**
64:16
**costs**
25:18, 26:22,
27:2, 29:6,
29:17, 31:13,
42:20, 44:5,
55:15, 55:16,
56:15, 57:5,
57:11, 57:16,
57:20, 58:2,
60:2, 62:5,
62:9, 62:12,
62:14, 62:19,
62:20, 65:11,
65:19, 66:5,
66:7, 66:8,
67:6, 67:16,
80:17, 87:15,
89:7, 110:18,
110:21, 121:9,
121:10
**could**
10:11, 18:9,
24:20, 26:5,
44:19, 48:8,

49:15, 50:7,
52:7, 54:15,
56:21, 77:22,
78:17, 80:18,
80:21, 82:10,
86:9, 87:17,
88:4, 89:3, 90:1
**couldn't**
48:8, 69:19,
86:2, 86:10
**counsel**
7:2, 10:18,
11:3, 11:7,
12:5, 12:6,
12:7, 12:10,
12:18, 25:7,
40:21, 41:4,
56:6, 59:7,
59:14, 69:15,
69:16, 81:15,
88:12, 92:5,
111:12, 125:10
**counter**
49:13
**counterpart**
59:12
**couple**
84:17
**course**
8:20, 12:2,
14:8, 43:7,
58:16, 58:21,
59:20, 68:10,
75:21, 87:14,
87:19, 88:5,
88:6, 110:1,
111:3, 111:4
**court**
1:1, 7:9, 7:11,
9:3, 10:3, 19:4,
21:15, 21:17,
27:4, 32:18,
34:12, 35:22,
42:13, 50:10,
94:22, 98:3
**cover**
43:2, 119:10,
120:7

**covered**
117:17
**creating**
40:13
**creative**
1:5, 1:10, 7:6,
7:18, 11:4,
14:7, 41:12,
41:15, 42:8,
45:14
**credentials**
9:18
**creditors**
108:7, 117:9,
117:15
**critical**
35:14
**crossover**
6:10, 77:13
**crr**
1:22, 2:2
**current**
85:22
**currently**
11:11, 11:13,
11:15, 20:21
**cut**
28:4, 122:9

**D**

**d'alessandro**
3:19, 17:7,
92:3, 95:15,
95:19
**d'allesandro**
95:12
**damaged**
37:10
**data**
49:7
**date**
29:12, 46:2,
46:3, 51:13,
65:3, 86:18,
95:5, 98:4,
105:3, 106:5,
115:19, 122:1,
122:4

**dated**
97:22, 115:20,
118:11, 121:22
**dawn**
1:22, 2:1,
125:3
**day**
60:9, 104:13,
107:7, 125:14
**days**
79:9
**dc**
9:20, 11:2
**dealing**
41:19, 42:13,
58:16, 58:21,
72:17, 75:10,
78:7, 78:8,
78:10, 78:13,
111:3, 111:4
**debt**
97:7
**debtor**
26:22, 57:4,
97:16, 99:21,
102:4, 104:22,
105:7, 106:21,
107:21, 108:5,
108:11, 108:20,
109:12, 110:9,
111:19, 112:8,
114:6, 114:14
**debtors**
1:7, 3:2, 4:9,
14:9, 19:17,
20:4, 20:12,
21:13, 22:4,
23:19, 32:18,
36:19, 40:5,
44:6, 45:14,
48:17, 48:20,
49:3, 49:10,
49:18, 50:9,
50:13, 50:17,
51:2, 51:8,
53:8, 53:21,
61:10, 61:14,
61:16, 61:18,

Transcript of Lester D. Mardiks, Corporate Designee
Conducted on January 19, 2021

133

61:22, 62:1,
62:4, 62:6,
62:9, 62:13,
62:14, 63:6,
63:14, 65:10,
65:12, 65:13,
66:4, 66:5,
66:12, 71:19,
71:22, 72:2,
80:10, 80:11,
80:13, 81:4,
81:8, 81:12,
81:20, 85:5,
85:9, 85:14,
85:18, 87:11,
87:13, 92:5,
95:7, 98:18,
99:9, 101:2,
101:14, 102:15,
106:2, 107:10,
107:14, 110:7,
110:17, 114:7,
117:13, 119:12
**decisions**
39:17, 41:18
**decrease**
77:1
**decreasingly**
43:8
**defined**
31:1, 36:2
**defining**
29:2
**definition**
26:10, 27:14,
37:1, 96:17
**definitions**
25:13
**degree**
87:16, 87:18
**delay**
78:22, 80:8,
80:11, 80:13,
80:14, 80:21
**delays**
78:18
**deliver**
93:11

**deliverable**
34:18, 93:6,
93:22
**delivered**
29:20, 30:7,
115:3
**delivery**
47:9, 48:15,
48:20, 49:1,
49:10, 49:17
**dennis**
11:2, 11:9,
13:8, 13:10,
13:20, 14:3
**departure**
13:17
**depending**
6:11
**deposed**
7:16, 7:21
**deposit**
104:15
**deposition**
1:9, 4:7, 4:8,
5:3, 6:6, 6:19,
7:8, 8:2, 8:20,
14:9, 15:13,
15:16, 15:19,
15:22, 16:8,
16:10, 16:13,
16:16, 16:19,
16:22, 17:5,
17:18, 18:3,
18:8, 18:12,
18:15, 66:16,
82:5, 117:3,
123:20, 124:3,
125:4
**depositions**
55:5, 65:7,
96:4
**deposits**
104:12
**describe**
9:12, 10:5,
20:14, 39:9,
40:11, 40:20,
56:21, 69:13,

72:7, 88:4
**described**
48:13, 57:17,
73:22
**describes**
55:15
**designated**
1:11, 6:8,
14:7, 16:5,
77:11
**designations**
6:5, 77:13
**detail**
76:16, 76:18,
77:18, 104:5,
104:10
**determine**
80:18
**determined**
36:19
**determining**
81:2
**developed**
33:21, 87:13
**development**
13:12
**developments**
10:22
**dialogue**
74:1, 88:11
**differences**
8:1
**different**
56:18, 56:22,
61:2, 95:13,
109:18, 109:20,
122:22
**difficult**
55:6
**diligence**
24:13
**diligent**
62:21, 63:3
**dip**
4:18, 5:6,
29:22, 120:18,
121:10, 121:20
**direct**
71:9

**direction**
125:8
**directly**
24:3, 40:16,
40:17, 47:20,
63:22
**directors**
10:15
**disbursements**
102:14, 102:20,
103:11, 105:6,
105:11, 105:20,
105:22, 106:22
**disciplinary**
9:22, 10:3
**disciplined**
12:21
**disclosure**
23:6
**discuss**
24:1, 41:2,
53:16, 60:12,
60:13, 63:13,
63:16, 74:10,
77:21, 123:16
**discussed**
6:17, 27:7,
54:14, 109:14,
117:4
**discusses**
56:19
**discussing**
27:14
**discussion**
74:14, 82:18,
83:17, 85:2,
109:8
**discussions**
19:1, 23:18,
40:4, 40:12,
40:20, 69:6,
72:14
**displayed**
100:9, 106:13,
111:11, 116:16
**distinction**
90:11
**district**
1:2

Transcript of Lester D. Mardiks, Corporate Designee
Conducted on January 19, 2021

134

**division**
1:3
**dla**
2:6, 7:5
**docket**
94:22, 95:4
**document**
15:2, 15:10,
19:14, 19:20,
20:6, 20:20,
20:21, 21:1,
21:22, 22:11,
22:14, 22:18,
22:22, 23:3,
23:10, 26:3,
26:21, 27:1,
28:2, 28:5,
28:10, 30:12,
30:22, 32:21,
34:15, 36:1,
37:2, 38:12,
38:20, 45:21,
46:10, 46:21,
47:1, 47:9,
51:20, 51:21,
51:22, 52:4,
52:10, 52:17,
55:10, 56:1,
56:2, 56:12,
58:9, 66:1,
73:6, 73:18,
79:12, 84:1,
89:12, 94:11,
94:14, 95:16,
100:9, 103:22,
106:13, 111:11,
111:12, 116:16,
118:9
**documentation**
67:7, 74:22
**documents**
8:19, 17:12,
18:7, 18:14,
18:17, 19:2,
29:20, 30:6,
34:2, 41:19,
55:7, 65:7,
74:15, 74:18,

75:1, 78:9,
84:16, 92:21,
96:15, 97:9,
117:4
**doing**
42:15, 42:16,
60:16, 69:15,
78:10, 79:18,
105:1
**done**
43:6, 58:17,
78:17, 90:6,
90:9, 123:5
**dotted**
13:18, 13:19
**double-checking**
83:8
**dozen**
60:4
**drafting**
23:5, 39:4,
39:10
**due**
24:13, 112:18,
123:2
**duly**
6:21, 93:12,
93:14, 93:16
**during**
8:19, 12:2,
12:22, 13:2,
18:6, 18:11,
35:9, 43:7,
51:1, 53:15,
54:20, 57:2,
84:2, 110:1,
110:20, 112:13,
113:7
**duties**
12:8, 54:14
**dwindling**
35:14

**E**

**each**
8:4, 29:20,
60:9, 68:3,
93:17

**earlier**
54:14, 79:3,
79:10, 87:10,
87:12, 93:3,
96:21
**ease**
26:2
**easier**
14:21, 22:20,
26:7, 72:11,
103:19
**eastern**
124:4
**edt**
1:14
**education**
9:12
**effect**
47:8, 54:12,
54:18, 93:17
**effective**
46:4, 47:6
**effectively**
35:17
**efficiently**
42:16
**either**
24:20
**elaborated**
44:12
**electronic**
49:7, 53:3
**else**
80:20, 89:17,
123:13
**elsewhere**
31:1
**email**
4:16, 5:4, 5:5,
41:21, 58:18,
63:9, 63:11,
63:13, 63:15,
64:12, 64:19,
65:4, 69:1,
83:6, 83:9,
83:20, 84:20,
86:14, 89:3,
118:11, 118:16,

119:17
**emails**
17:12, 18:19,
34:5, 52:12,
61:5, 61:7,
63:16, 63:20,
63:21, 84:3,
117:7, 117:9
**emily**
3:19, 17:7
**employed**
11:11, 11:13,
11:15, 42:7,
42:9, 47:20,
65:21, 125:10
**employee**
12:1, 12:14
**employees**
35:12, 42:6,
42:7, 49:3,
65:20, 65:21,
99:4, 99:9,
99:17, 114:8,
114:9, 114:10,
114:15
**employer**
64:6
**employment**
12:2, 12:22,
13:3, 48:1,
99:13
**encompassing**
52:8
**encumbered**
97:5, 97:6
**encumbering**
120:18
**encumbrances**
22:6
**end**
31:20, 78:18,
80:5
**ended**
71:22
**ending**
102:6
**endorsed**
70:16

Transcript of Lester D. Mardiks, Corporate Designee
Conducted on January 19, 2021

135

endorsement
70:13
engaged
29:10, 99:3
entail
119:1
enter
35:3
entered
13:10
entire
33:13, 53:18,
66:6
entirety
66:5
entitled
36:19, 37:7
entry
45:5
environments
10:22
epiq
50:2, 50:3,
70:6, 70:9,
107:19, 107:22,
108:2, 108:14,
108:17
equipped
35:16
esquire
2:5, 2:12, 3:3
essentially
58:15, 119:9,
122:21
estate
10:18, 10:19,
11:3, 12:5,
12:6, 12:10,
12:11, 12:13,
12:18, 62:6
estates
29:14
estimate
60:4
estimated
67:2
et
1:6, 74:20

even
64:5, 66:8,
80:3, 107:10,
110:8
ever
7:21, 9:21,
10:2, 10:14,
12:21, 68:16,
69:19, 70:5,
88:8, 101:2,
111:16
every
41:21, 60:9,
104:4, 104:13,
111:1
everybody
32:20
everyone
102:19
everything
35:20, 43:6,
89:1, 89:17,
90:13
evolved
11:6
exact
36:21
exactly
88:6, 110:2
examination
4:2, 7:2, 92:5
examined
7:1
example
53:22, 62:6,
67:20, 75:22
except
32:9, 47:11,
53:13, 74:19
exception
47:7
excess
31:14
excessive
37:9
exclude
97:2
excluded
27:15, 27:18,

