Entered: March 3rd, 2022
Signed: March 3rd, 2022
**SO ORDERED**



THOMAS J. CATLIOTA
U.S. BANKRUPTCY JUDGE

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF MARYLAND
### at Greenbelt

| | | |
|---|---|---|
| In re: | * | Case No.   20-14583-TJC |
| Creative Hairdressers, Inc., *et al.* | * | Chapter    11 |
| Debtors | * | Jointly Administered with |
| | * | Case No.   20-14584-TJC |

\*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*

## <u>MEMORANDUM OF DECISION</u>

The Internal Revenue Service ("IRS") asserts a priority claim against debtors Creative Hairdressers, Inc. and Ratner Companies, L.C. (the "Debtors") for the employer shared responsibility payment under §4980H of the Internal Revenue Code, part of the Patient Protection and Affordable Care Act.  The IRS seeks priority status as an excise tax under 11 U.S.C. §507(a)(8)(E).  The Debtors object, contending the employer shared responsibility payment is not an excise tax entitled to priority treatment, but is a nonpriority penalty.  The parties also dispute when the "transaction occur[red]" that gave rise to the employer shared responsibility payment, as that phrase is used in 11 U.S.C. §507(a)(8)(E)(ii).

For the reasons that follow, the Court concludes the employer shared responsibility payment is an excise tax entitled to priority and the "transaction occur[red]" at the time an employee enrolls in a qualified health insurance plan under the Patient Protection and Affordable

1

Care Act.  The Court also concludes that the claim against debtor Ratner Companies, L.C. should be disallowed

## Jurisdiction

The Court has jurisdiction over this matter pursuant to 28 U.S.C. §1334, 28 U.S.C. §157(a), and Local Rule 402 of the United States District Court for the District of Maryland. This matter is a "core proceeding" under 28 U.S.C. §157(b)(2)(K) and the Court has statutory and Constitutional authority to enter a final order.

## Background

On April 23, 2020, Creative Hairdressers, Inc. ("CHI") and Ratner Companies, L.C. ("RC") filed for Chapter 11 relief and have proceeded as debtors in possession pursuant to 11 U.S.C. §§1107(a) and 1108.[1]  The Court entered an order jointly administering these related cases under the CHI case, No. 20-14583-TJC.  ECF 86.

Prior to filing bankruptcy, CHI was one of the nation's largest independent family-owned chain of hair salons, operating approximately 800 hair salons under the Hair Cuttery, Bubbles and Cielo brands.  CHI employed over 10,000 full- and part-time employees.  RC provided management services to CHI and certain other affiliated entities.

As is well publicized, at the onset of the COVID-19 pandemic in March 2020, state and local governments ordered non-essential businesses like the Debtors' hair salons to close.  As a result of the sudden closure of CHI's stores, the Debtors were almost immediately depleted of liquidity, and filed bankruptcy soon thereafter.

---

[1] Unless otherwise noted, all statutory references herein are to the Bankruptcy Code, 11 U.S.C. §§101 *et seq.*, as currently in effect.

On June 2, 2020, the Court approved the sale of substantially all the Debtors' business to HC Salon Holdings, Inc. pursuant to the Order (A) Approving and Authorizing the Sale of Substantially All of Debtors' Assets Pursuant to the Amended and Restated Asset Purchase Agreement, Free and Clear of All Liens, Claims, Encumbrances and Other Interests, (B) Approving the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases Related Thereto, and (C) Granting Related Relief. ECF 465. The sale closed effective as of June 4, 2020. ECF 478.

### Pertinent Facts Not in Dispute

CHI was partially self-insured as defined by the Patient Protection and Affordable Care Act (the "ACA"). The Debtors qualified as an Applicable Large Employer under the ACA.[2] The Debtors offered minimum essential health insurance coverage to at least 95% of their employees, but some employees were allowed a tax credit or cost-sharing reduction for any of the following reasons: (a) the coverage did not provide minimum value; (b) the coverage was not affordable; or (c) the employee was not offered coverage. Under the ACA, if an employee receives a tax credit or cost-sharing reduction, then the IRS may charge the employer a shared responsibility payment ("ESRP").

For the tax period ending December 31, 2016, the IRS charged CHI an ESRP for the employees that were allowed a tax credit or cost-sharing reduction under the ACA. For each month from January 2016 through November 2016, over 450 of the Debtors' full-time employees were enrolled in a qualified health plan for which they were allowed a tax credit or cost-sharing reduction. On December 19, 2018, the IRS sent the Debtors a Letter 226-J with a

---

[2] An Applicable Large Employer is described as "an employer that is an applicable large employer (ALE). In general, an employer is an ALE for a year if it had an average of 50 or more full-time employees (including full-time equivalent employees) during the preceding calendar year." IRS's Ex. A; ECF 881-1 at p. 4 of 7.

proposed ESRP of $818,640.00 for tax year 2016, noting liability was applicable under 26

U.S.C. §4980H(b).  IRS's Ex. A; ECF 881-1.  The letter stated:

> This letter certifies, under section 1411 of the Affordable Care Act, that for at least one month in the year, one or more of your fulltime employees was enrolled in a qualified health plan for which a PTC was allowed.  Based on this certification and information contained in our records, we are proposing that you owe an ESRP of $818,640.00.