27:20, 27:21,
29:2, 29:16,
31:21, 36:2,
36:6, 36:10,
36:14, 36:17,
37:12, 38:3,
38:4, 96:16,
96:18, 96:19
excuse
71:17, 108:11
executed
24:8, 93:12,
93:14, 93:16
execution
20:15, 23:15,
29:18, 29:21,
39:11, 40:1,
40:7, 44:14,
64:21, 98:14,
98:19
executory
22:8
exhibit
4:8, 4:9, 4:12,
4:13, 4:14,
4:15, 4:16,
4:17, 4:18,
4:20, 4:21, 5:4,
5:5, 5:6, 5:7,
14:12, 14:13,
14:14, 14:17,
15:1, 19:5,
19:6, 19:8,
19:10, 21:16,
21:17, 21:18,
21:19, 21:21,
32:18, 34:13,
38:5, 38:6,
38:8, 38:10,
46:14, 46:15,
46:17, 46:19,
51:15, 55:8,
55:9, 55:22,
56:7, 72:19,
72:20, 73:1,
73:4, 82:21,
83:2, 83:10,
83:11, 91:11,

91:15, 91:18,
91:20, 92:8,
94:7, 94:15,
94:17, 94:19,
94:21, 95:13,
96:2, 100:7,
100:11, 100:12,
101:16, 101:20,
101:21, 102:2,
102:4, 106:6,
106:10, 106:14,
111:7, 111:9,
111:10, 112:5,
112:6, 115:12,
115:13, 116:13,
116:17, 117:21,
118:6, 118:9,
118:10, 118:15,
119:14, 120:11,
120:12, 120:14,
120:16, 122:7,
122:8, 122:12,
122:13
exhibits
4:6, 4:7, 5:2,
5:3, 92:4
existence
31:7
exists
89:1
expense
67:21
expenses
4:20, 29:6,
29:10, 29:11,
29:13, 29:17,
42:20, 50:14,
50:18, 55:1,
67:3, 67:4,
68:2, 87:15,
89:5, 89:18,
91:4, 110:18,
112:12, 112:18,
113:18, 115:4
experience
10:5
expertise
12:19, 40:22

Transcript of Lester D. Mardiks, Corporate Designee
Conducted on January 19, 2021
136

expires
125:16
explain
87:17
explained
105:8
extent
16:21, 17:2

**F**

f
28:13, 28:18
face
47:10
fact
31:19, 31:20,
109:22, 112:17
factors
80:18
fairly
87:20
familiar
20:3, 20:11,
21:12, 36:6,
100:17, 107:5
family
13:7, 14:5
fault
80:22
february
11:10
fee
113:14
feel
69:20
fees
29:6, 29:10,
30:3, 37:8,
48:6, 50:14,
50:18, 55:15,
55:16, 56:15,
61:11, 62:7,
63:9, 70:20,
70:22, 71:3,
71:8, 71:14,
87:15, 105:6,
106:19, 106:21,
107:15, 112:21,

113:2, 113:17,
113:20, 116:1,
119:8, 120:7,
121:9, 121:10
fell
67:14
few
8:1, 41:10,
60:9, 63:4,
82:8, 82:13,
94:10, 123:1
fewer
78:2
fiduciary
42:1, 119:13
file
81:9, 103:16
filed
37:22, 81:13,
94:22, 95:4,
98:3, 101:6
files
49:8
filings
69:4
final
59:22, 60:14,
60:21
financial
13:14, 13:18,
17:2, 17:10,
17:11, 53:5,
125:12
financing
29:22
find
92:16, 116:18
finished
9:2, 71:4
firm
7:5, 10:8,
98:15, 99:2,
113:5, 113:20,
115:16, 116:4
firm's
116:1
first
6:21, 10:12,

20:20, 21:3,
21:8, 44:18,
75:5, 84:10,
92:7, 107:7,
111:15, 111:19,
118:11
fits
103:8
five
10:13, 17:20,
75:17, 99:15,
100:20, 100:21
five-minute
82:4
follow
92:4
follow-up
123:14
following
6:5, 48:15,
48:19, 49:1,
49:9, 49:17,
50:6, 57:20,
64:21, 85:11
follows
7:1
foregoing
125:4, 125:5
form
16:4, 16:6,
32:10, 89:3,
102:17
former
42:6
forth
34:5
forthcoming
81:17
forward
39:16, 73:17,
75:16, 76:22,
84:7
four
10:18, 17:20,
107:11, 117:15
free
22:5
friction
69:11

front
27:19, 49:16,
76:16
full
7:13, 28:1,
33:15
fully
53:8
functions
75:9
fund
30:15, 30:18,
31:19, 33:15,
58:1, 110:17,
115:4, 115:8,
117:5, 119:2
funded
108:11, 121:10
funding
30:19, 104:15,
110:21
funds
35:13
furloughed
35:12, 99:4
further
75:15, 92:19,
123:12, 124:2
furtherance
119:13
fuzziness
89:20, 90:2

**G**

g-u-s-t-a-f-s-o-n
14:1
gained
12:15, 12:19
gathering
24:14
gatti
13:18
gave
115:2, 122:7
general
10:9, 11:6,
12:6, 12:7,
12:16, 37:19

Transcript of Lester D. Mardiks, Corporate Designee
Conducted on January 19, 2021

137

**generally**
20:3, 52:21, 57:9
**generated**
70:22
**genesis**
117:17
**getting**
92:22
**gittlitz's**
106:5
**give**
11:8, 15:5, 19:19, 34:21, 39:2, 48:8, 54:4, 65:1, 67:19, 83:13, 92:10, 93:1, 116:15
**given**
58:19, 125:6
**glasses**
8:21
**go**
16:5, 22:15, 26:6, 33:8, 38:22, 48:12, 51:15, 51:18, 52:11, 55:22, 56:4, 59:9, 67:20, 72:19, 75:3, 82:11, 83:7, 90:7, 91:19, 92:11, 92:13, 92:19, 95:17, 96:15, 96:17, 102:6, 102:8, 102:11, 102:22, 103:10, 103:14, 104:1, 104:4, 105:14, 105:17, 106:9, 106:11, 108:9, 112:20, 114:7, 116:10, 116:18
**goes**
6:11, 36:4, 54:6, 76:1,

111:21
**going**
6:5, 10:14, 16:3, 16:4, 18:1, 21:16, 26:18, 27:14, 28:6, 28:12, 32:17, 38:16, 54:19, 54:21, 55:6, 55:15, 64:9, 65:8, 66:17, 68:11, 73:17, 75:15, 76:22, 77:9, 77:12, 82:2, 84:6, 91:10, 91:12, 91:21, 94:7, 94:15, 95:21, 96:6, 96:7, 96:13, 104:4, 112:4, 116:18, 117:19, 118:8
**goldberg**
17:7
**good**
7:4, 37:1, 82:4, 87:21, 100:10
**granting**
22:9
**great**
103:20
**greenbelt**
1:3
**ground**
10:21
**group**
37:11, 84:3
**guess**
53:19
**guinot**
3:4
**gustafson**
13:16

**H**

**hair**
11:5

**hairdressers**
1:5, 1:10, 7:7, 7:18, 11:4, 14:7, 41:12, 41:15, 42:8, 45:15
**half**
60:3
**hand**
39:2, 66:12, 125:14
**handle**
10:11
**handling**
68:2, 75:8, 75:13
**hansen**
4:16, 83:22, 84:5
**happy**
123:17
**hart**
1:22, 2:1, 125:3
**hc's**
69:16, 88:12, 111:12, 114:14
**head**
63:8
**hear**
54:16, 86:10
**heard**
69:17, 72:4
**hearing**
98:19
**held**
12:4, 34:5, 82:18, 83:17
**help**
20:8, 25:22, 28:3, 38:22, 40:15, 42:12, 43:4, 44:19, 45:8, 45:9, 99:3, 103:13, 110:18, 121:5
**helped**
10:17, 76:5,

99:6
**helping**
11:5, 24:13, 39:6, 47:20
**here**
22:21, 30:15, 31:18, 31:19, 36:4, 36:12, 38:3, 47:18, 54:5, 54:10, 54:22, 55:3, 66:18, 74:10, 76:11, 77:12, 78:20, 84:10, 86:18, 91:18, 94:1, 95:18, 98:6, 103:13, 109:7
**here's**
70:13
**hereby**
125:4
**hereunto**
125:13
**herewith**
29:21, 30:7
**high**
9:11, 9:13
**higher**
95:8
**hire**
50:10
**hired**
114:11
**hodges**
122:17, 122:18, 122:19
**hold**
103:18, 116:12
**holdings**
2:4, 7:2, 7:6, 19:17, 84:11, 85:6, 85:10, 104:14, 115:16
**honor**
65:20
**hopefully**
81:6

Transcript of Lester D. Mardiks, Corporate Designee
Conducted on January 19, 2021                                  138

horvath
13:17, 64:1,
64:2, 64:12,
72:15
host
84:21, 92:15
hosting
84:16
hours
18:4, 70:3,
82:3
however
86:16
hr
75:9
hundred-thousand-
-dollar
117:5
hundreds
18:19, 19:3

                    I

idea
64:18, 78:15
identification
14:14, 19:8,
21:19, 38:8,
46:17, 73:1,
83:11, 94:17,
101:21, 112:6,
115:13, 117:21,
118:6, 120:12,
122:13
identify
72:13
immediately
87:22
implies
31:19
important
84:22, 85:5,
85:6, 85:7
in-house
12:19
inc
1:5, 1:10, 2:4,
7:2, 7:7, 7:18,
11:4, 19:18,

41:12, 41:15,
42:8, 45:15,
104:14
include
36:18, 114:12
included
29:4, 33:16,
37:14, 75:6,
76:20, 77:3,
77:8, 89:6, 89:8
includes
45:9
including
12:11, 29:9,
30:2, 41:4, 80:7
incur
67:3
incurred
29:7, 29:17,
66:8, 67:3,
67:6, 71:9,
106:21
indirectly
31:15
individual
68:3
individuals
64:16, 75:16,
75:17
inexpensively
42:17
influence
8:12
infor
84:12, 84:19,
85:11
inform
66:22, 67:1
information
23:8, 24:14,
40:11, 49:15,
50:8, 84:21,
85:1, 86:7,
86:11, 87:7,
87:8
infrastructure
44:16, 45:1
initial
83:20

initially
6:8, 12:10
input
73:11, 73:12
insolvency
44:6
instance
39:15, 69:22,
106:22
instead
58:22
intend
81:4
intended
45:18, 109:10
intent
117:4
intention
118:20, 119:4
interacting
42:2
interest
97:12, 125:11
interests
22:7
interpret
68:13
interpretation
33:19, 34:3
introduce
74:10
introduced
13:9
introduction
21:7, 21:9,
21:10
investment
10:20
invoice
5:7, 109:21,
111:2, 111:5,
123:3, 123:4
invoices
58:12, 58:14,
109:9, 109:10,
109:18
involved
12:17, 23:4,

23:9, 37:7,
37:8, 38:15,
39:4, 39:17,
43:8, 69:6,
98:17, 100:2,
108:4
involvement
73:20
issuance
61:19, 65:12,
69:3
issue
99:6, 114:14,
117:10
issues
41:19, 42:3,
42:4, 86:16,
86:17, 87:3,
87:4
it-related
48:4
item
75:5
items
6:8, 39:7,
61:6, 65:18,
68:14, 78:11
itself
43:5, 104:22

                    J

jacobson
3:18, 6:11,
6:12, 17:9,
17:14, 59:6,
66:15, 72:11,
72:18, 73:11,
77:19, 124:4
jamila
2:12, 7:4
january
1:13, 125:15,
125:17
job
1:20, 12:3,
12:8, 42:15,
69:15, 81:3,
85:3