ECF 881-1 at p. 2 of 7.

CHI responded on February 14, 2019, identifying errors, which included the mistaken

identification of some employees as full-time and eligible under the ACA for tax credits or cost-

sharing reductions.  IRS's Ex. B; ECF 881-2.  The IRS responded by Letter 227-L dated April

29, 2019, reducing the proposed ESRP to $778,050.00 again noting liability was applicable

under 26 U.S.C. §4980H(b).  IRS's Ex. C; ECF 881-3.

Beginning in 2017, CHI did not offer a health plan offering minimum essential coverage

to salon employees.  As a result, CHI accrued ESRP charges for 2017 and 2018.  For each month

of tax year 2017, over 350 of CHI's full-time employees were allowed a tax credit or cost-

sharing reduction by the IRS.

On October 3, 2019, the IRS sent the Debtors a Letter 226-J certifying that one or more

employees were allowed a tax credit and proposing an ESRP of approximately $13,901,259.96

under 26 U.S.C. §4980H(a).  IRS's Ex. D; ECF 881-4.  The letter stated:

> This letter certifies, under Section 1411 of the Affordable Care Act, that for at least one month in the year, one or more of your fulltime employees was enrolled in a qualified health plan for which a PTC was allowed.  Based on this certification and information contained in our records, we are proposing that you owe an ESRP of $13,901,259.96.

ECF 881-4 at p. 2 of 7.

CHI responded on December 4, 2019, and provided support that CHI had offered minimum essential coverage to at least 95% of their full-time employees and their dependents. IRS's Ex. E; ECF 881-5.  The IRS responded by Letter 227-L dated August 31, 2020, reducing the proposed ESRP for tax year 2017 to $1,311,930.00 and noting liability was applicable under 26 U.S.C. §4980H(b).  IRS's Ex. F; ECF 881-6.  The ESRP for 2017 is an estimate and has not been assessed.

In CHI's Schedules of Assets and Liabilities, ECF 281, it listed the IRS on Schedule E/F with a contingent, unliquidated, disputed claim of $778,050.00 for "ACA – ESRP PAYMENT – 2016" and a contingent, unliquidated, disputed claim in the amount of $1.00 for "ACA – ESRP PAYMENT – 2017-2019."

The IRS filed Proof of Claim No. 175-1 ("Claim No. 175-1") against only CHI for $2,094,029.28, asserting priority status under §507(a)(8).  In the Form 410 summary, the IRS listed an "Excise" for tax period ending December 31, 2016, assessed March 16, 2020, for $778,050.00, plus $4,049.28 in matured interest and an "Excise" tax for the period ending December 31, 2017, assessed October 8, 2019, for $1,311,930.00.

The IRS later filed an amended Proof of Claim No. 175-2 ("Claim No. 175-2").  It asserts the same amounts due, but as to both the Debtors, CHI and RC.

The IRS filed Proof of Claim No. 424-1 ("Claim No. 424-1").  In its papers, the IRS concedes that Claim No. 424-1 is a duplicate of Claim No. 175-2.

### Conclusions of Law

The dispute before the Court raises two questions: (1) whether the ESRP is an excise tax entitled to priority under §507(a)(8)(E) of the Bankruptcy Code and (2) if the ESRP is an excise

tax, are the amounts claimed by the IRS for 2016 and 2017 taxes "on a transaction occurring within three years of the petition" as required by §507(a)(8)(E).

The Bankruptcy Code grants priority status to certain allowed claims.  Section 507(a)(8) grants priority to "excise" taxes:

> (8) Eighth, allowed unsecured claims of governmental units, only to the extent that such claims are for—
>
> \*\*\*\*\*
>
> (E) an excise tax on—
> (i) a transaction occurring before the date of the filing of the petition for which a return, if required, is last due, under applicable law or under any extension, after three years before the date of the filing of the petition; or
>
> (ii) if a return is not required, a transaction occurring during the three years immediately preceding the date of the filing of the petition.