Transcript of Lester D. Mardiks, Corporate Designee
Conducted on January 19, 2021

139

**joel**
3:3, 60:9,
60:10
**july**
11:20, 11:22,
47:6, 49:4,
50:6, 50:15,
50:16, 50:19,
50:22, 79:21,
101:12, 101:13,
106:4, 107:7
**june**
24:12, 46:4,
64:20, 64:22,
80:5, 94:5,
107:7, 123:6
**justine**
2:12

**K**

**kansas**
9:13, 9:16,
9:19, 10:9
**keep**
95:21, 96:6
**keeping**
70:1
**kept**
99:5, 110:9
**kevin**
2:5, 123:15
**key**
18:20
**kinds**
42:10, 48:10
**knew**
13:9, 68:21
**know**
8:3, 9:3, 9:7,
9:8, 9:9, 17:20,
27:7, 40:13,
45:9, 49:4,
49:13, 50:10,
50:12, 51:11,
51:21, 53:4,
53:5, 53:15,
55:17, 56:3,
59:19, 60:3,

60:7, 60:17,
63:8, 63:11,
68:10, 68:21,
69:5, 69:22,
70:12, 71:4,
71:21, 74:3,
74:16, 74:17,
75:1, 75:6,
76:2, 76:8,
76:11, 77:2,
77:8, 78:4,
79:3, 81:7,
81:12, 81:20,
82:1, 84:9,
85:10, 85:12,
86:3, 86:13,
86:17, 88:9,
89:4, 90:1,
90:20, 91:19,
95:11, 97:1,
98:21, 99:12,
103:3, 107:19,
108:2, 109:3,
113:22, 115:6,
119:1, 119:10
**knowing**
85:12
**knowledge**
31:11, 91:2,
91:5, 94:2,
106:20, 107:2,
107:6
**known**
27:5
**kobbe**
2:5, 6:4, 32:8,
32:11, 32:14,
123:17

**L**

**labor**
99:2
**lacked**
44:16, 45:1
**lag**
78:22, 80:4
**lags**
78:18

**land**
10:17
**landlords**
120:8
**larger**
14:19
**largest**
10:14
**last**
6:3, 13:22,
15:2, 15:7,
18:4, 33:2,
33:4, 33:5,
33:6, 33:9,
45:18, 54:15,
55:14, 66:21,
84:2, 86:15,
87:3, 119:18,
120:19, 120:22
**lastly**
120:10, 120:11
**latarice**
75:8, 75:13
**late**
106:7
**later**
12:15
**latter**
75:11
**law**
7:5, 9:15,
9:19, 10:6,
10:7, 10:8,
10:10, 98:15,
113:20, 115:16,
116:1, 116:4
**lawson**
84:12, 84:15,
84:19, 85:11,
85:15, 85:19,
85:22, 86:5
**lc**
7:7, 7:19,
45:15
**leading**
98:13
**leases**
10:21, 12:13,

22:8, 108:12
**leasing**
12:11
**least**
49:5, 77:22,
111:21
**leave**
36:19, 91:9,
91:11, 92:2,
100:12, 110:2
**left**
90:21
**legal**
12:16, 38:1,
65:20, 116:1,
119:8
**less**
64:15, 69:9
**lesser**
16:21, 17:2
**lester**
1:12, 4:2,
6:20, 7:15
**let's**
96:1, 101:13,
103:14, 105:9,
106:9, 106:11,
106:17, 112:20,
114:5, 115:9,
116:13
**letter**
47:15, 48:16,
48:20, 49:2,
49:10, 49:18,
100:13, 100:16,
100:19, 106:5
**level**
76:18
**leybert**
3:20
**liabilities**
26:10, 27:15,
29:2, 29:6,
31:22
**liability**
26:17, 26:18,
27:18, 27:20
**license**
9:19

Transcript of Lester D. Mardiks, Corporate Designee
Conducted on January 19, 2021

140

licenses
9:18, 12:20
licensing
9:22
lien
37:14, 37:21,
38:1, 97:15,
97:16
liens
22:6, 37:15,
37:20, 97:13
life
92:9
light
16:7
likely
34:4, 73:16,
112:19
limited
32:4, 52:3,
71:8
limiting
64:16, 70:3
line
13:18, 13:19,
75:5, 77:10,
78:1
liquidation
81:9, 81:14
list
92:4, 101:20,
112:20
listed
15:16, 47:18,
47:22, 52:3,
53:9, 53:22,
56:15, 56:16,
74:7, 74:16
litigation
37:7
little
14:21, 20:18,
40:20, 51:6,
55:6, 89:20,
92:19, 107:18
littler
98:15, 98:18,
98:22, 99:2

littler's
114:1
lived
68:7
liz
122:19
llp(us
2:6
loan
97:9
locations
39:16, 39:17,
84:17
long
8:21, 45:17,
82:16, 92:21
longer
17:21, 42:8,
43:9, 54:11,
54:12, 54:18,
70:2, 75:12,
78:15, 80:19,
84:11, 84:12
look
54:2, 55:7,
65:2, 71:1,
89:22, 90:4,
93:8, 96:1,
100:6, 102:11,
102:17, 102:22,
103:10, 106:18,
112:2, 118:11,
118:15, 119:14
looked
69:21
looking
14:19, 20:22,
36:11, 61:2,
79:8, 79:12,
93:7, 115:19,
121:8
looks
28:4, 74:13,
76:22, 77:6
looming
79:2
lost
96:3, 119:15

lot
40:19, 74:21,
84:15
louis
9:15
love
74:11

**M**

m&t
37:12, 37:15,
37:17, 97:5,
97:6, 97:9,
97:13, 97:15
ma'am
72:21, 83:3
madam
62:22
made
6:18, 52:22,
61:4, 61:8,
105:6, 105:20,
105:22
mail
41:20
maintained
101:13
major
40:9
make
8:3, 22:10,
32:12, 32:21,
48:13, 56:11,
64:15, 99:22,
117:16
making
41:18, 78:11,
79:2
management
69:22
managing
42:14, 63:3
manner
68:2
many
17:12, 17:18,
17:19, 18:19,
35:11, 58:16,

59:19, 60:3,
76:8, 77:2,
77:8, 99:9,
99:13, 108:8,
120:19
marbury
2:7
march
11:19, 76:22,
78:18, 99:8,
99:10, 123:5
mardiks
1:12, 4:2, 4:7,
4:16, 5:3, 6:7,
6:20, 7:15,
19:19, 24:22,
33:11, 71:17,
92:13, 93:3,
95:22, 104:5,
106:18, 111:13,
112:9, 122:15
margins
39:7, 39:13
mark
94:7, 101:16,
122:7
marked
14:13, 14:14,
19:5, 19:8,
21:18, 21:19,
38:8, 46:15,
46:17, 73:1,
82:22, 83:11,
94:17, 101:21,
106:6, 112:2,
112:6, 115:13,
117:20, 117:21,
118:6, 120:10,
120:12, 122:10,
122:13
marketing
122:20, 122:22
marks
113:18
maryland
1:2, 2:9, 3:6,
125:22
mastercard
37:8, 96:20

Transcript of Lester D. Mardiks, Corporate Designee
Conducted on January 19, 2021                                          141

matter
7:17, 10:19,
47:14, 81:1
matters
12:11, 12:14,
42:13
maybe
26:5, 64:18,
72:9, 72:11,
74:19, 88:12,
99:11, 103:8
mckinney
75:8
mean
18:20, 18:21,
23:16, 39:14,
41:16, 42:4,
45:4, 45:14,
53:2, 54:9,
56:21, 77:11,
77:17, 84:7,
87:17, 87:19,
88:15, 90:1,
110:3, 115:6,
119:9
meaning
42:16
means
8:8, 30:22,
31:4, 87:8
medication
8:13
meet
17:17, 17:18
meet-and-confer
6:3
meetings
17:6, 17:8,
17:9, 17:15,
18:7, 18:11
member
14:4
memory
8:13, 52:12
mental
8:12
mentioned
31:9, 34:22,

39:13, 49:6,
53:19, 55:3,
60:20, 76:19,
120:2
mentions
84:10
merchant
37:8, 37:10
met
11:2, 11:9
middle
106:7
midwest
11:21
might
26:6, 77:4,
78:22, 90:21,
92:2, 96:9
million
66:15
mind
6:9, 108:9
mind-set
109:19
minor
23:7, 40:9,
52:14
minute
122:5
minutes
82:8
miscellaneous
62:5
mix
50:20
mixed
10:22
moment
15:1, 35:16,
48:9, 77:5,
85:22, 105:10,
109:5, 111:8,
114:5, 115:7,
120:2, 121:14,
123:11
moments
94:10, 123:1
money
110:17, 119:7

monitor
14:20
month
11:21, 64:18,
76:10, 107:7,
112:22
monthly
4:18, 59:2,
59:8, 59:13,
102:5, 107:11,
112:21
months
45:19, 46:1,
46:12, 67:12,
78:19, 91:1
more
11:6, 44:12,
67:13, 69:9,
69:12, 77:5,
79:9, 82:13,
86:11, 122:6
morning
7:4, 17:10,
72:4
most
17:8, 53:17,
66:10, 74:18,
74:19, 89:21,
90:21, 110:12
mostly
40:21, 50:20
motion
4:9, 4:17,
19:17, 20:4,
32:19, 55:12,
56:16, 74:11,
94:22, 95:6,
95:9, 101:6
move
11:21, 92:17,
103:3
movements
7:10
moving
39:16
much
10:10, 17:8,
18:2, 30:14,

35:20, 57:7,
60:1, 60:2,
66:12, 68:3,
73:22, 78:15,
102:14, 105:11
must
67:6
myriad
108:3
myself
59:7, 72:18,
75:13, 118:12

                N

name
7:4, 7:13,
13:22, 98:15
nationwide
99:2
nature
40:11, 42:17,
85:2
necessarily
48:8, 58:20,
65:18, 91:10
necessary
35:7, 44:16,
45:1
need
9:2, 9:6, 9:8,
35:21, 42:12,
55:22, 69:20,
84:11, 85:2,
85:18, 86:11,
91:19, 95:2,
103:9
needed
35:19, 43:3,
43:6, 43:9,
52:18, 54:11,
69:19, 70:2,
87:22
needs
78:2, 78:7,
84:6, 90:6, 90:8
negotiate
24:1, 41:2
negotiating
114:3

Transcript of Lester D. Mardiks, Corporate Designee
Conducted on January 19, 2021

142

negotiation
20:15, 23:9,
29:18, 29:21,
38:3, 39:10
negotiations
98:13, 98:18,
100:2, 121:15
neighborhood
66:14, 99:15
neither
125:10
never
51:8, 69:17,
88:20, 99:17,
99:18, 108:8
new
2:14
next
28:11, 36:5,
83:19, 100:6,
103:12, 105:14,
105:15, 119:14
niche
13:17
nine
6:6
nobody
88:8
nobody's
80:21
nod
7:10, 58:19
non-privileged
61:7
non-written
69:7, 69:9,
69:14
none
8:22, 20:18,
37:22, 63:2,
78:3
norman
13:5, 13:6,
13:10
nos
1:5
notarial
125:14

notary
2:2, 125:21
note
65:2
notes
18:6, 18:11,
52:12
nothing
6:22, 39:21,
79:2, 81:18
notice
2:1, 4:8, 4:14,
6:7, 15:13,
15:17, 47:4,
68:6, 108:3,
119:19
notices
99:6, 108:6,
108:14, 108:17
noticing
48:7, 49:18,
50:4, 50:5,
50:10, 53:22,
55:2, 62:7, 70:6
noting
71:17
number
48:7, 48:9,
77:7, 94:12
numbers
91:11, 92:12
numerous
117:7

———— O ————

oath
8:6
object
16:3, 16:4,
77:9, 77:16
objecting
16:6
objection
18:18, 20:17,
24:17, 25:10,
41:9, 54:3,
57:6, 57:14,
71:16, 71:18,