§507(a)(8)(E).[3]  "Statutory priorities . . . are intended 'to assure payment, if possible, to certain classes of claims by requiring that they be paid before others are satisfied.'"  *New Neighborhoods, Inc. v. W. Virginia Workers' Comp. Fund*, 886 F.2d 714, 718 (4th Cir. 1989) (quoting L. King, Collier Bankruptcy Manual §507.01 (1988)).  Claims entitled to priority are paid before other unsecured claims.  After the payment of priority claims, there is a presumption that the bankruptcy estate's remaining assets will be distributed equally among unsecured creditors.  *Ford Motor Credit Co. v. Dobbins*, 35 F.3d 860, 865 (4th Cir. 1994).  "Thus, statutory priorities must be narrowly construed."  *Id.*  "[I]f one claimant is to be preferred over others, the purpose should be clear from the statute."  *Howard Delivery Serv., Inc. v. Zurich Am. Ins. Co.*, 547 U.S. 651, 667 (2006) (citation omitted).

The Bankruptcy Code does not define the term "excise tax."  In *United States v. Reorganized CF & I Fabricators of Utah, Inc. ("CF&I")*, 518 U.S. 213, 224 (1996), the

---

[3] Both the IRS and the Debtors agree a return is not required to impose ESRP liability on the taxpayer, and therefore §507(a)(8)(E)(ii) applies.

Supreme Court addressed whether an exaction was an excise tax entitled to priority under §507(a)(7)(E) (1988)[4] or a nonpriority penalty.  The IRS asserted a claim against the debtor CF&I Steel Corporation for fees assessed for failing to make annual minimum funding contributions to a pension plan, as provided in 26 U.S.C. §4971(a).  Under §4971(a), an employer that failed to make its required contribution was assessed a tax of 10% on the accumulated funding deficiency.  The debtor failed to pay $12.4 million of the required contribution into its pension plans for the tax year prior to filing bankruptcy.  The exaction due under 26 U.S.C. §4971(a) was approximately $1.24 million.

The IRS sought priority status for the exaction as an excise tax.  The bankruptcy court allowed the claim, but determined it was a noncompensatory penalty, not an excise tax, and denied priority.  The district court and the Court of Appeals for the 10th Circuit affirmed.

In affirming, the Supreme Court focused on the operation—not the label—of the provision establishing the liability.  *CF&I,* 518 U.S. at 224.  It concluded that the Bankruptcy Act of 1978, which codified priority to several types of taxes, "reveals no congressional intent to reject generally the interpretive principle that characterizations in the Internal Revenue Code are not dispositive in the bankruptcy context, and no specific provision that would relieve us from making a functional examination of § 4971(a)."  *Id.*  The Court noted that a functional examination is supported by a long history of precedent in determining whether a tax is an "excise tax" for bankruptcy priority purposes.  *Id.*; *see United States v. La Franca*, 282 U.S. 568, 571-72 (1931) (a "tax" and a "penalty" "are not interchangeable one for the other. No mere exercise of the art of lexicography can alter the essential nature of an act or a thing; and if an exaction be clearly a penalty it cannot be converted into a tax by the simple expedient of calling

---

[4] Section 507(a)(8) is the current version of the same statute.

it such."); *City of New York v. Feiring*, 313 U.S. 283, 285 (1941) (determining whether a "tax" was entitled to priority treatment under §64 of the Bankruptcy Act of 1938); *United States v. New York*, 315 U.S. 510, 514-17 (1942) (relying on its decision in *Feiring* which examined the effect of the exaction).

The Court stated that "a tax is an enforced contribution to provide for the support of government; a penalty, as the word is here used, is an exaction imposed by statute as punishment for an unlawful act." *CF&I*, 518 U.S. at 224 (citing to *La Franca*, 282 U.S. at 571-72). The Court concluded that the pension provision at issue was obviously penal in nature. The 10% exaction was not created to support the government. The legislative committee reports stated that the previous statutory penalties did not incentivize employers to fully fund their plans. *Id.* at 226. Instead, the new provision would penalize employers directly by requiring them not only to fund the deficiency but also pay the 10% exaction. *Id.* The Court highlighted that the 10% excise was in addition to the Pension Benefit Guaranty Corporation's independent claim to the total amount of the pension contribution deficiency. Thus, the pension provision had a primarily punitive aim versus a goal to support the government.

The Supreme Court affirmed the use of this "functional approach" analysis of an exaction in *Nat'l Fed'n of Independ. Bus. v. Sebelius ("NFIB")*, 567 U.S. 519 (2012), which addressed whether the individual shared responsibility payment of the ACA passed Constitutional muster under the Taxing Clause.[5] At the time of the decision, the individual mandate required most

---

[5] As a threshold matter, the Court had to determine whether it had authority to enjoin the assessment or collection of the individual shared mandate under the Anti-Injunction Act ("AIA"), which barred suits going forward that sought to restrain the assessment or collection of any tax. The AIA "provides that no suit for the purpose of restraining the assessment or collection of any tax shall be maintained in any court by any person, whether or not such person is the person against whom such tax was assessed." *NFIB*, 567 U.S. at 543 (quoting 26 U.S.C. §7421(a)). The Court held that the AIA does not apply to every exaction and it only applies if Congress intended for the AIA to bar the court from restraining the assessment or collection at issue. Whether the exaction functioned as a tax was not determinative. Congress's intent was the sole inquiry. The Court looked to the statute to determine whether Congress intended for the AIA to apply to the individual shared responsibility payment. The Court found that the