81:22
objections
32:9
objective
35:12
obligated
50:9, 107:11,
107:15
obligations
30:4, 32:4,
42:1, 65:20,
119:13
occur
50:16
occurred
52:7, 53:4,
53:6, 91:1
occurring
35:9
occurs
66:11
offered
99:13
officer
13:5, 13:14,
13:18, 17:11,
41:12, 64:10,
93:16, 125:3
often
17:17, 58:22
oh
21:10, 43:16,
76:15, 89:15,
100:11, 103:4,
118:3, 122:20
okay
11:8, 14:18,
15:5, 15:9,
19:13, 19:22,
20:10, 20:19,
21:5, 22:16,
26:15, 27:16,
28:1, 28:14,
28:16, 30:13,
32:16, 36:4,
36:14, 43:16,
43:19, 46:22,
48:12, 48:19,

52:20, 55:13,
55:19, 56:3,
56:9, 56:13,
58:11, 70:14,
82:7, 82:14,
83:21, 86:22,
87:10, 90:15,
91:16, 91:22,
92:22, 93:2,
93:3, 94:2,
94:6, 95:21,
96:10, 96:13,
98:11, 100:14,
101:8, 102:17,
102:21, 104:3,
104:11, 104:20,
105:18, 106:17,
107:3, 107:5,
107:6, 108:2,
109:5, 109:11,
109:15, 110:16,
112:20, 113:16,
115:2, 115:22,
116:10, 116:17,
117:2, 118:5,
119:6, 120:1,
121:12, 121:13,
122:5, 122:11
once
71:12
one
9:9, 10:12,
12:14, 14:16,
15:5, 19:7,
27:20, 29:1,
38:7, 41:10,
46:20, 49:5,
51:17, 53:22,
54:6, 55:11,
56:18, 60:16,
60:17, 63:8,
63:18, 63:22,
66:2, 68:3,
68:10, 72:21,
74:1, 75:3,
75:9, 75:19,
77:7, 79:6,
80:18, 83:3,

Transcript of Lester D. Mardiks, Corporate Designee
Conducted on January 19, 2021

143

83:16, 84:7,
88:13, 89:19,
96:18, 100:8,
102:1, 106:12,
111:5, 111:10,
112:3, 116:15,
117:19, 118:5,
122:5, 122:11,
123:11
**ones**
18:20
**ongoing**
68:21, 69:10,
69:13, 72:1
**only**
31:21, 60:14,
62:18, 67:9,
76:11, 76:19,
80:7, 80:11,
80:13
**open**
11:5, 110:2
**opened**
10:13
**opening**
35:18
**operate**
35:17, 44:16,
45:1
**operated**
35:11
**operating**
4:18, 13:4,
64:10, 102:5
**operations**
102:16, 104:21
**opinion**
25:16
**opposite**
64:17
**order**
4:12, 22:3,
25:7, 32:7,
34:13, 37:3,
37:5, 91:14,
98:8, 98:14,
99:1, 99:20,
114:4, 116:11,

116:12, 116:21,
121:20
**orders**
120:18
**original**
95:10, 97:20,
97:21, 98:5,
118:20
**other**
9:18, 17:15,
19:2, 22:6,
29:20, 30:4,
32:4, 34:2,
39:6, 47:21,
48:2, 48:3,
53:2, 60:22,
68:22, 69:3,
69:7, 70:8,
80:17, 88:12,
89:12, 96:16
**otherwise**
9:6, 36:18,
125:12
**out**
13:10, 47:14,
47:17, 88:14,
88:15, 101:10,
108:6, 108:14,
108:17, 113:12,
114:6, 114:7,
122:9
**outcome**
125:12
**outside**
12:18, 52:6,
52:9
**over**
12:18, 15:3,
17:11, 18:1,
18:4, 47:21,
48:2, 59:20,
75:21, 90:21,
98:8, 121:15
**overlap**
6:14
**owed**
29:7, 53:21
**own**
18:1, 31:5,

43:6, 114:15

**P**

**p-o-z-e-z**
13:5
**page**
4:2, 4:7, 5:3,
15:1, 15:2,
15:7, 20:6,
20:9, 20:19,
21:4, 22:18,
25:20, 26:2,
26:4, 26:9,
27:10, 27:11,
27:14, 27:19,
28:1, 28:6,
28:11, 28:18,
30:8, 30:9,
32:19, 33:5,
34:14, 34:15,
36:1, 36:5,
37:2, 37:3,
38:11, 38:14,
38:17, 38:19,
38:20, 43:10,
45:20, 45:21,
51:18, 51:19,
55:9, 55:22,
56:1, 56:5,
56:7, 58:8,
66:1, 71:2,
83:19, 92:12,
92:16, 102:8,
103:12, 103:14,
103:16, 103:22,
104:1, 104:4,
105:14, 105:15,
105:16, 106:17,
120:20, 120:22,
121:6, 122:2
**pages**
1:21, 76:17,
104:2, 120:19
**paginations**
26:7
**paid**
29:15, 30:14,
31:10, 35:13,

37:10, 53:17,
53:18, 63:10,
76:7, 76:8,
76:9, 88:1,
88:6, 88:10,
90:17, 91:2,
91:3, 106:20,
107:7, 108:21,
109:3, 111:20,
112:13, 112:17,
112:21, 113:2,
113:14, 113:17,
113:20, 114:1,
116:6, 123:2
**pandemic**
35:10
**paper**
49:8
**paragraph**
20:7, 20:9,
20:20, 21:3,
21:7, 21:8,
32:19, 33:2,
37:3, 43:17,
55:9, 55:14,
56:15, 119:18
**paragraphs**
44:7
**paralegal**
3:19
**pardon**
11:12, 122:18
**parse**
109:10
**part**
28:9, 36:15,
37:14, 44:18,
53:17, 53:18,
54:15, 54:21,
57:8, 65:18,
74:10, 75:12,
76:4, 81:17,
84:14, 89:22,
95:15, 97:6,
99:20
**partial**
77:6
**particular**
79:6, 84:7,

Transcript of Lester D. Mardiks, Corporate Designee
Conducted on January 19, 2021                               144

84:8, 119:3
**particularly**
48:4
**parties**
34:6, 35:3,
58:16, 85:7,
87:13, 97:1,
111:3, 125:11
**partner**
17:7
**partners**
17:14
**parts**
6:13, 40:20
**party**
49:13
**past**
42:11
**pay**
31:13, 64:16,
66:5, 70:15,
70:17, 71:13,
78:11, 78:12,
80:15, 107:11,
107:15, 108:11,
109:1, 110:18,
114:20, 114:21,
114:22, 115:1
**payable**
30:4
**paying**
44:5, 61:11,
61:15, 61:19,
62:1, 62:5,
62:10, 62:15,
64:14, 65:11,
88:9, 116:1,
116:4
**payless**
10:16, 13:7,
13:9
**payment**
25:18, 30:4,
42:20, 50:13,
51:7, 59:10,
64:14, 68:20,
69:3, 70:6,
71:7, 72:14,

80:5, 88:3,
88:20
**payments**
30:3, 52:22,
53:4, 70:20,
107:12
**payroll**
61:15, 63:13,
64:14, 68:20,
70:1, 72:14,
72:17
**pdf**
26:4, 27:11,
28:6, 30:9,
103:16
**penalty**
8:6
**pendency**
51:1
**pending**
9:10, 32:17
**people**
17:15, 25:7,
35:13, 35:20,
40:17, 40:22,
41:10, 41:20,
42:5, 42:9,
45:10, 47:19,
60:7, 63:4,
70:1, 70:3,
76:4, 76:8,
76:13, 76:15,
76:19, 77:2,
77:6, 108:4
**perfect**
15:5, 83:7
**perfectly**
80:22
**perform**
80:19
**performance**
24:16, 25:8,
41:7, 100:20
**performed**
54:14
**performing**
25:11
**perhaps**
72:5

**period**
43:3, 45:12,
47:21, 54:20,
57:20, 102:6,
110:19, 112:14
**perjury**
8:6
**person**
77:14
**petition**
95:5, 98:4
**phil**
13:17, 64:1,
64:2
**phone**
41:21, 61:5,
74:20
**physical**
7:10, 8:11
**pick**
121:19
**pinpoint**
65:2
**piper**
2:6, 7:5
**plan**
81:8, 81:9,
81:13
**planned**
35:19, 88:18
**played**
47:14, 47:17,
101:10
**please**
7:9, 7:13, 8:3,
9:1, 9:7, 9:8,
9:11, 10:5,
14:16, 15:8,
16:8, 18:9,
19:7, 19:20,
25:1, 30:12,
34:21, 38:7,
51:17, 72:22,
83:14, 86:19,
86:21, 92:20,
93:9, 95:3,
95:18, 100:8,
102:1, 103:12,

103:18, 106:10,
106:12, 116:19,
116:22, 118:15,
119:21, 123:11
**pleased**
60:2
**plus**
18:5, 99:11
**point**
13:13, 26:20,
27:5, 27:8,
30:16, 31:16,
32:7, 35:18,
40:15, 51:1,
54:17, 58:3,
64:4, 64:8,
68:12, 73:16,
75:9, 75:14,
75:18, 78:13,
80:2, 84:11,
85:16, 86:3,
87:6, 118:22,
123:19
**portion**
51:22
**portions**
31:21
**position**
10:17, 11:5,
32:1, 33:17,
61:10, 61:14,
61:18, 61:22,
62:4, 64:13,
80:3, 80:10,
80:11, 87:13,
107:10, 107:14,
110:7
**positions**
12:3
**possession**
102:5
**possible**
66:22, 67:1,
67:5, 67:10,
67:17, 67:18,
67:19, 89:1
**possibly**
73:17, 85:8

Transcript of Lester D. Mardiks, Corporate Designee
Conducted on January 19, 2021                                      145

post-closing
29:13
postage
67:21
pozez
13:5
practical
68:1
practice
9:19, 10:11
practicing
10:9
pratt
3:5
preparation
20:15, 23:9,
65:13, 73:21
prepare
17:4, 17:17,
18:8, 18:14
prepared
15:15, 15:19,
15:22, 16:10,
16:13, 16:16,
16:19, 16:22,
57:8, 59:3,
59:20, 59:21,
60:21, 73:8,
73:10, 73:14,
74:1, 79:9,
79:15, 79:20,
81:8, 81:12
preparing
18:3, 18:12,
42:14, 62:3,
78:9, 117:3
present
3:18, 17:15,
53:10
presentation
67:13
presented
67:6, 67:22,
88:14
presenting
58:19, 67:12,
68:5
president
11:7, 12:5,

12:6, 12:7,
13:16, 64:10,
122:20
press
113:8, 113:12,
123:8
pretty
10:10, 17:8,
35:20, 36:21,
37:1, 52:7,
60:1, 73:22,
74:17, 87:21
previous
23:12
previously
53:19
primarily
6:13, 10:19,
24:13, 59:11,
60:8, 73:11
primary
35:12
prior
23:13, 23:20,
24:2, 40:1,
40:6, 46:12,
60:22, 67:4,
73:18, 73:19,
73:21, 99:8
priority
29:11
privileged
40:10
probably
18:5, 23:7,
36:21, 40:2,
40:8, 50:20,
60:19, 63:18,
64:20, 65:1,
65:2, 67:19,
77:4, 77:5,
99:15
proceeding
120:19
proceeds
29:16, 37:9,
37:16, 37:20,
38:2

process
31:7, 53:3,
59:8, 81:18
produce
65:4
professional
9:17, 61:11,
121:9
professionals
29:10
protocol
32:9, 32:13
provide
50:3, 68:16,
68:19, 69:2,
69:7, 70:5,
70:19, 76:17,
108:3
provided
50:14, 50:19,
50:21, 58:12,
58:14, 58:22,
59:9, 59:14,
74:3, 75:2,
78:4, 79:4,
79:5, 79:11,
98:21, 111:2,
111:12, 112:8
provides
28:22, 31:13
providing
71:10, 74:6,
110:9
provision
28:22, 29:4,
31:16, 37:4,
58:13, 66:3,
98:8, 116:22
provisions
29:1
public
2:2, 113:5,
125:1
pull
14:12, 19:5,
21:17, 32:18,
38:5, 46:14,
82:21

purchase
18:21, 20:11,
20:16, 22:5,
23:1, 23:3,
23:4, 23:5,
23:11, 23:12,
23:20, 24:2,
24:3, 24:7,
24:8, 24:12,
24:16, 25:7,
25:8, 25:12,
25:14, 25:17,
25:21, 30:9,
34:14, 34:15,
34:19, 35:2,
36:2, 36:11,
44:17, 45:2,
92:11, 92:14,
95:10, 96:2,
98:3
purchased
96:19
purchaser
26:18, 26:21,
27:21, 66:22,
67:1
purchaser's
67:4
purchasers
35:16
purchases
10:21
pure
79:1, 94:16
purpose
42:22, 43:2,
43:21, 44:3,
45:7, 73:14
purposes
96:14
pursuant
2:1, 22:4,
29:14, 58:13,
95:7
put
6:18, 16:7,
40:15, 40:22,
89:2, 90:12,