Americans to maintain minimum essential health insurance coverage.  Under the ACA, if an individual did not maintain minimum essential health insurance coverage, then the individual was required to make a shared responsibility payment to the IRS with their taxes and it was collected like a tax penalty.[6]

> Under the mandate, if an individual does not maintain health insurance, the only consequence is that he must make an additional payment to the IRS when he pays his taxes.  That, according to the Government, means the mandate can be regarded as establishing a condition—not owning health insurance—that triggers a tax—the required payment to the IRS.  Under that theory, the mandate is not a legal command to buy insurance.  Rather, it makes going without insurance just another thing the Government taxes, like buying gasoline or earning income.  And if the mandate is in effect just a tax hike on certain taxpayers who do not have health insurance, it may be within Congress's constitutional power to tax.

*NFIB*, 567 U.S. at 562-563 (citations omitted).

The Court applied a broad standard to determine whether the individual mandate was considered a tax authorized under Congress's taxing power: "When the validity of an act of the Congress is drawn in question, and even if a serious doubt of constitutionality is raised, it is a cardinal principle that this Court will first ascertain whether a construction of the statute is fairly possible by which the question may be avoided."  *See Id.* at 563 (citing *Crowell v. Benson*, 285 U.S. 22, 62 (1932)).

The Court pointed out that the ACA's label of the exaction was not controlling.  *See id.* at 564-565.  It determined that the individual mandate had attributes of a tax—it is paid to the Treasury; set in proportion to taxable income, dependents, and the like; and governed by regulations provided in the tax code.  *See id.* at 563-564.

---

statute described the exaction as a "penalty", and that Congress would have named the individual shared payment a "tax" if it wanted the AIA to apply.  Thus, the Court concluded that the AIA did not bar the suit.

[6] The law has since changed so that the individual shared responsibility payment is now zero dollars.  *See* Tax Cuts and Jobs Act of 2017, Pub. L. 115–97, § 11081, 131 Stat. 2092 (codified in 26 U.S.C. § 5000A(c)).

The Court next discussed the "functional approach" standard and the cases that applied the standard as confirmation that statutory labels cannot be relied upon to establish whether an exaction is a tax for constitutional purposes. The Court distinguished its reliance on labels when applying the AIA to statutorily described "taxes". *See, supra* n. 5. The fact that the individual mandate would influence conduct was not determinative because Congress had authorized taxes, such as the cigarette tax, to deter the purchase of tobacco and nicotine products. The mandate also raised revenue for the government, and the only negative consequence to the individual was to pay the exaction or pay for healthcare insurance.

After *NFIB*, many courts grappled with the question of whether the individual mandate was an excise tax under §507(a)(8)(E), with differing results. *See e.g.*, *In re Parrish*, 583 B.R. 873, 875 (Bankr. E.D.N.C. 2018), vacated *sub nom. United States v. Parrish*, No. 5:18-CV-173-FL, 2018 WL 6273577 (E.D.N.C. Nov. 30, 2018) (the individual mandate is a penalty); *In re Bradford*, 534 B.R. 839, 866 (Bankr. M.D. Ga. 2015) ("Exaction is not a penalty in compensation for actual pecuniary loss under §507(a)(8)(G)"); *United States - Internal Revenue Serv. v. Alicea*, 634 B.R. 54, 63 (E.D.N.C. 2021) (individual shared responsibility payment is not a tax entitled to priority).

The Fourth Circuit addressed whether the ESRP was a constitutional tax in *Liberty Univ., Inc. v. Lew ("Liberty")*, 733 F.3d 72 (4th Cir. 2013). It relied on the Supreme Court's analysis in *NFIB* to determine that ESRP is a tax under the "Taxing and Spending or General Welfare Clause." *Liberty,* 733 F.3d at 95-96. The Fourth Circuit applied the "functional approach" and concluded that the ESRP functioned as a tax and not a penalty:

> Turning now to the employer mandate, it is clear from the provision's face that it possesses the essential feature of any tax: it produces at least some revenue for the Government. Indeed, the Congressional Budget Office estimated that the employer mandate exaction will generate $11 billion annually by 2019.

> Looking beyond the essential feature to other functional characteristics, the exaction the ACA imposes on large employers looks like a tax in many respects. The exaction is paid into the Treasury, found in the Internal Revenue Code, and enforced by the IRS, which must assess and collect it in the same manner as a tax. Further, the employer mandate lacks a scienter requirement, does not punish unlawful conduct, and leaves large employers with a choice for complying with the law—provide adequate, affordable health coverage to employees or pay a tax.