91:17, 94:6,
106:10, 107:21,
116:13, 118:1
**putting**
23:7, 39:18,
113:16

**Q**

**question**
9:2, 9:3, 9:5,
9:7, 9:10,
23:17, 24:18,
25:1, 25:5,
32:17, 44:18,
55:4, 56:14,
61:6, 63:19,
81:7, 86:22,
87:1, 87:2,
96:15, 112:17
**questioning**
63:20, 77:10,
88:16, 93:4,
124:4
**questions**
6:15, 7:9,
16:5, 16:7,
23:2, 25:2,
42:6, 77:15,
82:13, 91:6,
91:12, 91:21,
100:15, 112:11,
122:6, 123:12,
123:14, 124:2
**quick**
20:8, 26:1,
28:6, 116:22
**quickly**
86:17
**quit**
76:6
**quite**
89:1
**quote**
102:15, 108:12,
109:12, 110:19,
117:5, 118:20

**R**

**raised**
99:5

**range**
99:10
**rather**
56:1
**ratner**
7:7, 7:18,
11:2, 11:3,
11:9, 11:16,
11:17, 11:19,
12:1, 12:3,
12:22, 13:3,
13:6, 13:9,
13:20, 14:3,
14:7, 41:11,
41:15, 42:7,
45:15, 113:6
**rd**
95:4
**read**
8:19, 9:4,
26:12, 26:14,
43:19, 71:6,
86:20, 93:9,
107:3, 107:4,
117:1, 117:2,
119:18, 119:19,
119:21, 119:22
**reading**
8:21, 18:1,
18:7, 71:5,
95:5, 125:9
**real**
10:18, 10:19,
11:3, 12:5,
12:10, 12:11,
12:13, 12:17,
20:8, 25:22,
28:5
**really**
80:21
**reason**
8:11, 8:15,
8:18, 37:11,
53:7, 71:13,
77:15, 78:8,
78:19
**reasonable**
58:1, 65:19,

66:7, 67:2,
67:16, 68:15,
70:18, 80:7,
80:9, 80:17,
80:22, 81:2
**reasonably**
67:2, 71:9
**reasons**
35:8, 78:21
**recall**
30:14, 84:4,
98:13, 101:1,
101:2, 101:5,
107:21, 108:1,
108:10, 108:20,
109:2, 109:12,
110:16, 111:4,
113:11, 117:9
**receipt**
104:5, 104:9
**receipts**
67:7
**receive**
53:3, 68:8
**received**
67:14
**recently**
67:13, 69:12,
115:18
**recess**
82:19, 123:21
**recital**
43:12, 43:15,
44:1, 44:3
**recitals**
43:10
**recognize**
15:10, 19:14,
21:22, 22:22,
38:12, 47:1,
73:6, 84:1
**recollection**
93:20, 97:8,
118:19
**recommend**
70:9
**recommendation**
49:21, 50:1,

70:11
**reconcile**
73:15
**reconvene**
123:18
**record**
6:18, 7:11,
7:14, 13:21,
14:17, 16:7,
19:11, 21:6,
21:21, 45:13,
46:19, 48:13,
73:3, 82:12,
82:18, 82:20,
83:10, 83:17,
94:19, 94:21,
95:6, 102:4,
107:4, 112:4,
115:12, 117:1,
118:9, 119:20,
119:21, 120:14,
120:16, 122:12,
123:22, 124:1,
124:5, 124:6,
125:6
**recorded**
7:8
**records**
84:20, 87:7,
117:12
**reduced**
75:15, 125:8
**reducing**
77:21, 77:22
**reduction**
77:7
**reference**
26:6, 27:13,
118:16
**referenced**
31:18, 32:5,
123:3
**referred**
30:15, 87:3,
109:18
**referring**
49:7, 59:5,
89:9

Transcript of Lester D. Mardiks, Corporate Designee
Conducted on January 19, 2021

**refers**
26:17, 27:18,
33:20, 44:11,
67:5, 86:17
**refresh**
93:20, 118:19
**regard**
114:3
**regarding**
23:19, 40:5,
61:5, 72:14,
84:6, 123:8
**regularly**
60:8
**rehired**
99:17, 99:18
**reimbursable**
32:3
**reimburse**
53:8, 67:15
**reimbursement**
50:18, 53:21,
70:11, 87:15,
88:18
**reject**
101:3, 101:6
**rejected**
39:20, 49:12,
85:14, 108:12
**rejecting**
39:16
**related**
22:9, 31:22,
39:15, 39:18,
39:19, 48:5,
57:5, 99:5,
113:8, 125:10
**relates**
25:17, 37:6,
42:19
**relating**
22:9, 40:9
**relations**
113:5
**relationship**
13:19, 14:2,
64:7
**relationships**
42:11, 42:12

**releases**
113:8, 113:12,
123:8
**relief**
20:3, 22:9
**remained**
98:10
**remaining**
41:17, 41:22,
61:11, 61:16,
63:14, 64:14
**remember**
40:12, 40:14,
84:8, 84:14,
96:20, 112:14,
112:15, 113:4
**reminder**
9:1
**rendered**
112:13
**renewing**
12:13
**rent**
108:12, 120:7
**rents**
117:15
**reopen**
99:19
**reorganization**
81:9, 81:13
**repeat**
24:20, 44:19,
44:21, 54:15
**repeated**
9:3
**repeatedly**
68:12
**rephrase**
9:6, 24:19,
24:22, 25:2,
25:5
**report**
13:2, 76:12,
104:8
**reported**
1:22
**reporter**
7:9, 7:11, 9:4,

19:5, 21:15,
21:17, 27:4,
32:18, 34:12,
35:22, 63:1
**reporter-notary**
125:1
**reporting**
13:19
**reports**
53:5
**repository**
84:15
**represent**
7:5
**representative**
1:11, 24:3,
41:3, 59:15,
59:16, 64:2,
64:5, 75:2
**representatives**
23:19, 34:9,
34:10, 40:5,
63:6, 65:10,
72:15
**request**
104:15, 115:4
**requested**
101:2, 111:5,
115:7, 115:8
**requests**
65:6
**require**
50:5, 70:11,
111:1
**required**
41:22, 66:4,
66:19, 66:20,
67:9, 70:15,
70:17, 99:21
**reserve**
32:9
**resolve**
86:16
**resolved**
86:18, 87:4,
87:9
**respect**
20:15, 24:10,

24:15, 25:8,
39:10, 41:7,
87:4, 87:14
**responding**
9:2, 78:8
**response**
58:20, 67:14,
86:15, 88:2
**responsibilities**
12:9
**responsibility**
11:6, 12:16,
78:12
**responsible**
13:6, 26:19,
41:11, 41:14,
57:19, 61:11,
61:15, 61:19,
62:1, 62:5,
62:10, 62:14,
64:13, 65:11,
65:15, 80:4
**rest**
20:1, 37:13,
91:17
**restate**
24:21
**restated**
22:5, 24:6
**restaurant**
10:13
**result**
30:5, 71:9,
71:10, 106:1,
106:22, 108:5
**resume**
124:3
**retention**
30:2
**retirement**
13:14
**returned**
11:20
**returns**
62:2, 65:13,
67:20
**revealing**
40:10

Transcript of Lester D. Mardiks, Corporate Designee
Conducted on January 19, 2021

148

| | | | |
|---|---|---|---|
| **review** | 59:6, 60:8, | 116:12, 116:21 | 45:2, 99:19, |
| 15:1, 18:14, | 60:10, 90:20 | **salon** | 104:21 |
| 18:17, 20:7, | **role** | 2:4, 4:22, 7:2, | **same** |
| 20:20, 23:11, | 20:14, 23:7, | 7:6, 19:17, | 32:13, 73:22, |
| 24:6, 25:6, | 24:10, 24:15, | 20:12, 21:13, | 79:12, 98:8, |
| 26:9, 26:13, | 41:6, 122:22 | 24:4, 30:14, | 109:21, 118:2 |
| 28:18, 39:22, | **roles** | 31:13, 33:14, | **sandler** |
| 43:10, 52:11, | 12:8, 39:9 | 34:9, 36:18, | 3:4 |
| 55:16, 59:22, | **ron** | 38:1, 39:16, | **satisfied** |
| 60:5, 60:6, | 13:14, 13:15 | 41:4, 44:4, | 93:19 |
| 60:10, 61:3, | **ron's** | 44:15, 44:22, | **satisfy** |
| 65:6, 116:22, | 13:14 | 48:17, 48:20, | 41:22 |
| 117:4 | **rpr** | 49:2, 49:10, | **saw** |
| **reviewed** | 1:22, 2:2 | 49:18, 50:5, | 84:2, 115:18, |
| 25:13, 102:9, | **rude** | 51:3, 52:22, | 121:14 |
| 113:11 | 14:20 | 53:8, 53:21, | **say** |
| **reviewing** | **rules** | 57:19, 58:12, | 17:22, 18:2, |
| 21:2, 28:20, | 50:10 | 59:14, 59:15, | 18:9, 25:3, |
| 34:20, 43:18, | **run** | 59:16, 60:14, | 36:17, 36:22, |
| 44:9, 55:20, | 35:21, 43:4, | 60:18, 61:10, | 41:14, 42:3, |
| 84:3, 96:5 | 45:8, 82:5, | 61:15, 61:18, | 44:7, 44:10, |
| **revised** | 108:22 | 61:22, 62:4, | 45:9, 45:14, |
| 111:9 | **running** | 63:6, 64:3, | 48:8, 50:16, |
| **revisions** | 74:12, 106:1, | 64:5, 64:7, | 52:13, 54:8, |
| 117:8 | 110:18, 110:21 | 64:13, 65:10, | 57:8, 59:5, |
| **rich** | **runup** | 65:11, 66:4, | 60:3, 60:5, |
| 13:18 | 98:18 | 68:16, 68:19, | 60:15, 68:5, |
| **richard** | | 69:2, 69:7, | 68:11, 68:22, |
| 17:7 | **S** | 70:5, 70:15, | 70:17, 77:17, |
| **rick** | **said** | 70:17, 70:19, | 80:8, 82:4, |
| 63:12 | 20:9, 37:16, | 71:13, 72:2, | 82:6, 82:9, |
| **right** | 54:17, 56:5, | 72:15, 74:4, | 82:10, 84:7, |
| 14:19, 26:8, | 63:2, 77:5, | 74:6, 75:2, | 85:8, 86:2, |
| 33:11, 77:14, | 83:4, 86:11, | 79:4, 79:5, | 86:7, 86:9, |
| 82:17, 83:4, | 88:8, 100:16, | 79:20, 80:4, | 86:12, 87:9, |
| 84:14, 91:14, | 104:17, 110:3, | 84:11, 85:6, | 88:15, 88:22, |
| 94:21, 100:1, | 112:19, 125:6 | 85:10, 85:21, | 90:15, 101:13, |
| 102:8, 103:3, | **sale** | 86:4, 87:11, | 109:20, 120:11 |
| 105:4, 105:9, | 4:12, 22:3, | 87:12, 88:6, | **saying** |
| 113:1, 120:1, | 24:11, 29:3, | 88:19, 90:17, | 20:1, 48:15, |
| 122:3 | 34:13, 37:3, | 91:2, 95:8, | 48:18, 48:19, |
| **rights** | 37:5, 37:14, | 104:13, 104:14, | 49:1, 49:9, |
| 38:1 | 91:14, 93:12, | 115:16 | 49:17, 63:9, |
| **rmr** | 98:7, 98:14, | **salon's** | 65:14 |
| 1:22, 2:2 | 98:19, 98:22, | 66:19, 71:21 | **says** |
| **road** | 99:20, 108:5, | **salons** | 26:20, 33:5, |
| 35:18 | 113:9, 114:4, | 11:5, 35:10, | 37:5, 47:13, |
| **rodger** | 116:10, 116:11, | 35:17, 44:16, | 58:4, 66:21, |
| 3:18, 17:9, | | | |