*Id.* at 97–98 (cleaned up).  The Fourth Circuit further rejected Liberty University's argument that the ESRP had penal characteristics:

> The employer mandate exaction is devoid of any scienter requirement and does not punish unlawful behavior.  Further, the exaction is collected by the Secretary of the Treasury in the same manner as a tax.
>
> Moreover, the amount of the employer mandate exaction is proportionate rather than punitive.  If Liberty offers adequate health coverage, but that coverage fails to satisfy the employer mandate's affordability and minimum value requirements, Liberty will be taxed $3000 times the number of employees who receive government assistance, prorated on a monthly basis and subject to a cap.  And if Liberty fails to offer adequate health coverage to its full-time employees, it will be taxed $2000 times thirty less than its number of full-time employees—presumably all of whom are being deprived of coverage—prorated over the number of months for which Liberty is liable.

*Id.* at 98 (cleaned up).  Thus, the Circuit rejected the argument that the ESRP is a penalty rather than a tax, and concluded that the ESRP "need not be read to do more than impose a tax."  *Id.*

Strictly speaking, the holding of *Liberty* is not determinative here.  The Fourth Circuit was required to determine whether the ESRP should be invalidated as an unconstitutional exercise of Congressional authority.  The Court applied the broad standard stated in *NFIB*— "whether a construction of the statute is fairly possible by which the question may be avoided" and that "every reasonable construction must be resorted to, in order to save a statute from unconstitutionality."  *NFIB*, 567 U.S. at 563.  In addition, as *Liberty* recognized, an exaction may be a tax for one purpose but not another, holding that the employer mandate exaction, like the individual mandate, was a tax under the Constitution but not for purpose of the AIA.  *Liberty*,

11

733 F.3d at 88-89.  Thus, an exaction may be a tax for constitutional purposes but a penalty under §507(a)(8)(E).  Accordingly, the specific holding of the case—that the ESRP is a tax for constitutional purposes—does not itself foreclose a court from reaching a different conclusion on the question whether the exaction is an excise tax under §507(a)(8)(E).

Nevertheless, while the specific holding of *Liberty* may not be determinative, the conclusions made by the Fourth Circuit in reaching that determination control.  In *CF&I*, the Supreme Court determined that "a tax is an enforced contribution to provide for the support of government; a penalty, as the word is used in the discussion under §507(a)(8)(E), is an exaction imposed by statute as punishment for an unlawful act."  *CF&I*, 518 U.S. at 224.  The Court also highlighted that the 10% excise was in addition to the independent claim for pension contribution deficiency and was primarily punitive.

In *Liberty*, the Fourth Circuit expressly concluded that the ESRP "does not punish unlawful behavior."  *Liberty*, 733 F.3d at 98.  It further concluded that "the amount of the employer mandate exaction is proportionate rather than punitive."  *Id.*  It stated the ESRP possesses the essential feature of any tax and produces at least some revenue for the government.  In light of these express conclusions, this Court could not conclude that the ESRP is a penalty, and not an excise tax, under the standards of *CF&I*.  Accordingly, the Court concludes the ESRP is an excise tax under §507(a)(8)(E).

The Court finds additional support for this conclusion in Fourth Circuit case law predating *CF&I*.  The Fourth Circuit previously held that an "excise tax is an indirect tax, one not directly imposed upon persons or property . . .  and is one that is imposed on the performance of an act, the engaging in any occupation, or the enjoyment or [sic] a privilege."  *New Neighborhoods*, 886 F.2d at 719 (holding that an assessment made to satisfy workers'

compensation claims where the employer failed to maintain workers' compensation insurance was entitled to priority as an excise tax). The Fourth Circuit further announced that an assessment is an excise tax if it is (i) an involuntary pecuniary burden, regardless of name, laid upon individuals or property; (ii) imposed by, or under authority of the legislature; (iii) for public purposes, including the purposes of defraying expenses of government or undertaking authorized by it; (iv) under the police or taxing power of the state. *Williams v. Motley*, 925 F.2d 741, 743 (4th Cir. 1991) (granting excise tax priority to a $300 uninsured motorist assessment imposed for failing to carry liability insurance as a motorist). The ESRP is an involuntary burden imposed by Congress and, as held in *Liberty*, was enacted for public purposes, including to raise funds for the Treasury, and is a valid exercise of Congress's taxing power. It therefore meets the standard set forth in *Williams*. While it is not apparent whether the Fourth Circuit test and its progeny survives *CF&I*[7], to the extent it does, it only serves to support this Court's conclusion that the ESRP is an "excise tax" under §507(a)(8)(E).

Finding that the ESRP is an excise tax does not resolve the dispute. As pertinent here, §507(a)(8)(E) provides that allowed unsecured government claims are entitled to priority only to the extent such claims are for an excise tax on "a transaction occurring during the three years immediately preceding the petition date." §507(a)(8)(E). The parties dispute whether there is a "transaction" that imposes the ESRP and, if so, when the transaction "occur[s]" under the ACA.