Transcript of Lester D. Mardiks, Corporate Designee
Conducted on January 19, 2021

149

75:5, 86:15,
100:19
**schedule**
39:5, 39:12,
40:1, 52:1,
53:9, 54:1,
55:17, 56:16,
57:1, 89:7,
89:8, 89:13,
96:12, 96:13,
96:16
**schedules**
23:6, 23:8,
39:7, 39:18,
40:16
**school**
9:11, 9:13,
9:15, 10:6, 10:7
**scope**
52:15
**screen**
79:13, 94:7,
94:20, 95:3,
106:10, 116:14
**scroll**
15:7, 33:7,
52:17, 83:19,
96:1
**seal**
125:14
**second**
14:16, 15:6,
19:7, 19:18,
33:12, 34:21,
38:7, 38:11,
38:14, 38:17,
38:19, 38:20,
43:12, 43:14,
43:17, 44:2,
46:20, 51:17,
65:1, 72:21,
83:3, 83:16,
100:8, 102:1,
102:13, 103:11,
106:9, 106:12,
111:10, 112:3,
116:15, 116:19,
117:19, 118:5,

122:11
**section**
26:6, 27:13,
28:12, 30:10,
30:18, 30:21,
31:20, 34:16,
45:22, 46:8,
46:9, 58:6,
58:7, 65:22,
66:17, 71:1,
92:8, 92:20,
93:7, 93:8,
93:9, 106:11,
106:18, 107:3,
109:8, 116:20
**security**
97:9
**see**
6:12, 14:18,
14:21, 32:20,
32:22, 33:4,
33:13, 38:21,
40:2, 47:18,
54:5, 55:3,
73:17, 76:16,
78:19, 83:20,
89:1, 90:20,
95:2, 95:17,
96:18, 97:22,
100:21, 102:17,
104:12, 104:15,
105:19, 109:6,
109:9, 115:21,
116:21, 118:16,
121:2, 121:9,
121:19, 122:1,
122:5
**seeing**
28:1
**seeking**
20:4, 50:13,
50:17, 57:5,
59:9, 74:7, 74:9
**seen**
69:1, 100:16,
115:16, 115:18,
122:15
**sees**
72:12

**segal**
13:14
**sell**
95:7
**seller**
37:7, 43:8,
45:11, 45:14,
93:11
**sellers**
29:8, 29:10,
29:15, 30:4,
35:11, 37:11,
43:4, 71:10
**selling**
97:17
**send**
67:20, 108:6,
108:14, 108:17
**sending**
60:17, 114:6
**senior**
11:7, 12:6,
122:20
**sense**
6:18
**sensitive**
68:9, 68:10
**sent**
34:5, 47:4,
60:14, 63:11,
63:21, 64:12,
64:19, 68:17,
79:20, 83:20,
87:11, 88:5,
88:20, 92:3,
101:19, 109:12,
109:14, 111:6,
111:16, 115:10
**sentence**
33:2, 33:4,
33:5, 33:6,
33:9, 33:13,
55:14, 66:21,
71:5, 86:15,
87:3
**separate**
33:3, 33:16
**september**
46:5, 51:14,

71:12, 76:1,
76:10, 79:15,
101:4, 101:7,
107:8, 109:2,
109:4, 110:5,
110:9, 110:10,
111:21, 115:21,
116:8, 116:9
**seriatim**
65:8
**series**
87:10
**serve**
58:14, 109:21
**servers**
84:17, 84:21
**service**
94:3
**services**
4:10, 4:13,
18:22, 20:2,
21:13, 31:17,
33:20, 34:2,
34:18, 35:3,
35:6, 35:15,
38:13, 38:20,
39:5, 39:11,
39:22, 40:6,
41:3, 41:8,
42:19, 43:11,
43:21, 44:4,
44:12, 44:15,
45:6, 45:18,
45:21, 46:11,
47:11, 47:19,
48:2, 48:4,
48:7, 49:2,
49:6, 49:11,
49:19, 50:3,
50:14, 50:17,
50:18, 50:21,
51:2, 51:3,
51:9, 51:13,
51:16, 51:19,
52:1, 52:3,
53:1, 53:9,
53:10, 53:11,
53:13, 53:22,

Transcript of Lester D. Mardiks, Corporate Designee
Conducted on January 19, 2021

54:1, 54:10,
54:11, 54:18,
54:20, 55:17,
56:16, 57:1,
57:2, 57:13,
57:21, 58:5,
58:8, 66:18,
71:10, 78:4,
89:6, 89:13,
89:16, 90:16,
90:18, 90:22,
91:3, 91:13,
93:5, 93:15,
93:21, 98:21,
107:13, 110:9,
110:12, 112:13
**session**
17:10
**sessions**
17:21
**set**
125:13
**settlement**
37:6, 38:2
**several**
29:1, 35:8,
63:18, 84:6
**shall**
29:15, 67:3,
119:12
**shapiro**
3:4, 4:22, 63:9
**sharp**
3:20, 94:10,
103:15, 105:15,
111:7
**she'll**
25:2
**sheet**
119:3, 119:4
**sher**
3:3, 3:4, 4:4,
4:22, 5:4, 5:5,
6:2, 16:3, 17:6,
17:13, 18:18,
19:19, 19:22,
20:17, 21:6,
21:10, 24:17,

24:22, 25:4,
25:10, 26:5,
32:7, 32:12,
32:15, 41:9,
54:3, 55:11,
55:13, 56:10,
57:6, 57:14,
59:11, 60:9,
60:19, 62:22,
63:9, 65:6,
71:16, 72:18,
73:13, 77:9,
81:22, 82:3,
82:5, 82:9,
82:14, 82:17,
83:9, 86:15,
88:11, 91:8,
91:16, 91:20,
92:1, 92:6,
92:10, 92:18,
94:9, 94:13,
94:16, 95:2,
95:11, 95:17,
95:20, 98:12,
99:14, 100:10,
101:16, 101:19,
102:19, 103:14,
103:18, 103:20,
104:1, 105:17,
106:8, 106:15,
106:17, 111:6,
112:1, 115:9,
116:13, 116:18,
118:1, 118:4,
119:15, 122:5,
122:10, 123:11
**shoe**
10:16
**shoes**
10:16, 13:8
**shopping**
10:21, 12:12
**short**
13:4, 17:21
**shortcut**
96:14, 102:19
**shorthand**
125:1

**should**
17:22, 71:13,
80:15, 82:7,
85:16, 95:9
**shouldn't**
69:18
**show**
8:19, 61:8,
76:13, 82:6,
111:6, 115:10,
117:13, 117:19,
120:10
**showed**
98:7
**showing**
88:17
**shows**
76:11
**shrug**
7:11
**shut**
35:11
**sic**
107:8, 107:21
**sides**
40:21
**signature**
65:17, 68:1,
102:10
**signature-p1kal**
125:18
**signed**
40:3, 57:22,
94:4, 102:9
**significant**
53:12
**signing**
41:18, 78:9,
125:9
**similar**
42:10
**simply**
11:4, 88:6
**simultaneous**
14:22, 72:10,
98:1, 108:15
**since**
49:4, 57:12

**single**
111:1
**sir**
19:12, 22:14,
28:14, 30:13,
46:21, 58:11,
93:2, 94:11,
101:18, 102:3,
102:7, 105:17,
115:15, 118:4,
118:14, 119:4,
121:1
**sitting**
103:5
**situation**
45:11, 81:1
**six**
17:19, 17:20,
60:20, 60:21,
61:1, 68:17
**size**
35:21
**slightly**
122:21
**slow**
51:6
**slowly**
96:7
**small**
10:13, 72:5
**smith**
2:8
**sold**
36:15, 97:2
**some**
6:9, 6:14,
6:15, 17:8,
17:20, 17:21,
23:2, 34:4,
35:18, 39:7,
39:17, 42:11,
47:19, 48:3,
48:4, 48:5,
48:10, 48:11,
49:8, 54:19,
57:8, 59:21,
59:22, 64:11,
65:21, 68:12,

Transcript of Lester D. Mardiks, Corporate Designee
Conducted on January 19, 2021

151

68:14, 68:22,
69:13, 74:22,
75:4, 75:9,
76:4, 76:16,
85:1, 89:2,
89:3, 89:12,
90:3, 102:12,
109:6, 111:18,
112:11, 117:15,
120:7
**somebody**
80:20
**someone**
75:13
**something**
40:22, 53:12,
67:22, 69:21,
81:15
**sometimes**
26:6, 87:22,
96:3
**somewhat**
52:14
**somewhere**
17:19, 66:14
**soon**
35:18, 75:16,
75:20
**sooner**
45:19
**sorry**
18:9, 23:16,
24:20, 25:22,
33:10, 38:15,
43:14, 44:18,
54:15, 55:11,
56:5, 62:11,
80:16, 83:15,
86:9, 86:12,
86:22, 92:15,
96:4, 100:11,
103:4, 103:5,
116:13, 118:9,
121:5, 122:9
**sort**
6:16, 42:4,
77:12, 91:16
**sought**
95:7

**spaces**
12:12
**speak**
77:19
**speaking**
14:22, 69:16,
72:10, 98:1,
108:15
**specific**
14:9, 58:20
**specifically**
35:2, 37:22,
43:11, 44:8,
44:10, 54:5,
55:2, 55:3
**specificity**
39:9, 84:8
**specified**
29:12, 31:21,
32:1, 54:10,
54:22, 93:18
**specify**
65:18
**speculating**
77:18
**speculation**
79:1
**spell**
13:21
**spelled**
13:5
**spent**
17:22, 18:2
**spirit**
67:15
**spoke**
87:10, 87:12
**st**
9:15, 83:20,
84:18, 85:11,
86:5, 86:13
**staff**
61:16, 63:14,
64:14, 68:20,
72:17, 75:6,
75:7, 75:12,
75:22, 76:5,
76:9, 76:10,

76:20, 77:2,
77:3, 77:21
**staffing**
63:19, 63:20,
78:3
**stage**
74:9
**stand**
77:12
**standard**
32:8
**stanton**
5:7, 113:4,
113:5, 113:8,
123:2
**stanton's**
113:14
**start**
91:10
**started**
11:22, 13:7
**starters**
88:8
**starting**
10:6, 13:11
**starts**
36:4, 103:8
**state**
7:13, 44:2,
120:16, 125:22
**stated**
47:7
**statement**
4:19, 4:21,
102:5, 102:7,
104:7, 104:9,
104:10
**statements**
102:12, 103:1
**states**
1:1, 32:3,
67:21
**stating**
47:5
**statute**
50:9
**stay**
116:19

**stenographically**
125:7
**step**
23:16, 35:17,
41:22, 110:3,
111:8
**stepped**
38:16
**still**
47:19, 48:3,
54:12, 54:21,
72:1, 72:5,
85:18, 101:13
**stop**
102:8, 102:13,
103:15
**storage**
48:4, 49:6,
49:7, 49:8,
49:11
**stored**
84:22
**stores**
12:12, 12:13
**street**
3:5
**stub**
108:12, 120:7
**stuck**
103:7
**subject**
9:21, 10:2
**subsection**
28:13, 28:18
**subsequent**
13:16
**subsequently**
113:6
**substances**
8:13
**substantially**
22:4
**suburban**
9:13
**success**
30:3
**successor**
97:12