Congress enacted the ACA "to increase the number of Americans covered by health insurance and decrease the cost of health care." *NFIB*, 567 U.S. at 538-539.

---

[7] See *In re C-T of Va., Inc.* for a discussion of the expansive nature of the Fourth Circuit definition of "excise tax" in the context of an assessment like that in *CF&I*. *United States v. Unsecured Creditors' Comm. of C-T of Va. (In re C-T of Va., Inc.)*, 977 F.2d 137, 140 (4th Cir. 1992). This Court is not aware of any case law that specifically alters the Fourth Circuit's definition of "excise tax," even if the holding of *C-T* might have been the opposite after *CF&I*.

The ACA "pursues these goals through a complex network of interconnected policies focused primarily on helping individuals who do not receive coverage through an employer or government program to purchase affordable insurance directly." *Halbig v. Burwell*, 758 F.3d 390, 394 (D.C. Cir. 2014).

The ACA is designed to facilitate the enrollment in qualified plans by employees who are not offered adequate insurance by the employer. Such employers are charged the ESRP as an exaction—determined to be an excise tax above—for their failure to provide coverage. The ACA imposes the ESRP on large employers that either do not offer health coverage or do not offer a certain level of coverage where the employee "enroll[s] . . . in a qualified health plan with respect to which an applicable premium tax credit or cost-sharing reduction is allowed or paid with respect to the employee." 26 U.S.C. §4980H(a); (b).[8] In essence, "§4980H(a) imposes an

---

[8] Sections 4980H (a) and (b) provide:

(a) Large employers not offering health coverage. If –

(1) any applicable large employer fails to offer to its full-time employees (and their dependents) the opportunity to enroll in minimum essential coverage under an eligible employer-sponsored plan (as defined in section 5000A(f)(2)) for any month, and

(2) at least one full-time employee of the applicable large employer has been certified to the employer under section 1411 of the [ACA] as having enrolled for such month in a qualified health plan with respect to which an applicable premium tax credit or cost-sharing reduction is allowed or paid with respect to the employee,

then there is hereby imposed on the employer an assessable payment equal to the product of the applicable payment amount and the number of individuals employed by the employer as full-time employees during such month.

(b) Large employers offering coverage with employees who qualify for premium tax credits or cost-sharing reductions.—

(1) In general. —If—

(A) an applicable large employer offers to its full-time employees (and their dependents) the opportunity to enroll in minimum essential coverage under an eligible employer-sponsored plan (as defined in section 5000A(f)(2)) for any month, and

(B) 1 or more full-time employees of the applicable large employer has been certified to the employer under section 1411 of the [ACA] as having enrolled for such month in a qualified health

14

assessable payment on an applicable employer who fails to offer coverage to its full-time employees and their dependents, while §4980H(b) imposes an assessable payment on an applicable employer who provides coverage that does not satisfy the mandate's affordability criteria." *Liberty*, 733 F.3d at 85.

It is the underinsured or uninsured employee's act of enrolling in a qualified health plan that triggers the ESRP. While it is true that the amount of the ESRP is not finally determined or imposed until a later date, the "transaction occur[s]" under §507(a)(8)(E) when an employee who is not offered the minimum level of insurance coverage and who meets certain financial standards enrolls in a qualified health plan. Enrolling underinsured or uninsured employees in qualified health plans is the very purpose of the ACA. The transaction the statute is intended to create is the transaction that gives rise to the claim.

Substantial support for this conclusion is found in *DeRoche v. Ariz. Indus. Comm'n (In re DeRoche)*, 287 F.3d 751 (9th Cir. 2002). There, an employer failed to carry required workers' compensation insurance. An employee was injured at work on July 30, 1991, and received compensation from a special workers' compensation fund that protects employees where the employer fails to maintain insurance. *DeRoche*, 287 F.3d at 753. Under the program, the state workers' compensation agency sent notice to the employer indicating that the employee had been paid by this special compensation fund and assessing the employer the liability to reimburse the fund. *Id.* The injured employee was entitled to a continuing award, and the workers'

---

plan with respect to which an applicable premium tax credit or cost-sharing reduction is allowed or paid with respect to the employee,

then there is hereby imposed on the employer an assessable payment equal to the product of the number of full-time employees of the applicable large employer described in subparagraph (B) for such month and an amount equal to 1 /12 of $3000.

compensation amount grew from an initial award of approximately $4,000 to more than $22,000 over three years.  The agency sent periodic assessments of the increased amounts.  *Id.* at 754. After the employer filed a petition under Chapter 7 on November 28, 1994, the state sought a determination that the claim was not dischargeable pursuant to §523(a)(1)(A) as a priority claim under §507(a)(8).[9]  The bankruptcy court held that each separate supplement and continuing award was a transaction, and therefore awards that were assessed during the three-year period prior to the petition fall within the period in §507(a)(8) and are nondischargeable under §523(a)(1)(A).  *Id.* at 754-55.  The district court affirmed, and the Ninth Circuit reversed.  *Id.* at 755.