Transcript of Lester D. Mardiks, Corporate Designee
Conducted on January 19, 2021

152

sufficient
70:11, 70:12
suit
37:9
suite
3:5
sunday
118:12
supervising
12:18
support
33:19, 34:3,
34:9, 63:6,
65:10, 74:15
supporting
67:6
supports
66:4
supposed
106:4, 110:8,
116:7
sure
14:11, 22:10,
24:18, 27:1,
28:2, 32:12,
32:21, 33:4,
46:16, 48:13,
50:7, 56:11,
77:7, 77:10,
77:19, 78:11,
79:17, 81:17,
93:10, 99:22,
117:16
susan
13:16
susan's
13:17, 13:21
suspended
12:21
sworn
6:21, 8:9
systems
35:19, 45:10,
48:3, 48:16,
48:17, 83:5,
83:9, 84:13,
84:19, 85:3,
85:11

**T**
take
9:9, 9:10,
15:1, 18:6,
18:11, 26:19,
78:16, 82:4,
82:8, 82:16,
86:21, 93:8,
96:14, 98:12,
100:6, 105:15,
106:8, 110:3,
111:8, 115:9,
116:21, 116:22,
118:15, 123:16
taken
82:19, 123:21,
125:4, 125:7
taking
41:17, 41:21,
64:12, 82:10
talk
59:11, 84:9,
109:5, 109:17,
114:5, 123:19
talked
123:1
talking
21:7, 89:11,
89:12, 89:13,
100:11, 120:3
talks
44:11
tax
62:1, 65:13,
67:20, 69:3
taxes
62:3
technician
3:20, 14:16,
15:5, 19:7,
19:10, 19:21,
20:8, 21:21,
22:13, 22:17,
25:22, 26:4,
28:3, 28:5,
28:9, 28:14,
28:17, 30:11,

32:20, 33:1,
33:10, 38:7,
38:10, 38:22,
39:3, 46:16,
46:19, 51:17,
52:19, 55:21,
56:3, 56:9,
56:11, 58:10,
72:21, 73:3,
83:1, 83:3,
83:7, 83:10,
83:15, 83:18,
91:18, 91:22,
92:15, 92:22,
94:11, 94:14,
94:19, 100:8,
100:14, 101:18,
102:1, 103:13,
103:16, 103:19,
103:21, 104:3,
105:16, 105:18,
106:12, 106:14,
106:16, 111:10,
112:3, 115:12,
116:15, 116:17,
118:3, 118:5,
118:8, 118:13,
119:16, 120:14,
121:1, 121:4,
122:3, 122:9,
122:11, 123:13,
124:5
tell
8:9, 25:1,
103:15
term
9:5, 30:20,
30:22, 31:1,
36:2, 36:6,
46:1, 46:11,
47:17, 54:21,
119:3, 119:4
terminate
47:11, 101:3,
110:4, 110:8
terminated
45:19, 46:12,
47:6, 51:13,

71:12, 79:15,
110:2
terminating
101:9
termination
4:14, 57:12,
57:20, 66:9,
100:13, 101:9,
106:5, 116:6,
116:7, 116:9
terms
52:5, 110:4
testified
7:1, 96:21,
101:8, 105:10
testify
6:12, 6:22,
8:16, 14:9,
15:15, 15:19,
15:22, 16:10,
16:13, 16:16,
16:19, 16:22
testifying
8:5
testimony
97:18, 101:10,
125:6, 125:7
th
47:6, 50:22,
116:8, 123:5,
125:14
thank
19:11, 19:22,
21:11, 22:16,
25:4, 28:16,
32:13, 32:15,
33:1, 55:13,
82:17, 91:8,
100:5, 105:4,
111:22, 120:15
themselves
43:5
thereafter
125:8
therefore
97:16
thereof
64:11

Transcript of Lester D. Mardiks, Corporate Designee
Conducted on January 19, 2021

153

**thereto**
22:9
**thing**
44:19, 62:18,
76:11, 95:6
**things**
11:22, 12:19,
18:1, 40:14,
40:16, 42:17,
47:20, 48:2,
48:5, 48:8,
48:10, 50:20,
51:6, 51:7,
53:16, 54:6,
54:19, 56:18,
56:22, 58:17,
60:1, 78:1,
87:21, 87:22,
88:10, 88:14,
89:10, 90:3,
101:10, 111:20
**think**
6:2, 6:4, 6:14,
6:16, 6:17,
24:5, 36:22,
37:1, 39:7,
46:3, 47:10,
49:12, 53:11,
56:18, 57:9,
59:11, 61:9,
62:22, 63:2,
63:3, 63:18,
63:22, 64:4,
64:9, 66:6,
68:10, 69:10,
72:5, 75:20,
76:15, 79:2,
79:10, 82:3,
82:7, 82:16,
84:2, 84:3,
87:6, 90:21,
91:13, 93:7,
94:9, 95:18,
96:9, 97:4,
101:10, 101:11,
101:17, 105:10,
105:15, 112:16,
112:19, 114:21,

115:10, 115:18,
120:2
**third**
121:20
**thought**
6:17, 112:16
**thousands**
108:6
**three**
17:20, 45:19,
46:1, 46:12,
60:12, 74:2,
75:19, 76:19,
77:6, 99:16,
120:17
**through**
1:11, 29:12,
31:7, 41:20,
48:12, 52:12,
52:17, 55:22,
56:1, 68:2,
75:3, 80:5,
91:19, 102:14,
104:4, 108:22,
109:10, 112:20
**throughout**
14:8, 58:17,
105:20, 110:10
**time**
12:14, 12:18,
13:4, 18:1,
18:2, 25:12,
27:1, 27:5,
27:9, 30:16,
35:16, 40:15,
43:3, 45:12,
47:21, 53:15,
54:17, 61:3,
64:4, 64:8,
68:9, 68:12,
73:16, 75:3,
75:10, 75:15,
75:18, 75:21,
77:22, 80:2,
81:16, 82:4,
86:21, 87:6,
110:17, 111:1,
111:5, 111:19,

118:2, 118:22,
119:8, 123:12,
124:4
**times**
17:18, 17:19,
60:9
**timing**
123:19
**title**
19:18, 38:21,
122:21
**titles**
12:3
**today**
14:10, 15:13,
65:7, 86:19,
93:3, 117:3
**together**
23:8, 39:18,
40:16, 41:1,
81:19, 87:20
**told**
47:15, 69:18,
69:20, 72:6,
72:7, 75:18,
107:22
**took**
11:22, 19:18,
120:19
**top**
63:8, 86:14,
95:2, 104:2,
122:2
**topeka**
9:16, 10:8
**topic**
15:16, 15:20,
16:1, 16:11,
16:14, 16:17,
16:20, 17:1
**topics**
6:6, 6:10,
14:10, 15:14,
17:3
**total**
61:1
**touch**
107:22

**track**
119:15
**tracking**
91:10
**traded**
121:16, 121:20
**tradeoff**
117:14, 120:3
**trading**
120:6
**transaction**
24:11, 94:4
**transactions**
29:19, 30:1,
30:5, 72:12
**transcribed**
7:8
**transcript**
4:6, 5:2,
14:15, 19:9,
21:20, 38:9,
46:18, 73:2,
83:12, 94:18,
101:22, 112:7,
115:14, 117:22,
118:7, 120:13,
122:14, 125:5
**transfer**
4:21, 27:22,
29:3, 36:15,
115:15
**transition**
4:13, 4:20,
18:22, 20:2,
21:12, 31:17,
33:20, 34:1,
34:17, 35:3,
35:6, 35:15,
38:13, 38:19,
39:5, 39:11,
39:22, 40:6,
41:2, 41:8,
42:19, 43:7,
43:11, 43:21,
44:4, 44:12,
44:15, 45:6,
45:18, 45:20,
46:11, 51:2,

Transcript of Lester D. Mardiks, Corporate Designee
Conducted on January 19, 2021

154

51:3, 51:9,
51:13, 51:16,
51:19, 52:2,
52:22, 53:11,
53:13, 54:11,
54:18, 54:20,
56:20, 57:2,
57:9, 57:12,
57:21, 58:5,
58:8, 66:18,
71:2, 84:22,
88:21, 89:6,
89:16, 89:21,
90:5, 90:16,
90:17, 90:22,
91:13, 93:5,
93:15, 93:21,
94:3, 110:19,
110:20, 112:14,
113:7, 123:9
**transitional**
43:3
**transitioning**
99:3
**transitions**
4:10
**treated**
14:4
**tremendous**
69:11
**tribunal**
10:3
**triggered**
48:6
**true**
125:5
**trust**
67:12
**trustee**
48:7, 70:20,
71:3, 71:8,
71:14, 105:6,
106:19, 106:21,
107:15, 113:2
**truth**
6:22, 7:1, 8:9
**truthfully**
8:16

**try**
42:16, 99:21,
116:18
**trying**
14:20, 64:15,
92:16, 92:17
**tsa**
4:14, 18:21,
18:22, 43:1,
43:2, 47:5,
54:7, 54:8,
56:17, 64:21,
66:1, 66:9,
71:12, 79:15,
89:7, 89:8,
89:14, 98:14,
98:19, 98:22,
99:20, 100:7,
106:9, 107:11,
107:15, 110:1,
110:4, 112:18,
114:3, 116:7,
116:9, 116:11
**tuesday**
1:13
**turn**
15:3, 20:6,
20:19, 22:18,
25:20, 27:10,
28:11, 30:8,
32:19, 34:12,
34:14, 35:22,
37:2, 38:11,
45:20, 55:8,
58:7, 65:22,
92:7, 96:11,
105:9, 116:20,
120:21
**two**
44:7, 55:7,
56:18, 56:22,
60:7, 75:12,
75:19, 75:20,
78:1, 79:9,
82:3, 104:2
**two-minute**
123:16
**two-person**
10:8

**typewriting**
125:8
**typical**
8:2
**typically**
60:13

U

**ucc**
121:2
**ultimately**
78:2, 88:1,
108:21
**under**
8:6, 8:12,
17:19, 24:16,
25:8, 25:11,
25:13, 29:19,
34:18, 36:10,
41:7, 44:17,
45:2, 51:9,
52:22, 53:10,
71:10, 71:14,
76:8, 76:9,
81:21, 93:6,
100:19, 100:20,
107:11, 107:14,
108:10, 110:3,
112:18, 115:4,
121:10, 125:8
**undergrad**
9:14
**understand**
8:4, 8:5, 8:8,
9:5, 14:6,
24:18, 25:1,
89:9
**understanding**
26:16, 27:17,
28:21, 29:5,
30:21, 31:3,
33:14, 34:17,
35:1, 36:9,
37:4, 42:22,
43:20, 44:14,
44:22, 45:17,
47:8, 47:16,
48:14, 51:12,

52:2, 52:21,
58:18, 67:8,
70:10, 71:7,
87:21, 88:19,
99:16, 101:12,
104:20, 105:5
**understood**
69:16
**unencumbered**
37:12, 37:16,
37:19
**unexpired**
22:8
**unfortunately**
89:20
**united**
1:1
**university**
9:14, 9:15
**unless**
45:19
**unpaid**
53:12
**unreasonable**
62:19, 62:20,
80:12, 80:16
**until**
9:1, 11:20,
13:14, 43:8,
69:11, 101:4
**up-to-speed**
43:5, 80:20
**uploaded**
94:9
**urban**
10:22
**usage**
72:5, 107:13
**use**
10:22, 47:12,
47:16, 48:5,
70:14, 70:21,
71:19, 71:21,
101:13, 107:22
**using**
45:9, 49:21,
72:2, 84:12,
106:2, 110:13

Transcript of Lester D. Mardiks, Corporate Designee
Conducted on January 19, 2021