In *DeRoche*, the Ninth Circuit examined what was the date of the "transaction" to determine what taxes arose in the three-year priority and nondischargeable period.[10]  It noted that the "transaction" in a workers' compensation case is not so obvious.  It recognized numerous separate acts that needed to occur to impose liability on the employer: (1) the employer failed to carry workers' compensation insurance; (2) an employee was injured; (3) the employee filed a workers' compensation claim; (4) the Commission determined the employee was entitled to compensation; (5) the government paid compensation to the injured employee; and (6) the government assessed the employer for reimbursement of the compensation paid to the worker. *Id.* at 755.  "The assessment for reimbursement to the [Worker's Compensation] Fund, which comes at the end of this sequence of events, is the "excise tax" in question."  *Id.*

The court held that the transaction "is the act of employing a worker without carrying the required insurance when the worker is injured.  The date of the transaction is the date the

---

[9] Section 523(a)(1)(A) makes nondischargeable a §507(a)(8) tax for the three-year period specified in that section.

[10] In a prior case, the Ninth Circuit held that the reimbursement of the special compensation fund by an uninsured employer was an excise tax under §507(a)(8).  *See Camilli v. Ariz. Indus. Comm'n*, 94 F.3d 1330, 1333-34 (9th Cir. 1996).

employee is injured." *Id.* at 753.  Accordingly, because the injury occurred outside the three-year period, none of the amounts were allowed.  In reaching that conclusion, the court rejected the state's position that each assessment of an award was the relevant transaction for §507(a)(8)(E) purposes, noting that a "transaction giving rise to a tax is ordinarily an act external to the taxing authority." *Id.* at 756.  For similar reasons, the court rejected the employer's position that the transaction was either the state agency's acceptance of the employee's claim or the various determination dates by the taxing authority.

The rationale of *DeRoche* applies here.  Although an employee does not suffer a physical injury, the harm to the employee that the ACA seeks to rectify is not being offered adequate coverage in the workplace, necessitating the need for the employee to enroll in a qualified plan. In *DeRoche,* the employee suffered a single injury and received compensation at different times over a number of years.  Here, the employee enrolls in a qualified plan and the ESRP is assessable for any month of noncompliance.  While the ESRP is assessed in monthly increments after an employee enrolls in a qualified plan, the post-enrollment ESRP assessments nonetheless relate back to the original transaction—the date the employee enrolls in the qualified plan—just as multiple payments made in *DeRoche* related back to the date of injury.  Thus, any ESRP assessment attributed to an employee's enrollment before the priority date will be unsecured even if the employee's enrollment in a qualified plan continues beyond the priority date.  The difference here is that the employer has the ability to terminate the ESRP by providing adequate coverage.  But while that difference may affect the employer's ultimate liability, it does not change the result under §507(a)(8)(E).

The IRS argues the transaction occurs when it sends the certification required by the statute because the ESRP does not arise until the IRS sends the Letter 226-J.  Like *DeRoche*, this

Court rejects any transaction date predicated on action by the taxing authority.  Further, like *DeRoche,* the final act by the taxing authority that imposes liability does not control.  As the Ninth Circuit noted, an excise tax requires "an act (or failure to act) by the taxpayer."  *Id*. at 757.

In addition, the IRS's position that the date it sends the certification is the date the transaction occurs could have devastating consequence to a bankruptcy case.  Here, for 2016, the IRS issued the certification required by the statute by letter dated December 19, 2018—almost two full years after the tax year.  ECF 881-1.  For 2017, the IRS issued the certification by letter dated October 3, 2019, some twenty-two months after the tax year.  ECF 881-4.  A determination that the date of the certification is the date the transaction occurs could grant priority status to claims that arise from employees enrolling in health plans as much as five years before the petition date.  That result is neither a narrow reading of a priority provision nor consistent with the three-year limitation on the priority claim.  In addition, the IRS's view could grant post-petition administrative claim status under §503(b) to claims that arise from employees enrolling in health plans as much as two years before the petition date.  Here, for example, if the petition had been filed the day before the IRS sent the December 19, 2018 certification letter, under the IRS's view, the claim for 2016 taxes would be a post-petition claim.  These results are not consistent with either the purpose or spirit of §§507(a)(8) or 503(b).

The IRS next argues the transaction occurs as of April 15 of the year following the period in question.  It contends that this date is the date by which employees must file Forms 1040 and is the final event of claiming the premium tax credit, thereby triggering the ESRP.  ECF 881-1 at p. 17.  The Court disagrees that filing the tax return is the transaction under §507(a)(8).