155

**utilize**
119:12

---
**V**
---

**various**
48:16, 48:17,
78:12
**vary**
60:1, 60:2
**velocity**
84:12, 84:16,
84:19, 84:20,
85:11, 85:14,
85:19, 86:1,
86:5, 87:5
**vendors**
42:10, 78:9
**verbally**
7:9
**version**
23:12, 24:7
**versions**
23:20, 24:2,
60:22, 61:2,
73:18, 73:19,
73:21, 79:3,
79:11, 79:14,
79:19
**via**
2:16, 3:8
**viable**
37:21
**vice**
11:7, 12:5,
12:6, 12:7,
122:20
**video**
14:19
**videoconference**
1:9, 2:16, 3:8
**view**
34:9, 35:7,
35:8, 38:2,
62:20, 63:7,
65:11, 66:4
**violations**
99:22
**virginia**
9:20

**virtual**
55:5, 96:3
**visa**
37:8, 96:20
**volume**
10:16

---
**W**
---

**w-2s**
61:20, 65:12,
69:3, 114:5,
114:6, 114:14
**w-a-r-n**
99:6
**wait**
9:1, 102:13
**waived**
125:9
**want**
8:2, 15:7,
26:12, 32:12,
48:12, 56:4,
65:1, 70:13,
90:17, 93:6,
93:8, 94:6,
96:11, 96:17,
100:6, 100:19,
101:16, 102:11,
103:10, 109:5,
109:6, 109:9,
111:6, 112:1,
115:9, 118:3,
119:19, 119:22,
120:10, 120:21,
121:4, 123:15
**wanted**
46:8, 117:16,
119:10, 121:16
**wants**
67:22
**warn**
99:6, 99:22
**washburn**
9:15
**washington**
9:14, 9:20,
11:2
**water**
82:11

**way**
13:10, 16:4,
22:20, 28:2,
42:16, 70:21,
71:8, 72:2,
74:12, 74:13,
85:12, 85:21,
89:10, 89:19,
90:4, 92:18,
96:7, 96:12,
101:10, 103:1,
103:19, 115:2
**ways**
96:8
**we'll**
6:5, 65:6,
75:20, 110:2
**we're**
20:21, 21:16,
27:14, 42:15,
65:8, 70:1,
70:2, 70:3,
70:14, 75:19,
79:8, 82:10,
88:9, 91:12,
92:1, 92:22,
94:7
**we've**
16:5, 62:21,
63:3, 68:11,
74:12, 74:14,
81:18, 82:2,
87:7, 90:22
**wear**
8:21
**week**
6:3, 18:4,
60:9, 73:9, 84:2
**welcome**
22:17, 28:17
**went**
9:13, 9:15,
10:11, 11:1,
11:2, 11:21,
17:11, 102:14,
113:12
**weren't**
31:22, 35:16,

48:11, 53:5
**west**
3:5
**whatever**
78:8, 78:19
**whatsoever**
8:22
**whereas**
43:17
**whereof**
125:13
**whether**
42:6, 47:13,
52:6, 56:14,
70:12, 87:2,
93:4, 93:21,
99:4, 110:16,
112:11, 112:12,
113:11, 113:16
**whoever**
78:7
**whole**
6:22, 44:19,
95:6, 106:17
**willis**
2:12, 4:3, 6:4,
7:3, 7:4, 14:12,
15:3, 19:4,
21:6, 21:8,
21:15, 22:10,
26:5, 26:8,
28:8, 28:11,
32:8, 32:16,
33:7, 34:12,
35:22, 38:5,
46:14, 51:15,
51:18, 52:16,
55:8, 55:11,
55:12, 55:21,
56:7, 58:7,
65:4, 65:22,
72:19, 82:2,
82:7, 82:11,
82:15, 82:21,
83:2, 83:5,
83:13, 87:1,
91:6, 91:15,
93:4, 98:7,

Transcript of Lester D. Mardiks, Corporate Designee
Conducted on January 19, 2021

156

100:15, 107:18,
112:11, 123:15,
124:1
**wind**
4:15, 25:18,
26:21, 27:2,
27:6, 29:13,
30:15, 30:20,
31:3, 31:6,
31:13, 31:22,
32:3, 33:3,
33:15, 33:22,
41:11, 41:14,
42:20, 44:5,
44:11, 50:21,
54:7, 54:8,
54:12, 54:22,
55:1, 56:19,
57:2, 57:5,
57:9, 57:11,
57:16, 58:2,
61:12, 62:13,
65:19, 66:5,
66:10, 67:16,
68:20, 70:18,
72:19, 73:7,
74:12, 74:16,
75:5, 75:6,
75:22, 76:9,
76:13, 76:20,
77:2, 77:3,
78:1, 78:5,
78:16, 79:4,
79:14, 79:19,
80:1, 80:3,
83:5, 83:9,
85:1, 88:20,
89:7, 89:11,
89:17, 89:21,
90:7, 90:10,
90:11, 91:3,
109:13, 109:19,
114:17, 115:4,
115:8, 117:6,
118:17, 118:20,
119:1, 119:11
**winding**
62:6

**winds**
78:3
**wire**
4:21, 115:15
**wished**
47:11
**within**
68:7, 77:10
**without**
40:10, 58:20,
62:16, 67:4,
72:7, 95:5,
120:18
**witness**
14:18, 15:4,
19:13, 22:11,
22:16, 25:3,
28:12, 28:16,
32:22, 39:2,
46:22, 52:16,
52:20, 56:12,
56:13, 82:15,
83:14, 91:7,
92:17, 112:1,
124:3, 125:13
**woman**
75:10
**wonderful**
92:3
**word**
31:19, 69:17
**words**
31:5, 31:6,
38:16, 39:20
**work**
10:5, 11:3,
12:11, 12:16,
86:16, 99:21,
114:1, 123:5
**worked**
10:9, 13:13,
13:15, 40:17,
81:18, 88:14,
88:15
**working**
10:19, 11:17,
13:8, 40:17,
40:18, 67:11,

68:2, 75:11,
76:5, 76:6,
87:20, 98:14
**worries**
103:22
**wouldn't**
51:6, 53:5
**wound**
54:13
**wrap**
81:3
**writing**
69:5, 88:10,
89:3
**written**
58:20, 66:19,
67:4, 67:9,
67:17, 67:18,
68:16, 68:19,
69:2, 70:5,
70:19, 88:20

**Y**

**yeah**
19:21, 25:3,
25:5, 39:3,
45:7, 61:2,
63:17, 64:5,
67:11, 76:21,
82:1, 82:7,
83:15, 83:21,
84:2, 85:9,
87:6, 88:8,
89:15, 89:19,
94:1, 94:5,
99:19, 103:6,
103:14, 104:19,
107:17, 108:8,
110:20, 112:19,
121:13, 123:17
**year**
10:9, 10:12,
11:8
**years**
10:18
**yep**
73:19
**yesterday**
74:5, 101:19,

111:7, 111:13,
111:19, 112:2,
112:8, 115:10,
117:20, 118:2,
120:11, 122:10
**york**
2:14

**$**

**$100,000**
30:19, 31:9,
31:14, 117:18
**$104,546**
76:2
**$2**
66:15
**$25,000**
107:7, 107:12
**$27,325**
76:1
**$30,000**
113:14, 123:2
**$350,000**
121:11
**$438,000**
104:16
**$50**
67:21
**$500,000**
108:11, 108:21,
117:15
**$793,010.05**
102:21

**1**

**1**
95:14, 124:3
**10**
45:21, 105:14,
105:17
**10,000**
99:11, 99:12
**100**
121:15, 121:16
**10020**
2:14
**101**
4:18

Transcript of Lester D. Mardiks, Corporate Designee
Conducted on January 19, 2021                    157

**1099**
69:3
**11**
1:4, 7:6, 7:17,
82:19, 82:20,
99:11
**112**
4:20
**115**
4:21
**117**
5:4
**118**
5:5
**12**
55:9, 101:20,
123:18, 123:21,
123:22, 124:6
**120**
5:6
**122**
5:7
**125**
1:21
**1251**
2:13
**14**
4:8, 14:13,
14:14, 14:17,
37:2, 37:3,
49:4, 50:6,
50:15, 50:16,
50:19, 50:22,
79:21, 112:2
**14583**
1:6
**14584**
1:7
**15**
4:9, 19:6,
19:8, 19:10,
32:18, 32:19,
55:9, 67:20,
91:15, 91:18
**16**
4:12, 21:18,
21:19, 21:21,
34:13, 51:18,

91:20, 92:8,
116:13, 116:17
**17**
4:13, 4:14,
5:4, 30:8, 38:6,
38:8, 38:10,
47:6, 51:16,
51:19, 55:22,
56:1, 56:5,
56:7, 56:8,
91:15, 91:19,
91:20, 100:7,
106:4, 106:10,
106:14, 118:12
**175**
119:11, 121:16
**18**
4:14, 34:15,
46:15, 46:17,
46:19, 91:21,
100:12, 100:14,
106:6
**19**
1:13, 4:9,
4:15, 55:22,
56:5, 72:20,
73:1, 73:4,
92:1, 111:9,
111:10
**1987**
11:10
—— 2 ——
**2 (a**
93:7
**2.3**
30:10, 31:20,
116:21
**2.5**
34:16, 34:22,
92:8, 92:20,
93:1, 93:8, 93:9
**20**
1:6, 1:7, 4:14,
4:16, 4:17,
4:19, 4:21, 5:4,
5:6, 18:4, 56:1,
83:1, 83:2,

83:10, 83:11,
121:22, 122:8,
122:10, 125:14
**2000**
3:5
**2008**
107:8
**2009**
13:15
**2020**
46:5, 50:6,
50:15, 50:19,
51:14, 64:22,
71:13, 79:16,
79:21, 84:18,
95:4, 99:8,
99:10, 102:6,
110:10
**2021**
1:13, 125:15
**2025**
125:17
**21**
4:12, 4:17,
94:7, 94:13,
94:15, 94:17,
94:19, 94:21
**212**
2:15
**21201**
3:6
**21209**
2:9
**22**
4:18, 95:1,
95:4, 95:14,
101:16, 101:21,
102:2, 102:4
**23**
4:17, 4:20,
95:4, 112:5,
112:6
**24**
4:21, 115:12,
115:13
**25**
5:4, 5:7,
117:21, 118:9,

118:10, 118:11,
123:5
**25,000**
112:21
**250**
3:5
**26**
5:5, 118:6,
118:10, 119:16
**27**
5:6, 82:19,
120:12, 120:14,
120:16
**28**
4:21, 5:6, 5:7,
116:8, 121:22,
122:12, 122:13
**29**
55:9, 56:15
—— 3 ——
**30**
1:9, 6:2, 18:5,
22:18
**3000**
2:10
**31**
1:14, 4:16,
4:19, 83:20,
84:18, 85:11,
86:5, 86:13,
102:6
**335**
2:15
**34**
123:21
**347176**
1:20
**35**
32:19
**37**
26:2, 26:4
**38**
4:13
**385**
3:7
—— 4 ——
**4,000**
99:17

Transcript of Lester D. Mardiks, Corporate Designee
Conducted on January 19, 2021

**4/6/20**
5:7
**40**
36:1, 123:18
**41**
27:11, 28:6,
82:20, 123:22
**410**
2:10, 3:7
**42**
124:6
**4277**
3:7
**438**
104:19
**438,000**
104:18
**45**
124:3
**4500**
2:15
**46**
4:14
**4th**
46:5, 94:5,
110:5, 110:9

| 5 |
| --- |

**5.1**
107:3
**5.2**
58:6, 65:22,
66:17, 109:8,
109:18
**5.3**
71:1, 106:18,
106:19
**5.5**
58:7
**50**
30:9
**51**
34:14
**58**
104:1, 105:15
**580**
2:10

| 6 |
| --- |

**6,000**
99:15

**6225**
2:8
**6th**
123:6

| 7 |
| --- |

**7.2**
93:18
**73**
4:15
**75**
121:19
**75,000**
121:2
**793**
105:11, 105:13

| 8 |
| --- |

**83**
4:16
**838,000**
104:17
**87**
11:20

| 9 |
| --- |

**9**
1:14
**9.1**
45:22, 46:8,
46:9
**92**
4:4
**94**
4:17