Employees file tax returns on many dates other than April 15 in a given year.  While using April 15 might ease what is undoubtedly a substantial burden on the IRS, there is no

18

significance to that date other than it is often the un-extended deadline for filing Form 1040.

Moreover, claiming a tax credit on Form 1040 would not be considered a "transaction" in the

usual sense of that word, any more than reporting income or claiming a deduction on the form

would be the "transaction" that generated the income or the deduction. *See Transaction*, Black's

Law Dictionary (11th ed. 2019) ("[t]he act or an instance of conducting business or other

dealings; esp., the formation, performances, or discharge of a contract").

Further, central to the ACA's effort to increase the number of Americans covered by

health insurance and decrease the cost of health care are the "Exchanges." 42 U.S.C.

§18031(b)(1).

> Exchanges are "governmental agenc[ies] or nonprofit entit[ies]" that serve as both
> gatekeepers and gateways to health insurance coverage. *See id*. §18031(d)(1).
> Among their many functions as gatekeepers, Exchanges determine which health
> plans satisfy federal and state standards, and they operate websites that allow
> individuals and employers to enroll in those that do. *See id.* §18031(b)(1), (d)(l )-
> (d)(4).

*Halbig*, 758 F.3d at 394. Aside from being a marketplace for the purchase of health insurance,

the Exchanges can determine an individual's eligibility to obtain advance payment of a health

insurance premium tax credit. Under 42 U.S.C. §18082, advance determination of the applicable

tax credit is made for individuals enrolling in qualified health plans. That section further

provides for the Secretary of the Treasury to make advance payments of the credit to reduce the

premiums payable by the individual. Accordingly, while filing the return may provide

verification of the premium tax credit, the statutory framework is designed to enable employees

to realize the economic benefit of the tax credit long before the return is filed, at the time of

enrollment. Therefore, filing the return is not the transaction under §507(a)(8)(E).

Finally, the Debtors rely on cases that hold that the individual shared responsibility

payment of the ACA is not an excise tax under §507(a)(8)(E) because there is no transaction—

the employee simply failed to purchase insurance. *See United States v. Chesteen (In re Chesteen)*, 799 Fed. Appx. 236 (5th Cir. 2020). But the individual shared responsibility payment is not before the Court. As established at length above, the ESRP *is* triggered by a transaction—the employee's enrollment in a qualified plan. Further, as in *DeRoche*, the Fourth Circuit has held that excise tax priority can be applicable where a party fails to carry insurance. *New Neighborhoods*, 886 F.2d at 719 ("The obligation imposed upon employers [to carry workers' compensation insurance] is imposed upon employers as a class and liability arises through the transaction of act of employing."); *Motley*, 925 F.2d at 745 (holding that the assessment imposed on uninsured motorists is an excise tax for §507(a)(8)(E) purposes).

In sum, the petition date was April 23, 2020. The three-year period in §507(a)(8)(E) begins on April 23, 2017. Any ESRP amounts arising from employee enrollments in a qualified plan prior to that date are excluded from priority, and will be deemed general unsecured claims.

The Debtors also object to the claim to the extent it is asserted against RC. The IRS's amended claim lists both CHI and RC as debtors. Claim No. 175-2. The IRS did not file a claim in RC's bankruptcy case, only CHI's. Because 26 U.S.C. §4980H imposes ESRP liability on certain "employers," whether the IRS is entitled to enforce its claim against RC will turn on whether RC was the applicable employer. Throughout these proceedings, RC has maintained that it is not an employer. Instead, the record shows that CHI had over 10,000 full- and part-time employees, operating approximately 800 salons, while RC provided management services to CHI. ECF 6 ¶¶ 4-5. The IRS has not advanced any evidence to refute this position. Therefore, the IRS cannot sustain its claim against RC for ESRP liability and the objection to claim is sustained as to RC.

**Conclusion**

For the foregoing reasons, the claim is disallowed in its entirety to the extent asserted against RC.  Further, the Court will sustain in part the objection to Claim No. 175-2 and Claim No. 424-1 against CHI.  The claim against CHI is entitled to priority under §507(a)(8)(E) only to the extent it asserts an ESRP claim arising from employee enrollments in qualified plans after April 23, 2017.  Therefore, the claim for 2017 ESRP is allowed as a priority claim only to the extent it arises from enrollments after April 23, 2017.  The ESRP claim arising from employee enrollments in qualified plans prior to April 23, 2017, is excluded from priority and is allowed as a general unsecured claim.  Therefore, the claim for 2016 ESRP is disallowed in its entirety as a priority claim, and the claim for 2017 ESRP is disallowed as a priority claim to the extent it arises from enrollments before April 23, 2017.  A separate order will follow.

cc:      Debtors
         Counsel for Debtors
         Counsel for IRS
         United States Trustee
         All creditors and parties in interest

**END OF MEMORANDUM OF DECISION**